# Exhibit "1"

## (Hi-Shear Lease)

LEASE

CITY OF TORRANCE,
a municipal corporation

("City")

and

HI-SHEAR CORPORATION,
a Delaware corporation

("Lessee")

July 27, 2004



615/062579-0068
470523.09 PM04

# TABLE OF CONTENTS

**Page**

1.  LEASED PREMISES ................................................................. 2

2.  INITIAL TERM; OPTION TO EXTEND ............................................. 2

3.  RENT ........................................................................... 3

4.  ADJUSTMENT OF RENT DURING OPTION PERIODS; FAIR RENTAL
    VALUE ......................................................................... 4

5.  ADDITIONAL RENT ................................................................ 6

6.  PLACE OF PAYMENT AND LATE PAYMENT ........................................ 6

7.  USE ............................................................................ 7

8.  TITLE AND POSSESSION .......................................................... 7

9.  CONSTRUCTION .................................................................. 8

10. LIENS .......................................................................... 11

11. OFF-STREET PARKING ............................................................ 12

12. ALTERATIONS AND ADDITIONAL IMPROVEMENTS ................................ 12

13. MAINTENANCE ................................................................... 14

14. SURRENDER ...................................................................... 14

15. SUBORDINATION ................................................................. 16

16. AVIGATION EASEMENTS .......................................................... 16

17. TAXES, ASSESSMENTS AND UTILITY CHARGES ................................... 18

18. LIABILITY ...................................................................... 20

19. INSURANCE ...................................................................... 24

20. CASUALTY; INSURANCE PROCEEDS ............................................... 27

21. ASSIGNMENT AND SUBLETTING ................................................. 29

22. ENCUMBRANCES .................................................................. 31

23. BREACH OR DEFAULT ............................................................. 35

Page

24. COMPLIANCE WITH LAW ....................................................................38

25. CITY'S RIGHT OF ACCESS ................................................................38

26. QUIET ENJOYMENT .............................................................................38

27. NOTICES ................................................................................................38

28. AMENDMENTS AND MODIFICATIONS ...........................................40

29. APPROVALS BY CITY; CITY ACTING IN ITS PROPRIETARY
    CAPACITY ............................................................................................40

30. CONDEMNATION ................................................................................40

31. GENERAL PROVISIONS ......................................................................43

EXHIBITS

Exhibit A    Legal Description of Leased Premises
Exhibit B    Sketch Map of Leased Premises
Exhibit C    Description of the Project, Conceptual Plans
Exhibit D    Quitclaim Deed and Release
Exhibit E    FAA Provisions and Avigation Requirements

## LEASE

THIS LEASE (this "Lease"), made and entered into at Torrance, California, dated for reference purposes only as of July 27, 2004, and effective as of the 1st day of August, 2004, (the "Effective Date") by and between the CITY OF TORRANCE, a municipal corporation, hereinafter referred to as "City", and HI-SHEAR CORPORATION, a Delaware corporation ("Lessee").

### W I T N E S S E T H :

(a)    The City is the owner in fee of the real property constituting the Leased Premises (as defined in Section 1 below), approximately 14 acres in size, located at 2600 Skypark Drive, in the City of Torrance, California.  Said Leased Premises are a part of the Torrance Municipal Airport, the boundaries of which are described in that certain Quitclaim Deed ("Quitclaim Deed") executed by the United States of America, dated March 5, 1948, recorded on May 13, 1948, in Book 27145, Page 362, of Official Records in the Office of the County Recorder of Los Angeles County (the "Official Records"), a copy of which Quitclaim Deed is attached hereto as Exhibit "D".

(b)    By instrument of Release dated July 25, 1962, recorded on August 24, 1962, in Book R-1308, Page 800, of Official Records, a copy of which Release is attached hereto as Exhibit "D", the United States of America, acting by and through the Administrator of the Federal Aviation Administration, released, with certain exceptions, the Leased Premises, among other lands, from the conditions, reservations and restrictions of said Quitclaim Deed.

(c)    The City leased to Lessee (or Lessee's predecessors in interest) the Leased Premises and certain adjoining property (the "Adjoining Premises"), and Lessee has been in continuous occupancy of the Leased Premises, pursuant to that certain Consolidation Lease Agreement dated May 31, 1959 and that certain Lease Agreement dated May 31, 1959, as amended by that certain Amendment to Consolidation Lease Agreement dated July 1, 1960, and that certain Second Amendment to Consolidation Lease Agreement dated May 4, 1983 (collectively, with any and all other amendments, modifications, and agreements related thereto, the "Consolidated Lease Agreement"); that certain Lease dated July 1, 1960 (together with any and all other amendments, modifications, and agreements related thereto, the "7/1/1960 Lease"); that certain Lease Agreement dated November 19, 1954 (together with any and all other amendments, modifications, and agreements related thereto, the "11/19/1954 Lease"); and that certain Lease Agreement dated August 9, 1956 (together, with any and all other amendments, modifications, and agreements related thereto, the "8/9/1956 Lease") (the Consolidated Lease Agreement, the 7/1/1960 Lease, the 11/19/1954 Lease, the 8/9/1956 Lease and any and all other amendments, modifications, and agreements by and between Lessee and/or Lessee's predecessors in interest relating to the Leased Premises are collectively referred to herein as the "Original Lease").

(d)    As of June 30, 2004, the Consolidation Lease Agreement and the 7/1/1960 Lease will expire by their terms. The 11/19/1954 Lease and the 8/9/1956 Lease provide an expiration of November 30, 2004.  Notwithstanding the foregoing or any provision in the 11/19/1954 Lease

and/or the 8/9/1956 Lease to the contrary, the parties desire to terminate the 11/19/1954 Lease and the 8/9/1956 Lease and City desires to lease to Lessee, and Lessee desires to hire from City, the entire Leased Premises pursuant to this Lease, for Lessee's continued use of the entire Leased Premises for manufacturing and industrial uses consistent herewith, all on the terms and conditions set forth herein effective as of the Effective Date.

(e)     The City will benefit from the execution of this Lease, inter alia, by reason of (i) the potential for greater rents which may flow to it as contrasted to the rents receivable under the Original Lease, (ii) the potential for increased property taxes that will result from the upgrading of the improvements on the Leased Premises, and (iii) the impetus to the upgrading and revitalization of the surrounding area that is expected to result therefrom.

(f)     The City Council therefore declares that the Leased Premises are being leased hereby for commercial development for business purposes pursuant to the authority contained in Sections 37380 and 37379 of the California Government Code and pursuant to the powers conferred on the City by the provisions of Article XI of the Constitution of the State of California and by the Torrance Municipal Code.

(g)     The City, acting by and through the City Council, has determined by Resolution Number 2004-94 adopted on July 27, 2004, that such property is not required for other City purposes and that it is in the public interest that this Lease be executed.

NOW, THEREFORE, IN CONSIDERATION OF THE LEASED PREMISES AND OF THE MUTUAL COVENANTS HEREIN CONTAINED, IT IS HEREBY AGREED AS FOLLOWS:

1.     LEASED PREMISES

For and in consideration of the rents, covenants and conditions herein contained, the City does hereby lease to Lessee and Lessee hereby hires from City that certain real property commonly known as 2600 Skypark Drive, located in the City of Torrance, State of California which real property is legally described on Exhibit "A", and located as shown on Exhibit "B", attached hereto and made a part hereof, which real property is hereinafter referred to as the "Leased Premises", together with the nonexclusive easements more particularly described on Exhibit "A" and depicted on Exhibit "B" as the "Remediation Easement" and the "Watermain Easement", and reserving therefrom, together with the right to grant and transfer the same, the "Road Easement", as more particularly described on Exhibit "A" and depicted on Exhibit "B". Lessee and City stipulate that the Leased Premises contain 14 acres and that, notwithstanding any remeasurement that may occur, the City and Lessee agree for all purposes of this Lease the Leased Premises shall be deemed to consist of 14 acres.

2.     INITIAL TERM; OPTION TO EXTEND

The "Term" of this Lease shall begin on the Effective Date and expire at midnight June 30, 2014.

Provided that Lessee is not then in default hereunder, Lessee shall have the right and option to extend the term of this Lease for three (3) five year periods (each an "Option

Period" and collectively, the "Option Periods"), upon the same terms and conditions herein provided for in this Lease, except for rental adjustments to be made during said Option Periods pursuant to Article 4 below, and except that Lessee shall have no further options to extend the term. Lessee shall exercise the foregoing option(s), if at all, by giving City written notice of each such exercise not less than twelve (12) calendar months prior to the expiration of the initial term or prior exercised extended term of this Lease (in accordance with the provisions of Article 4 below).

3.    RENT

On or before the first day of each month during the Term of the Lease, Lessee shall pay, in advance, to the City rent (together, along with any and all applicable adjustments hereinafter referred to as "Rent") pursuant to the following schedule:

| | | |
|---|---|---|
| Year 1 | July 1, 2004-June 30, 2005 | $1250.00 per acre per month, Monthly Rent = $17,500 |
| Year 2 | July 1, 2005-June 30, 2006 | $1562.00 per acre per month, Monthly Rent = $21,868 |
| Year 3 | July 1, 2006-June 30, 2007 | $1875.00 per acre per month, Monthly Rent = $26,250 |
| Year 4 | July 1, 2007-June 30, 2008 | $2187.50 per acre per month, Monthly Rent = $30,625 |
| Year 5 | July 1, 2008-June 30, 2009 | $2500.00 per acre per month, Monthly Rent = $35,000 |
| Year 6 | July 1, 2009-June 30, 2010 | $3000.00 per acre per month, Monthly Rent = $42,000 |
| Year 7 | July 1, 2010-June 30, 2014 | Monthly Rent based on CPI adjustments |

Commencing on July 1, 2010, and the commencement of each Lease Year (as hereinafter defined) thereafter (the "Adjustment Date"), the Rent shall be increased in proportion to the increase, if any, in the "Consumers Price Index, All Urban Consumers", 1982-84 = 100 ("Index"), prepared by the United States Bureau of Labor Statistics, Department of Labor (the "Bureau") for the immediately preceding Lease Year; provided, however, in no event shall any installment of minimum monthly Rent adjusted in accordance herewith be less than one hundred two percent (102%) of the monthly Rent in effect immediately preceding the applicable Adjustment Date nor exceed one hundred five percent (105%) of the monthly Rent in effect immediately preceding the applicable Adjustment Date. As used herein, the term "Lease Year" shall mean each twelve (12) month period commencing on July 1, 2004. The proportionate increase in the Index for each Lease Year shall be determined by dividing the Index published for the second month preceding the then current Adjustment Date by the Index for the second month preceding the immediately preceding Adjustment Date. In the event that the Index is not published in the requisite month, then the Index utilized shall be the Index published for the month that is closest chronologically.

If said Bureau shall revise said Index, the parties shall accept the method of revision or conversion recommended by said Bureau; if said Index shall be discontinued with no recommended substitute, another index generally recognized as authoritative shall be substituted by agreement of the parties. If the parties are unable to agree upon a substitute index within thirty (30) days after demand by either party, on application of either party, then the substitute index shall be selected by the Chief Officer of the San Francisco Regional Office of the Bureau of Labor Statistics or its successor.

4.    ADJUSTMENT OF RENT DURING OPTION PERIODS; FAIR RENTAL VALUE

A.    Adjustment

(1)    Notwithstanding the provisions of Article 3 above, or any other provision to the contrary set forth herein, in the event that Lessee intends to exercise its option(s) to extend the Term of this Lease pursuant to Article 2 above, then on or before the date that is at least twelve (12) calendar months prior to the commencement of any Option Period, Lessee shall deliver notice to City of such intent and City and Lessee shall conduct a Fair Market Rent Analysis (as hereinafter described). To the extent that, after the Fair Rental Value is determined in accordance with this Section 4, Lessee desires to revoke the exercise of its option(s) hereunder, then Lessee shall deliver to City written notice of such revocation on or before the date that is nine (9) calendar months prior to the expiration of the initial term or prior exercised extended term of this Lease; provided, however, if through no fault of Lessee the Fair Rental Value has not been determined on or before the date that is (9) calendar months prior to the expiration of the initial term or prior exercised extended term of this Lease, Lessee shall have fifteen (15) calendar days after the Fair Rental Value has been determined to deliver the notice of revocation. If such notice of revocation is not delivered in a timely manner, the Term of the Lease will be deemed extended without the need for further action. Commencing on the date of commencement of each Option Period, the Rent shall be adjusted to the Fair Rental Value (as hereinafter defined) in accordance with this Article 4.

(2)    "Fair Rental Value" shall mean the amount determined by the parties to be the fair market value of the Leased Premises, exclusive of the improvements thereon, based upon the manufacturing and industrial uses permitted hereunder as of the date that is twelve (12) calendar months prior to the commencement of any Option Period, multiplied by a 7.0% annual rate of return. The foregoing calculation shall be referred to herein as the "Fair Rental Value Analysis."

(3)    The parties hereto acknowledge that the Rent has not been calculated in the manner described in the immediately preceding Paragraph, and that, accordingly, the Rent shall not be considered in determining the Fair Rental Value of the Leased Premises during any Option Period for which these Fair Rental Value provisions are applicable.

(4)    If the parties cannot agree on the Fair Rental Value of the Leased Premises for any given Option Period, then such Fair Rental Value shall be determined by arbitration in accordance with Paragraph 4(B) below. Pending such determination by the arbitrators, Lessee shall continue to pay the Rent in accordance with this Lease until the Fair Rental Value of the Leased Premises has been determined by the arbitrators. The adjusted Rent determined by the arbitrators (which shall be equal to the Fair Rental Value of the Leased Premises) shall be retroactive to the date upon which the Option Period (as applicable) commenced, and on the first day of the month following the date on which the arbitrators determine the Fair Rental Value of the Leased Premises (the "Adjustment Date"), Lessee shall pay the adjusted Rent for the period from the commencement of the applicable Option Period to the Adjustment Date, and for the month commencing on the Adjustment Date.

(5)    Commencing on the date that is one year after each Adjustment Date, and each Lease Year thereafter during an Option Period, the adjusted Rent shall be increased in proportion to the increase, if any, in the Index, prepared by the Bureau (as more particularly set forth in Section 3); provided, however, in no event shall any installment of minimum monthly Rent adjusted in accordance herewith be less than one hundred two percent (102%) of the monthly Rent in effect immediately preceding the applicable Adjustment Date nor exceed one hundred five percent (105%) of the monthly Rent in effect immediately preceding the applicable Adjustment Date.

B.    Arbitration

(1)    If arbitration is required to fix the Fair Rental Value of the Leased Premises, such arbitration shall be conducted in the following manner:  Within ten (10) days after the parties determine that they have failed to determine a mutually acceptable figure for the Fair Rental Value, the City shall appoint an arbitrator and give written notice thereof to Lessee, and within ten (10) days after the receipt of such notice, Lessee shall appoint an arbitrator and give written notice thereof to the City, or in case of the failure of either party hereto so to do, the other party shall have the right to apply to the Superior Court of Los Angeles County, California, to appoint an arbitrator to represent the defaulting party.  The two arbitrators thus appointed (in either manner) shall select and appoint in writing a third arbitrator and give written notice thereof to the City and Lessee, or if within ten (10) days after their appointment, the two arbitrators shall fail to appoint a third, then either party hereto shall have the right to make application to said Superior Court to appoint such third arbitrator.  All such arbitrators shall have a minimum of ten (10) years experience commercial real estate appraisal and shall be both impartial and unrelated to either of the City or the Lessee.

(2)    The three arbitrators so appointed (in either manner) shall within ten (10) days after all have been appointed fix a convenient time and place in the County of Los Angeles within thirty (30) days thereafter for hearing the matter to be arbitrated and shall give written notice thereof to each party hereto at least five (5) days prior to the date so fixed, and said arbitrators shall with reasonable diligence hear and determine the matter in accordance with the provisions hereof and of the statutes and judicial decisions of the State of California at the time applicable thereto, and shall execute and acknowledge their award thereon in writing and cause a copy thereof to be delivered to each of the parties hereto.

(3)    The award of a majority of said arbitrators shall determine the question arbitrated, and a judgment may be rendered by said Superior Court confirming said award, or the same may be vacated, modified, or corrected by said Court, at the instance of either of the parties hereto, in accordance with the then existing statutes of the State of California applicable to arbitrations, the provisions of which statutes shall apply hereto as fully as though incorporated herein.

(4)    If two of the three arbitrators first appointed as aforesaid shall fail to reach an agreement in the determination of the matter in question, the same shall be decided by three new arbitrators, who shall be appointed and shall proceed in the same manner as hereinabove set forth, and said process shall be repeated until a decision is finally reached by two of the three arbitrators selected.

(5)      Each of the parties hereto shall pay for the services of its appointee and one-half (1/2) of the fee charged by the arbitrator selected by their appointees and of all other proper costs of arbitration, with the exception of attorneys' fees and witness fees which shall be borne solely by the party incurring such fees.

5.      ADDITIONAL RENT

In addition to the Rent described in Article 3 above (as such Rent may be adjusted in accordance with Article 4 above), all other charges and sums payable by Lessee hereunder shall be deemed to be additional rent ("Additional Rent") hereunder, whether or not the same be designated as such, and shall be due and payable (if payable to a third party) not later than the dates on which the same are due and payable, or (if payable to City) within ten (10) days of City's written demand or together with the next succeeding installment of Rent, whichever shall first occur, and City shall have the same rights and remedies upon Lessee's failure to pay the same as for the nonpayment of the Rent.

6.      PLACE OF PAYMENT AND LATE PAYMENT

A.      Place of Payment

All Rent and Additional Rent payments shall be paid, without deduction or offset, to the office of the Treasurer of the City at 3031 Torrance Boulevard, Torrance, California, 90503, or at such place as the City shall from time to time designate in writing.

B.      Late Payment

In the event any payment required hereunder is not made within ten (10) days after the date City delivers written notice that the payment has not been made when due, the Lessee acknowledges that the amount necessary to adequately compensate the City would be impracticable and extremely difficult to calculate.  Therefore, Lessee agrees that in addition to the Rent and Additional Rent, Lessee shall pay an additional 3% of the overdue amount as a late charge; provided, however, that in no event shall the amounts payable to the City pursuant to this Paragraph 6(B) exceed the maximum amounts allowed by law.

C.      No Relief from Default

The provisions herein for payment of late charges shall not be construed to extend the date for payment of any sums required to be paid by Lessee hereunder or to relieve Lessee of its obligation to pay all such sums at the time or times herein stipulated. Notwithstanding the imposition of such late charges, Lessee shall be in default under this Lease if any or all payments required to be made by Lessee are not made at the time herein stipulated (including any grace periods set forth in this Lease), and neither the demand for, nor collection by, City of such late charges shall be construed as a curing of such default on the part of Lessee.

7.    USE

Lessee's use of the Leased Premises shall be consistent with Lessee's existing uses of the Leased Premises immediately prior to the Effective Date, including, without limitation, light manufacturing, manufacturing, storage, services, repair, engineering, sales, product demonstration, ancillary storage, parking of cars for Lessee's employees and invitees (but not for public or other third party parking) and all other uses incidental and related to manufacturing, warehouse and office facility in connection with Lessee's business of manufacturing and distribution of aerospace fasteners and automotive components and for no other purpose or purposes, unless the prior written consent of the City Council thereto has been obtained, which consent may be given or refused in the sole discretion of the City Council.

8.    TITLE AND POSSESSION

A.    Possession

Possession of the Leased Premises shall be deemed to have been delivered to Lessee on the Effective Date.  Lessee acknowledges and agrees that Lessee (and/or its predecessors-in-interest) has had exclusive possession of the Leased Premises and the Adjoining Premises since 1954 and that Lessee is and shall be responsible for the current condition of the Leased Premises, the Adjoining Premises and any affected surrounding premises, and the improvements located thereon and for the expeditious investigation, removal, and remediation of all Hazardous Materials (as defined in Section 18(B) below) that may have been discharged, released, placed or disposed of on, in, under, or about the Leased Premises, the Adjoining Premises and any affected surrounding premises, and/or the improvements located thereon, during the term of the Original Lease (except for Hazardous Materials that have migrated onto the Leased Premises, Adjoining Premises, or any affected surrounding premises through no fault of Lessee) and, with respect to the Leased Premises only, during the term of this Lease ("Lessee Contamination").  Lessee further agrees that it shall defend, indemnify and hold City and the City's officers, directors, trustees, members, agents, employees, contractors, consultants and representatives, and City's property, harmless from any and all claims, demands, liabilities, obligations, expenses and/or penalties arising out of or in connection with Lessee's Contamination in accordance with the provisions of Article 18 below.

B.    Warranty of Authority

(1)    The City warrants that it has full right, legal capacity and authority to enter into and perform its obligations under this Lease and that the Mayor and the City Clerk are authorized and directed to execute and attest this Lease for and on behalf of the City, and that the Charter of the City authorizes the City Attorney to approve the form of this Lease; and except as otherwise set forth in this Lease, no approval or consent not heretofore obtained is necessary in connection with its execution on behalf of the City or the performance of the City's obligations hereunder.

(2)    Mary Hanley, as the Chief Financial Officer and Secretary of Lessee, hereby represents and warrants to the City that he/she has the full right, legal capacity and authority to enter into the obligations of Lessee under this Lease; that said Lessee is or shall

be the sole owner of the leasehold interest under this Lease as of the instant prior to the time of effectiveness of this Lease; that no approval or consent is necessary in connection with his execution of this Lease on behalf of Lessee or the performance of Lessee's obligations hereunder; that a true and correct copy of Lessee's Certificate of Formation, as filed with the Delaware Secretary of State, have been delivered to the City, and that Lessee is a duly qualified corporation in good standing under the laws of the State of Delaware and is duly qualified to transact business and in good standing under the laws of the State of California.

9.      CONSTRUCTION

      A.      Covenant to Remodel, Upgrade, and Rebuild

           (1)     Subject to the conditions hereinafter provided in this Paragraph 9, Lessee agrees to upgrade the existing landscaping and exterior facades of the buildings on the Leased Premises by completing, at its own cost and expense, the work described on Exhibit "C" hereto, which work is hereinafter called the "Project".

      B.      Construction Plans

           Attached hereto as Exhibit "C" are the conceptual plans and specifications for the Project (the "Plans"). Within thirty (30) days of the Effective Date, Lessee shall prepare and submit to the Director of Community Development an application for the Director's approval of the final plans and specifications for the Project. From and after the date that the Director approves of the final plans and specifications for the Project, no revisions or modifications to such final plans shall be made unless the Lessee has obtained the prior written consent of City, which consent may be withheld in City's sole and absolute discretion.

      C.      Building Permits and Parcel Map

           Before commencing the Project, Lessee shall obtain all applicable permit(s), including, without limitation building permits, as required by the Torrance Municipal Code (which incorporates the City's Building and Fire Codes) and any amendments thereto, or any other Applicable Laws. Lessee agrees that if, in the reasonable opinion of the City Attorney of the City, this Lease, or any transaction contemplated by this Lease, requires the filing for record, in accordance with the Torrance Municipal Code and the California Subdivision Map Act, of a parcel map with respect to this Lease, Lessee shall fully cooperate (which cooperation shall include, without limitation, execution by both Lessee and Lessee's lender(s), if applicable of any an all consents, applications, and maps as may be necessary or desirable), at no expense to Lessee, with the City in the preparation, processing and filing for record of such a parcel map.

      D.      Completion

           (1)     Subject to the provisions of Paragraph 9(E) below, Lessee shall commence the Project not later than one hundred eighty (180) days after the Effective Date, shall proceed with the Project with reasonable diligence, and shall complete the Project within five (5) years of the Effective Date.

(2)     The Project shall be deemed to be complete when, and only when, (a) all work for the Project has been completed in accordance with the approved Plans (as set forth in Paragraph 9(B) above), (b) the City Manager or designee, in his or her reasonable discretion, has confirmed the completion of the Project in accordance with the approved Plans, and (c) the Director of Building and Safety, or designee, has confirmed the completion of the Project in accordance with the approved Plans.

      E.    Force Majeure

The time within which Lessee is obligated hereunder to commence and complete the Project or cure any default on the part of Lessee hereunder shall be extended for a period of time equal in duration to, and performance in the meantime shall be excused on account of and for and during the period of, any delay caused by strikes, threats of strikes, lockouts, war, threats of war, insurrection, invasion, acts of God, calamities, violent action of the elements, fire, action or regulation of any governmental agency, law or ordinance, impossibility or material delays in obtaining materials, administrative delays by the City in the processing of governmental permits or improvements, delays directly caused by the City's changes to the Plans, or other things beyond the control of Lessee.  Notwithstanding anything to the contrary set forth in this Lease, this Paragraph shall not apply to any delay resulting from Lessee's changes to the Plans.

      F.    FAA Filing

Prior to the commencement of any work on the Project, if applicable, Lessee shall file Form 7460-1 and receive approval thereof from the Federal Aviation Administration.

      G.    Interference with Aircraft

Lessee shall not light or operate, or cause or permit to be lighted or operated, any equipment which would interfere with the navigation, landing or takeoff of aircraft on the runways and in the aeronautical areas of the Airport.

      H.    Acoustical Treatment

The following provisions are set forth solely for the purposes of the City disclosing to Lessee that certain acoustical treatments may be required pursuant to Applicable Laws, including, without limitation rules and regulations promulgated by the FAA.  The provisions of this section shall not be interpreted in any manner to impose any additional responsibility, other than as is imposed under Applicable Laws, upon Lessee with respect to the matters set forth herein it being expressly understood and agreed that the City is not requiring any retrofitting or other acoustical treatment of the Lessee's improvements beyond what is required by Applicable Laws.

(1) All buildings located upon the Leased Premises shall be designed to provide an interior noise level within a LegA weighted sound level of 50 dBA and a Lmax peak value of 60 dBA.  The designer must prepare detailed plans of construction showing the sound insulation assembly to resist the airborne community noise equivalent level contours of 60 dB

CNEL or greater. The contour map will be provided by the Airport Division of the City's Department of Transportation.

To the extent applicable, before commencement of the Project, Lessee shall submit to the Director an analysis of the plans by an acoustical engineer certifying that, in his opinion, such level will not be exceeded. A building permit will not be issued for any buildings unless and until the City's acoustical consultant certifies that, in his reasonable opinion, such level will not be exceeded.

(2)    Definitions of standards specified in Section 1092 of Part 1 of Title 25 of the California State Housing Code are incorporated in this Lease as a minimum standard of compliance.

(3)    Before occupancy of any part of any constructed, remodeled, or reconstructed building is permitted, the Lessee shall submit to the Department of Building and Safety a statement by an acoustical engineer certifying that said buildings have been constructed in accordance with such acoustical plans and that, in his opinion, such level has not been exceeded. Such occupancy shall not be approved unless and until the City's acoustical consultant certifies that, in his reasonable opinion, such level has not been exceeded.

      I.    Liquidated Damages

If Lessee fails to comply with the timing requirements of Paragraph 9(D), as to the completion of the Project, then Lessee shall pay to the City the sum of $10,000 for each month or fraction thereof until such completion of the Project as liquidated damages for such failure to complete of the Project.

Lessee agrees and stipulates that it would be extremely difficult to fix the actual damages of City that would result from Lessee's failure to timely comply with Paragraph 9(D), and that, accordingly, the agreement of Lessee to pay the amounts specified above as liquidated damages in lieu thereof is reasonable under the circumstances existing as of the date hereof.

      J.    Property of Lessee

Any Improvements existing as of the commencement of the Term of this Lease or which shall be constructed, remodeled, reconstructed or placed on the Leased Premises shall become the property of Lessee for the Term of this Lease, subject to the terms and conditions hereof, and shall become the property of the City (exclusive of Lessee's trade fixture and equipment) upon the expiration or sooner termination of this Lease as provided herein. Lessee shall be responsible for all maintenance of all Improvements in accordance with the provisions of this Lease.

470523.09 PM04

-10-

10.    LIENS

   A.    Payment by Lessee

        (1)    Subject to Lessee's right to contest the same as hereinafter provided in Paragraph 10(D) below, Lessee agrees that it will pay as soon as due all mechanics', laborers', materialmen's, contractors', subcontractors', or similar charges, and all other charges of whatever nature which may become due, attached to or payable on said Leased Premises or any part thereof or any building, structure or other improvements thereon, from and after the date as of which this Lease is executed or as a result of any work performed on the Leased Premises by Lessee or any of Lessee's agents, employees or contractors prior to such date. Notwithstanding the foregoing, Lessee shall not be responsible for any such charges arising from work performed on the Leased Premises by the City's employees or agents.

        (2)    Nothing herein contained shall in any respect make Lessee the agent of the City, or authorize Lessee to do any act or to make any contract encumbering or in any manner affecting the title or rights of the City in or to the Leased Premises or the improvements thereon.

   B.    Notice

        Before any buildings, structures or other improvements or additions thereto, of an aggregate cost in excess of Fifty Thousand Dollars ($50,000) are constructed, remodeled or reconstructed upon the Leased Premises, Lessee shall serve written notice upon the City, in the manner provided for in Paragraph 27 herein, twenty (20) days prior to commencement of Lessee's intention to perform such work for the purpose of enabling the City to post and record notices of nonresponsibility under the provisions of Section 3094 of the California Civil Code, or any other similar notices which may be required by law.

   C.    Bond

        If any such mechanics' or other liens shall at any time be filed against the Leased Premises or any portion thereof or interest therein, Lessee shall cause the same to be discharged of record within thirty (30) days after the date of filing the same, or otherwise free the Leased Premises from the effect of such claim of lien and any action brought to foreclose such lien, or Lessee shall promptly furnish to the City a bond in an amount and issued by a surety company satisfactory to the City, securing the City against payment of such lien and against any and all loss or damage whatsoever in any way arising from the failure of Lessee to discharge such lien.

   D.    Contest

        Any contest by Lessee of any such liens shall be made by Lessee in good faith and with due diligence and Lessee shall fully pay and immediately discharge the amount of any final judgment rendered against the City or Lessee in any litigation involving the enforcement of such liens or the validity thereof.

E.   Discharge by City

In the event of Lessee's failure to discharge of record any such uncontested lien within said thirty (30) day period or to pay and satisfy any such judgment as aforesaid, the City may, but shall not be obligated to, pay the amount thereof, inclusive of any interest thereon and any costs assessed against Lessee in said litigation, or may discharge such lien by contesting its validity or by any other lawful means.

F.   Repayment by Lessee

Any amount paid by the City for any of the aforesaid purposes, and all reasonable legal and other expenses of the City, including reasonable counsel fees, in defending any such action or in connection with procuring the discharge of such lien, with all necessary disbursements in connection therewith, together with interest thereon at the rate of one and one-half percent (1-1/2%) per month from the date of payment, shall be repaid by Lessee to the City on demand; provided that, interest payable hereunder shall in no event exceed the maximum per annum rate permitted under applicable law.  To the extent any such payment of interest hereunder would exceed such maximum rate, such payment shall be deemed to be an advance against Rent as to which Lessee shall be credited on the next installment of Rent payable hereunder.

G.   Survival

The provisions of this Article 10 shall expressly survive the expiration or earlier termination of this Lease.

11.   OFF-STREET PARKING

Lessee shall comply with any and all off-street parking requirements of all ordinances of the City and laws of the State.  This provision shall not limit the scope of the provisions of Paragraph 24 herein.

12.   ALTERATIONS AND ADDITIONAL IMPROVEMENTS

A.   Construction Approval

Except as provided in Article 9 above, Lessee shall not construct any exterior building, structure or other improvement on the Leased Premises unless the plan showing the location thereof and construction plans and specifications are first approved by the Director of Building and Safety and by the City Council of the City, and the giving of such consent shall be within such Director's and City Counsel's sole discretion and shall not be a waiver of any rights to object to further or future construction.  Lessee's construction, remodeling and/or reconstruction of the interior of any building, structure or other improvement located on the Leased Premises shall not require the consent by the City Council of the City and shall only be subject to approval by the Director of Building and Safety (and/or other applicable governmental agencies) to the extent required by Applicable Laws.

B.    Alteration Approval

Except as provided in Article 9 above, Lessee shall not make any exterior changes or alterations, structural or otherwise, to any building, structure, or other improvement on the Leased Premises unless the consent of the City Manager or his designee is first obtained. Such consent shall not be unreasonably withheld, and the giving of such consent shall not be a waiver of any rights to object to further or future alterations.

C.    Provisions Governing

Following the completion of the Project, as required by Article 9 above, in the event that (and in each case that) Lessee shall construct any additional or replacement buildings, structures or other improvements (including alterations or additions to the existing buildings) on the Leased Premises, Lessee shall construct such improvements and each of them in accordance with the provisions of this Lease governing the construction contemplated by Lessee; provided, however, that:

(1)    The completion date set-forth in Paragraph 9(D) shall not apply to such construction; and

(2)    The other provisions of Article 9 shall apply to such construction.

D.    Demolition

Except for any demolition, reconstruction and construction as permitted by Article 9, in case any building or structure is demolished, Lessee shall restore the land to City's reasonable satisfaction and in the same condition as existed upon commencement of the Original Lease, free of all Lessee Contamination, within twelve (12) months following such demolition or such longer time as may be reasonably necessary to remediate any Lessee Contamination. Failure of Lessee to comply with the provisions of this Paragraph 12(D) shall constitute a default of this Lease. This provision shall expressly survive the expiration or earlier termination of the term of this Lease.

E.    Value and Utility

All changes and alterations shall be of such a character that when completed, the value and utility of the building, structure or other improvement changed or altered by such changes or alterations shall not be less than the value and utility thereof immediately before any such change or alteration.

F.    Alterations Following Commencement

All work done in connection with any changes or alterations following the commencement thereof shall be performed in a good and workmanlike manner and with due diligence.

13.    MAINTENANCE

    A.    Lessee Maintain

        Lessee, at its own expense, shall maintain said Leased Premises and all buildings, structures, roadways, landscaping, parking, sewer and other improvements thereon (collectively, the "Improvements"), and shall keep the same in good and sanitary condition and repair, with the understanding that the structures currently on the Leased Premises have aged and are not in new condition and Lessee is under no obligation to upgrade any buildings or structures except as may be required by Applicable Laws or as provided in Article 9 above.

    B.    Periodic – Structures and Pavement

        As often as necessary to properly maintain their appearance, Lessee shall, at its own expense, (1) paint or clean or otherwise preserve and beautify the surfaces of the exterior of all Improvements located on said Leased Premises and (2) repair or replace any area of pavement or slabs on the Leased Premises as have spalled, weathered, alligatored, or otherwise failed, with like materials and workmanship, and shall as often as necessary promptly repair or replace any damaged areas thereof.  The treatment(s) applied shall restore the appearance of and act as a preservative of the building, structures, structural members, pavement, slabs, and other improvements located on the Leased Premises.

    C.    Landscaping

        Lessee, at its own expense, shall maintain the landscaping on the Leased Premises in an attractive manner, all in compliance with the approved Plans.

    D.    Self-Help

        If Lessee fails or refuses to commence and diligently prosecute to completion the repair and maintain the Leased Premises as required by this Section 13 within sixty (60) days of receipt of written notice from City, then City may enter the Leased Premises and make such repairs or perform such maintenance without liability to Lessee for any loss or damage that may accrue to Lessee, Lessee's property, or to Lessee's business by reason thereof. All reasonable sums disbursed, deposited or incurred by City in connection with such repairs or maintenance, plus ten percent (10%) for overhead, shall be due and payable by Lessee to City, as an item of Additional Rent, within ten (10) days of Lessee's receipt of an invoice and supporting documentation for such sum from City.

14.    SURRENDER

    A.    Structures

        At the expiration of the Term of this Lease or upon the sooner termination thereof, this Lease shall terminate without further notice and Lessee shall surrender said Leased Premises to the City and all Improvements thereon, including but not by way of limitation, any

alterations, additions or improvements, shall remain for the benefit of the City (exclusive of Lessee's trade fixtures, equipment and personal property). Any holding over by Lessee after expiration shall not constitute a renewal or extension or give Lessee any rights in or to the Leased Premises except as otherwise expressly provided in this Lease.

B.   Removal

No buildings, structures or other improvements shall be removed from said Leased Premises (exclusive of Lessee's trade fixtures, equipment and personal property) or voluntarily destroyed or damaged during the Term of this Lease without the prior written consent of the City Manager.

C.   Movable Structures

Machines, trade fixtures and similar installations which are installed in any building, structure or other improvement on the Leased Premises shall not be deemed to be part of the realty even though such installations are attached to the floors, walls or roofs of any building or structure or to outside pavements, so long as such installation can be removed without structural damage to any building, structure or other improvement on the Leased Premises.

D.   Personal Property

Any and all personal property of every kind and nature whatsoever, which Lessee or its sublessees places in, upon or about the Leased Premises during the Term hereof (or during the term of the Original Lease) may be removed therefrom prior to the expiration of the Term of this Lease and shall, as between the City and Lessee, be and remain the personal property of Lessee or its sublessees, as the case may be, provided that any such personal property left on the Leased Premises upon surrender to the City shall be presumed to be abandoned by Lessee.

E.   Lighting, Etc.

Notwithstanding anything to the contrary contained in Paragraphs 14(C) or 14(D) above, any and all lighting, plumbing, air cooling, air conditioning, heating and ventilating equipment (except for such items that are used in connection with Lessee's equipment) shall be deemed to be a part of the realty, and regardless of whether or not any such item or equipment can be removed without structural damage to the building, structure or improvement in which it is installed, it shall not be removed from such building, structure or other improvement except for repairs, alterations and replacement with newer equipment, without the consent of the City Council, and all such equipment shall remain as a part of the realty at the expiration of the Term of this Lease.

F.   Removal at Expiration

Notwithstanding the above provisions of this Article 14, the City may give notice of its election, not less than one (1) year prior to the expiration of the Term of this Lease (including during any Option Period), to require, upon expiration of this Lease, the removal of

any or all Improvements located on the Leased Premises and the restoration of the land to City's reasonable satisfaction and to the same condition as existed upon commencement of the Original Lease, free of all Lessee Contamination, in which event the Lessee shall remove such Improvements and restore the Leased Premises within 120 days following the expiration of the Term of this Lease.  Such period shall not constitute an extension or renewal of this Lease.

15.   SUBORDINATION

   A.   Quitclaim Deed

         Lessee acknowledges that it has received a copy of the Quitclaim Deed executed by the United States of America, dated March 5, 1948, Exhibit "D" attached hereto and made a part hereof (recorded on May 13, 1948 in Book 27145, Page 362 of Official Records), upon which the City holds title to said Leased Premises and Lessee agrees to comply with the provisions thereof as amended to the date of this Lease.  This Lease shall be subordinate to such provisions as amended and to any further agreements between the City and the United States of America required by such provisions as amended, and Lessee agrees to execute such additional instruments or agreement as may be required by City or the United States to confirm or effectuate such subordination.

   B.   FAA Provisions

         Lessee acknowledges its acceptance of and its agreement to comply with the Federal Aviation Administration ("FAA") provisions shown on Exhibit "E" attached hereto and made a part hereof (the "FAA Provisions").

   C.   Changes in FAA Requirements

         Lessee shall, at it sole cost and expense, be responsible for (and shall not be entitled to receive any reduction of rent for any changes to) changes to the requirements promulgated by the FAA or any other governmental entity regulating the Torrance Municipal Airport relating to the construction and operation of the Leased Premises (the "FAA Requirements") and the City shall not be obligated to the Lessee in any manner with respect to changes in the FAA Requirements.

16.   AVIGATION EASEMENTS

   A.   Interference with Navigation

         Lessee agrees that:

         (1)   It will not erect or permit the erection or growth of any building, structure, tree or other object on said Leased Premises above any elevation above mean sea level as shown on Exhibit "E" (175 feet at the northerly boundary and 250 feet in the center); and

         (2)   It will not use said Leased Premises or permit said Leased Premises to be used in any manner which might interfere with the landing or taking off of

aircraft from the airport, or which otherwise constitutes an air navigation obstruction, or which creates an interference; and

(3)    It will not light or operate, or cause to be lighted or operated, any equipment which would interfere with the navigation, landing or takeoff of aircraft on the runways and in the aeronautical areas of the airport.

B.    Avigation Easements

(1)    The City reserves the following easements from the leasehold estate created hereby:

(a)    The right to take any action necessary to prevent the erection or growth of any building, structure, tree or other object into the air space above those elevations shown on Exhibit "E" attached hereto, and to remove from such air space, or mark and light as obstructions to air navigation, any and all buildings, structures, trees or other objects that may at any time project or extend above the elevations shown on Exhibit "E" together with the right of ingress to, egress from, and passage over the said Leased Premises for such purposes;

(b)    The right to enter onto the said Leased Premises for the purpose of causing the abatement of any interference with the landing and taking off of aircraft from said airport; and

(c)    A right of flight for the passage of aircraft in the air space above the surface of the said Leased Premises, together with the right to cause in said air space such noise as may be inherent in the operation of aircraft, now known or hereafter used for navigation of, or flight in the air, using said air space or landing at, or taking off from, or operating at, or on said airport.

(2)    "Aircraft" as used in this Paragraph includes aircraft now or hereafter developed which utilize the airport or such air space whether similar or dissimilar to existing aircraft.

(3)    "Interference" as used in this Paragraph includes without limitation any interference with radar, any electrical or other interference with radio or other communication between airport and aircraft, or any use of activity which makes it difficult for pilots to distinguish between airport and other lights, creates glare or otherwise impairs visibility or which otherwise endangers the landing, taking off or maneuvering of aircraft or the safety of those using the airport, or is hazardous thereto.

(4)    In the event that the City exercises any of its rights pursuant to the above provisions of Article 16, the City shall not be liable to the Lessee for any damage suffered as a result thereof and the Lessee shall reimburse the City for all reasonable and necessary expenses incurred by the City therefor.

17.    TAXES, ASSESSMENTS AND UTILITY CHARGES

    A.    Net Lease

        It is the intention of City and Lessee that all costs, expenses and obligations of every kind relating to the use, operation or occupancy of the Leased Premises which may arise or become due during the term of this Lease shall be paid by Lessee (other than costs incurred by City in negotiating the terms and provision of this Lease and any amendments thereto), and that City shall be indemnified by Lessee against such costs, expenses, and obligations. Accordingly, Lessee agrees to pay before delinquent every charge, lien or expense accruing or payable during the Term (including any Option Term(s)) of this Lease in connection with the use or occupancy of said Leased Premises, including, but not by way of limitation, all taxes and assessments, insurance costs, operating costs, water, electricity, gas, telephone, utilities and all other costs for services used by Lessee, its sublessees, licensees and concessionaires on said Leased Premises.

    B.    Payment of Taxes

        Lessee agrees to pay at least ten (10) days prior to delinquency all taxes which shall be levied against the Leased Premises and the Improvements thereon, and against any buildings, structures or any improvements hereafter erected or constructed on the Leased Premises, and which become a lien against said Leased Premises and the improvements. Lessee shall provide proof of its payment of such taxes prior to any such taxes becoming delinquent. Furthermore, in accordance with California Revenue & Taxation Code § 107.6, Tenant hereby acknowledges that the possessory interest granted herein may be a taxable interest and, Tenant's obligations with respect to the payment of any and all costs associated with Tenant's use of the Leased Premises shall include, without limitation, the obligation to pay any such possessory interest tax.

    C.    Payment of Assessments

        Lessee, at Lessee's sole cost and expense, agrees to pay before delinquent any and all assessment, tax, fee, levy or charge in addition to, or in partial or total substitution of any assessment, tax, fee, levy or charge levied against the Leased Premises or against any buildings, structures or any improvements erected or constructed by the Lessee on the Leased Premises made for maintenance purposes, such as (without limitation) lighting, water lines, sewer (wastewater facilities), fences or other utilities (even if said assessments or charges are for items that would otherwise be characterized as "capital improvements"). Tenant and City acknowledge that Proposition 13 was adopted by the people of the State of California in June, 1978 and that assessments, taxes, fees, levies and charges may be imposed for such services as fire protection, street, sidewalk and road maintenance, refuse removal and for other governmental services formerly provided without charge to property owners or occupants. It is the intention of Lessee and City that all such new and increased assessments, taxes, fees, levies and charges and all similar assessments, taxes, fees, levies and charges be included within the definition of assessments for the purposes of this Lease. With respect to any taxes or assessments (such as community facilities districts and/or Mello-Roos taxes) that may be paid, without becoming delinquent and/or incurring penalty, over more than a one (1) year period,

Lessee may pay such taxes or assessments over the longest available period and shall have no obligation to pay installments relating to time periods after the expiration or earlier termination of this Lease.

      D.      Valuation; Possessory Interest Tax

Lessee understands that, under the law now in effect, the Leased Premises will be valued by the City's Tax Assessor for the purpose of assessing and levying real property (possessory interest) taxes by adhering to the formula contained in the case of De Luz Homes, Inc. v. County of San Diego, 45 Cal. 2d 546, 290 P.2d 544 (1955). Lessee agrees that if at any time during the Term or Option Term(s) of this Lease the law is changed so as to require that said assessor value the interest of Lessee in the Leased Premises in a manner other than that being used by said assessor on the date of execution of this Lease as first above written, then the Lessee shall be responsible for any and all amounts due and owing for said real property (possessory interest) taxes.

      E.      Sale of Fee Interest

In the event the City sells or transfers all or any portion of the Leased Premises and such sale or transfer results in an increase in the applicable real property taxes upon reappraisal of the Leased Premises, the Lessee shall be obligated to pay such tax and any and all taxes, assessments, liens, charges and other similar matters applicable to the Leased Premises prior to such reappraisal and/or applicable to the Leased Premises pursuant to normal increases following such reappraisal shall remain the sole responsibility of Lessee.

      F.      Sales Tax Permit

If applicable, Lessee agrees that it will require all sublessees approved by City hereunder to have obtained a California State Sales and Use Tax Permit for the portion of the Leased Premises utilized by such sublessee before doing business thereon.

      G.      Contests

Lessee shall have the right, at the Lessee's sole cost and expense, to contest the amount or legality of any taxes, assessments or utility charges which it is obligated to pay, and make application for the reduction thereof, or of any assessments upon which the same may be based, provided that Lessee first posts a bond with the City in an amount equal to the amount of such taxes, assessments or charges contested with interest and penalties, or by paying the amounts contested under protest. Lessee agrees that it will prosecute any such contest or application with due diligence and will within thirty (30) days after an adverse final determination thereof pay the amount of any such taxes, assessments or charges which may have been the subject of such contest or application as so determined, together with any interest, penalties, costs and charges which may be payable in connection therewith.

      H.      Ad Valorem Taxes

If, during the Term, federal or state taxes shall be imposed, assessed or levied on the fee interest of City in the Leased Premises, or on or with respect to any real or

personal property constituting a portion of the fee interest of City in the Leased Premises, or on the rents derived by City from the Leased Premises in lieu of or in addition to such real or personal property taxes, and such new tax would most fairly be characterized as in the nature of an ad valorem or use tax, as opposed to an income or franchise tax on City's income. Lessee shall pay all such taxes, assessments, levies or charges imposed upon City within thirty (30) days of demand therefor by City.

I.    Additional Rent

In addition to Rent, all taxes, charges, and sums payable by Lessee under this Paragraph 17 are acknowledged and agreed by Lessee to constitute Additional Rent under this Lease, whether or not such charges and sums are designated as such. City shall have the same rights and remedies upon Lessee's failure to pay Additional Rent, or any portion thereof, as for the nonpayment of Rent.

18.   LIABILITY

A.    Lessee's Indemnification

Lessee has accepted the condition of the Leased Premises, and the Remediation Easement, and the Watermain Easement (as such terms are defined on Exhibit "A") and hereby releases the City from and agrees to indemnify and hold the City (with "City" being defined for purposes of this Paragraph as including City, City's Mayor, City's City Council and its members, City's boards and commissions and their respective members, and City's officers, employees and agents) free and harmless from and, at City's request, defend City against, any and all liabilities and claims for damages, losses, costs and expenses (including defense costs and reasonable attorneys' fees) relating to or arising from breach of contract, any injury or death to any persons, including, but not limited to, Lessee and its employees and agents, or damage to or loss of use of property of any kind whatsoever and to whomsoever belonging, including, but not limited to, property of Lessee, from any and all cause or causes whatsoever (except City's negligence or willful conduct), which occurs on or about, or is in any way connected with, the Leased Premises, the Improvements, any buildings or other improvements subsequently constructed on the Leased Premises, the Remediation Easement and the Watermain Easement (as such terms are defined on Exhibit "A") during the term of this Lease, or results or arises from the activities conducted by Lessee or its officers, employees, agents, contractors, subcontractors, and sublessees.

With respect to damage or injury resulting from the condition of the Leased Premises, the Remediation Easement Area, the Watermain Easement Area, or from the Lessee's or Lessee's employees' or invitees' activities upon the Leased Premises, the Remediation Easement Area, and/or the Watermain Easement Area, and without limiting the generality of the foregoing, Lessee hereby agrees that City shall not be liable for any injury to Lessee's business or any loss of income therefrom or for the damage to the goods, wares, merchandise, improvements, or other property of Lessee, Lessee's offices, agents, employees, invitees, customers, or any other person in or about the Leased Premises, the Remediation Easement Area, the Watermain Easement Area, nor shall City be liable for injury or death to the person of Lessee, any sublessee, or any of their respective officers, employees, agents or

contractors, whether such damages or injury is caused by any cause whatsoever (except as a result of City's negligence or willful conduct), and whether the same damage or injury results from conditions arising upon the Leased Premises, the Remediation Easement Area, or the Watermain Easement Area, or from the Lessee's activities upon the Leased Premises, the Remediation Easement Area, or the Watermain Easement Area.

It is the intention of City and Lessee that City be released from and indemnified, held harmless and (at City's option) defended against any and all injuries (including death) to persons and damage to property described in this Paragraph to the fullest extent permitted by law. If at any time during the term of this Lease, the right of City to be so released, indemnified, held harmless or (at its option) defended shall be enlarged or reduced by reason of the application of any law or legal standard, City's rights under this Paragraph shall be ipso facto enlarged or reduced to conform to such requirements such that City shall at all times during the term hereof be released form and indemnified, held harmless from and (at its option) defended against those matters to the fullest extent permitted under then applicable law.

Lessee's obligation to indemnify, defend and hold harmless under this Lease will apply even in the event of concurrent negligence on part of City; provided, however, that nothing in this Paragraph will excuse City of its responsibility for liability arising from City's negligence or willful misconduct.

Notwithstanding any other provision of this Lease, Lessee's indemnification as set forth in the provisions of this Section shall survive the expiration or earlier termination of this Lease and shall continue in perpetuity.

B.    Hazardous Materials; Lessee Contamination; Indemnity and Release

Lessee shall be fully responsible, at Lessee's sole cost and expense, for any and all Lessee Contamination. Lessee, at Lessee's sole cost and expense, shall promptly take all investigatory and/or remedial action required or ordered by any and all governmental authorities for the clean-up of any Lessee Contamination. From and after the Effective Date, Lessee shall neither (nor allow its permittees to) bring onto, create or dispose of, in or about the Leased Premises, any Hazardous Materials in violation of, nor engage in any activities in or about the Leased Premises that violate, any Environmental Laws (as hereinafter defined). If Lessee knows, or has reasonable cause to believe, that Hazardous Materials, or a condition involving or resulting from the same, has come to be located in, on, under or about the Leased Premises, Lessee shall immediately give written notice of such fact to City, and as required by law, to all appropriate governmental agencies. Lessee shall also immediately give City a copy of any statement, report, notice, registration, application, permit, business plan, license, claim, action or proceeding given to, or received from any governmental agency or private party, or persons entering or occupying the Leased Premises, which concerns or in any way relates to the existence, presence, spill, release, discharge of, or exposure to any Hazardous Materials or any other contamination in, on, or about the Leased Premises.

Lessee understands and agrees that in the event Lessee incurs any loss or liability concerning Hazardous Materials not within the provision of the first paragraph of this Section 18(B), whether attributable to events occurring prior to or following the Effective Date,

then Lessee shall look solely to such person(s) or entity(ies) as are responsible for the existence of the Hazardous Materials, but in no event shall Lessee look to City (City being defined for the purposes of this paragraph as City, City's Mayor, City's City Council and its members, City's boards and commissions and their respective members, and City's officers, employees and agents) for any liability or indemnification regarding Hazardous Materials.   Lessee hereby waives, releases, remises, acquits and forever discharges City of and from any and all Environmental Claims, Environmental Cleanup Liability and Environmental Compliance Costs, as those terms are defined below, and from any and all actions, suits, legal or administrative orders or proceedings, demands, actual damages, punitive damages, loss, costs, liabilities and expenses, which concern or in any way relate to the physical or environmental conditions of the Leased Premises, the existence of any Hazardous Material thereon, or the release or threatened release of Hazardous Materials therefrom, whether existing prior to, at or after the Effective Date.  It is the intention of the parties pursuant to this release that any and all responsibilities and obligations of City, and any and all rights, claims, rights of action, causes of action, demands or legal rights of any kind of Lessee, its successors, assigns or any affiliated entity of Lessee arising by virtue of the physical or environmental condition of the Leased Premises, the existence of any Hazardous Materials thereon, or any release or threatened release of Hazardous Material therefrom, whether existing prior to, at or after the Effective Date, are by this release provision declared null and void and of no present or future force and effect as to the parties.  IN CONNECTION THEREWITH, LESSEE EXPRESSLY AGREES TO WAIVE ANY AND ALL RIGHTS WHICH LESSEE MAY HAVE WITH RESPECT TO SUCH RELEASED CLAIMS UNDER SECTION 1542 OF THE CALIFORNIA CIVIL CODE WHICH PROVIDES AS FOLLOWS:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

LESSEE'S INITIALS: _____

CITY'S INITIALS: _____

Lessee shall defend, indemnify and hold harmless City, City and their officers, directors, employees, agents and representatives (collectively, the "Indemnified Parties") from and against any and all Lessee Contamination, Environmental Claims, Environmental Cleanup Liability, Environmental Compliance Costs, and any other claims, actions, suits, legal or administrative orders or proceedings, demands or other liabilities (collectively, "Claims") resulting at any time from the physical and/or environmental conditions of the Leased Premises whether before or after the Effective Date or from the existence of any Lessee Contamination and/or other Hazardous Materials or the release or threatened release of any Lessee Contamination and/or other Hazardous Materials of any kind whatsoever, in, on or under the Leased Premises and/or the Adjoining Premises or any other affected surrounding premises, including, but not limited to, all foreseeable and unforeseeable damages, fees, costs, losses and expenses, including any and all attorneys' fees and environmental consultant fees and

investigation costs and expenses, directly or indirectly arising therefrom, and including fines and penalties of any nature whatsoever, assessed, levied or asserted against any Indemnified Parties to the extent that the fines and/or penalties are the result of a violation or an alleged violation of any Environmental Law.

For purposes of this section, the following terms shall have the following meanings:

(a)    "**Environmental Claim**" means any claim for personal injury, death and/or property damage made, asserted or prosecuted by or on behalf of any third party, including, without limitation, any governmental entity, relating to the Leased Premises or its operations and arising or alleged to arise under any Environmental Law.

(b)    "**Environmental Cleanup Liability**" means any cost or expense of any nature whatsoever incurred to contain, remove, remedy, clean up, or abate any contamination or any Hazardous Materials on or under all or any part of the Leased Premises, including the ground water thereunder, including, without limitation, (A) any direct costs or expenses for investigation, study, assessment, legal representation, cost recovery by governmental agencies, or ongoing monitoring in connection therewith and (B) any cost, expense, loss or damage incurred with respect to the Leased Premises or its operation as a result of actions or measures necessary to implement or effectuate any such containment, removal, remediation, treatment, cleanup or abatement.

(c)    "**Environmental Compliance Cost**" means any cost or expense of any nature whatsoever necessary to enable the Leased Premises to comply with all applicable Environmental Laws in effect. "Environmental Compliance Cost" shall include all costs necessary to demonstrate that the Leased Premises is capable of such compliance.

(d)    "**Environmental Law**" means any federal, state or local statute, ordinance, rule, regulation, order, consent decree, judgment or common-law doctrine, and provisions and conditions of permits, licenses and other operating authorizations relating to (A) pollution or protection of the environment, including natural resources, (B) exposure of persons, including employees, to Hazardous Materials or other products, raw materials, chemicals or other substances, (C) protection of the public health or welfare from the effects of by-products, wastes, emissions, discharges or releases of chemical sub-stances from industrial or commercial activities, or (D) regulation of the manufacture, use or introduction into commerce of chemical substances, including, without limitation, their manufacture, formulation, labeling, distribution, transportation, handling, storage and disposal.

(e)    "**Hazardous Material**" is defined to include any hazardous or toxic substance, material or waste which is or becomes regulated by any local governmental authority, the State of California, or the United States Government. The term "Hazardous Material" includes, without limitation, any material or substance which is: (A) petroleum or oil or gas or any direct or derivate product or byproduct thereof; (B) defined as a "hazardous waste," "extremely hazardous waste" or "restricted hazardous waste" under Sections 25115, 25117 or 25122.7, or listed pursuant to Section 25140, of the California Health and Safety Code, Division 20, Chapter 6.5 (Hazardous Waste Control Law); (C) defined as a "hazardous substance" under

Section 25316 of the California Health and Safety Code, Division 20, Chapter 6.8 (Carpenter-Presley-Tanner Hazardous Substance Account Act); (D) defined as a "hazardous material," "hazardous substance," or "hazardous waste" under Sections 25501(j) and (k) and 25501.1 of the California Health and Safety Code, Division 20, Chapter 6.95 (Hazardous Materials Release Response Plans and Inventory); (E) defined as a "hazardous substance" under Section 25281 of the California Health and Safety Code, Division 20, Chapter 6.7 (Underground Storage of Hazardous Substances); (F) "used oil" as defined under Section 25250.1 of the California Health and Safety Code; (G) asbestos; (H) listed under Chapter 11 of Division 4.5 of Title 22 of the California Code of Regulations, or defined as hazardous or extremely hazardous pursuant to Chapter 10 of Division 4.5 of Title 22 of the California Code of Regulations; (I) defined as waste or a hazardous substance pursuant to the Porter-Cologne Act, Section 13050 of the California Water Code; (J) designated as a "toxic pollutant" pursuant to the Federal Water Pollution Control Act, 33 U.S.C. § 1317; (K) defined as a "hazardous waste" pursuant to the Federal Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq. (42 U.S.C. § 6903); (L) defined as a "hazardous substance" pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq. (42 U.S.C. § 9601); (M) defined as "Hazardous Material" pursuant to the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 et seq.; or (N) defined as such or regulated by any "Superfund" or "Superlien" law, or any other federal, state or local law, statute, ordinance, code, rule, regulation, order or decree regulating, relating to, or imposing liability or standards of conduct concerning Hazardous Materials and/or underground storage tanks, as now, or at any time here-after, in effect.

Notwithstanding any other provision of this Lease. Lessee's release and indemnification as set forth in the provisions of this Section, as well as all provisions of this Section shall survive the termination of this Lease and shall continue in perpetuity.

19. INSURANCE

A. Liability

(1)    Lessee agrees that at all times during the Term of this Lease and any renewal or extension thereof, it will maintain in full force and effect at Lessee's expense a comprehensive (commercial) general liability insurance with the broad form comprehensive liability endorsement and automobile liability insurance policy which will insure and indemnify the Lessee and the City, the City Council and each member thereof, and every officer and employee of the City against liability or financial loss resulting from any suits, claims, or actions brought by any person or persons and from all costs and expenses of litigation brought against the City in the amount of $10,000,000 combined single limit for any injury to persons and/or damages to property (i) in or about said Leased Premises and any Improvements constructed thereon, the Remediation Easement Area, and the Watermain Easement Area, or (ii) by reason of the use and occupation by Lessee or by any other person or persons of said Leased Premises, the Remediation Easement Area, and the Watermain Easement Area. The City, the City Council, and every officer and employee of the City, acting in due course of his employment or his official capacity, shall be named as an additional insured on said policy.

(2)    It is understood that the type of insurance and minimum limits of liability insurance required herein may become inadequate for such purposes during the Term of

this Lease, and Lessee agrees that it will add such insurance coverage and increase such minimum limits at its sole expense by such amounts as may be reasonably required by the City. In the event that the Lessee objects to such increase on the grounds that it is unreasonable and the dispute cannot be resolved by the parties, the issue shall be decided by arbitration in accordance with the rules of the American Arbitration Association.

B.   Property Damage

(1)   Lessee agrees that at all times during the Term of this Lease and any renewal or extension thereof, it will maintain in full force and effect at Lessee's expense an insurance policy which will insure and indemnify the Lessee and the City from loss occurring to Improvements (excluding grading and fill but including foundations) located on the Leased Premises, by reason of fire, extended coverage perils, and "all risk" perils, including but not by way of limitation flood, demolition, and increased cost of construction and contingent liability arising out of the operation of building codes.  If required by any "Leasehold Mortgagee" (as hereinafter defined), such property damage insurance shall also cover loss resulting from earthquake, but only to the extent required by such Leasehold Mortgagee.  During the period from the dates of this Lease until the completion of the Project contemplated under Paragraph 9 herein, and thereafter during any subsequent period of construction as contemplated under Paragraph 12 herein, such insurance shall include builder's risk insurance in so-called non-reporting form covering the total cost of work performed and equipment, supplies and materials furnished.

(2)   The amount of such insurance shall be at least eighty percent (80%) of the full replacement cost of the Improvements located on the Leased Premises with an agreed amount endorsement.  The City shall be named as an additional insured on said policy, including earthquake coverage, if required.

C.   Rent Insurance

(1)   Lessee agrees that at all times during the Term of this Lease and any renewal or extension thereof, it will maintain in full force and effect at Lessee's expense a business interruption and/or rent or rental value insurance policy with endorsements and coverage equivalent to the fire, extended coverage and "all risk" perils policies described in Paragraph 19(B) above, in an amount not less than twelve (12) months Rent, plus the estimated annual cost of taxes and the annual premiums for such policy.

(2)   All business interruption and/or rent or rental value insurance policies provided for herein shall name the City and Lessee as insureds as their respective interest may appear, but shall be deposited with the City.  Such business interruption and/or rent or rental value insurance policies shall provide for payment or loss to the City to the extent of Lessee's obligations hereunder, and the difference between such payment and the amount of insurance collected shall be payable to Lessee.  Any business interruption and/or rent or rental value insurance proceeds received by the City shall be applied against Lessee's rental obligations hereunder.

D.    Carrier Rating and Cancellation

All policies enumerated in this Paragraph 19 shall be issued by an insurer admitted to do business in California, which qualifies as a member of the California Insurance Guaranty Fund, and which is rated in Best's Insurance Guide with a financial rating of A:XII or better, or as may be accepted in writing by the City Manager. Said policies shall provide that the insurance coverage shall not be cancelled or reduced by the insurance carrier without the City having been given sixty (60) days prior written notice thereof by such carrier. Lessee agrees that it will not cancel or reduce said insurance coverage and will replace any insurance cancelled, reduced or non-renewed by the insurance company during the Term of this Lease.

E.    Copy of Policy

At all times during the Term of this Lease, Lessee shall maintain on file with the City Clerk of the City a certified copy of each insurance policy, and any and all amendments thereto, required to be maintained by Lessee pursuant to this Lease.

F.    Failure to Provide

Lessee agrees that if it does not keep the aforesaid insurance in full force and effect, the City may, after thirty (30) days notice to Lessee, obtain the necessary insurance and pay the premium thereon, and the repayment thereof shall be deemed to be Additional Rent and payable as such on the next day after notice of the payment by the City for the said insurance.

G.    Lessee's Insurance Primary

The insurance provided in the policies of insurance required hereunder to be maintained by Lessee shall be primary and non-contributing with any insurance that may be carried by the City.

H.    Subrogation

Lessee agrees to waive its right of subrogation against the City. Any insurance policies procured by Lessee hereunder shall provide that, to the extent that insurance is provided, the insurance carrier waives all rights of subrogation against the City and all of Lessee's subtenants and other occupants of the Leased Premises.

I.    Cross Liability Endorsement

It is agreed that claims for personal injury or property damage made by an insured hereunder against another insured hereunder shall be covered in the same manner as if separate policies had been issued to each Insured. Nothing contained herein shall operate to increase the insurance company's limit of liability as provided under such policy.

20.   CASUALTY: INSURANCE PROCEEDS

A.   Statement of Costs

In the event of the partial or total destruction of any of the Improvements located on the Leased Premises where the cost of repair or replacement exceeds Ten Thousand Dollars ($10,000), as established jointly by Lessee and the Director of Building and Safety of the City, Lessee shall promptly furnish the City with:

(1)   A statement of the original cost of the damaged structures (if available); and

(2)   An itemized statement setting forth the estimated cost of reconstruction thereof or repairs thereto, prepared by a California licensed architect or engineer.

B.   Duty to Repair – Where Insurance

(1)   During the first five Lease Years, in the event of the partial or total destruction of any of the Improvements located on the Leased Premises by any cause which is by the terms of this Lease required to be insured against (including any partial destruction where the cost of repair is less than Ten Thousand Dollars ($10,000)), Lessee shall repair or rebuild the affected Improvements to the condition existing prior to the occurrence of such destruction or damage, and shall do so even though the proceeds of the insurance policies covering the loss shall be insufficient to reimburse Lessee thereof; provided, however, that if such proceeds of insurance are more than sufficient to pay the cost of any such rebuilding, Lessee shall be entitled to receive any surplus.

(2)   At any time after the expiration of the fifth Lease Year, in the event of the partial or total destruction of any of the Improvements located on the Leased Premises by any cause which is by the terms of this Lease required to be insured against, Lessee may elect to either (a) repair or rebuild the affected Improvements to the condition existing prior to the occurrence of such destruction or damage, or (b) demolish those buildings, structures and improvements designated by the City as requiring demolition, restore the land to City's reasonable satisfaction and in the same condition as existed upon commencement of the Original Lease, free of all Lessee Contamination; provided, however, notwithstanding Lessee's election under the immediately preceding subsection (b), this Lease shall continue in full force and effect and such election shall not release Lessee of its obligations hereunder.

(3)   Any insurance proceeds exceeding Fifty Thousand Dollars ($50,000) shall be payable to an insurance trustee, acceptable to both parties, who shall disburse the funds for construction purposes as construction progresses and with such safeguards as said trustee may deem to be desirable to assure that workmen and materialmen are paid and that no mechanics liens may be recorded.  If the Approved Leasehold Mortgagee, as defined in Paragraph 22(B) of this Lease, agrees to disburse such proceeds for restoration as aforesaid, such Approved Leasehold Mortgagee shall be acceptable to the City as the insurance trustee for purposes of this provision.

C.    Duty to Repair – Where No Insurance

(1)    In the event of the partial or total destruction of any of the buildings, structures or other improvements on the Leased Premises by any cause which is by the terms of this Lease not required to be insured against, then:

(a)    If the cost to repair or restore such buildings, structures or other improvements is reasonably estimated to be less than ten percent (10%) of the value of same immediately prior to such damage or destruction, then Lessee shall proceed to repair and replace the same at its own expense; or

(b)    If the cost to restore or repair such damage or destruction is reasonably estimated to exceed ten percent (10%) of the replacement value of such buildings, structures or other improvements immediately prior to such damage, Lessee may elect to demolish those buildings, structures and improvements designated by the City as requiring demolition, restore the land to City's reasonable satisfaction and in the same condition as existed upon commencement of the Original Lease, free of all Lessee Contamination and terminate this Lease by notifying the City in writing of its intent to do so within thirty (30) days of the event causing such damage or destruction.

(2)    If Lessee shall elect to terminate this Lease as provided for above, it shall have no further obligation for rental or other payments hereunder from and after the date that such demolition and restoration are completed, and from and after the date that such demolition and restoration are completed, neither Lessee nor any Leasehold Mortgagee shall have any right, title, interest, lien or encumbrance in, to or upon the Leased Premises or any of the Improvements located thereon.

D.    Duty to Repair - Last Year of Lease Term

In the event of the partial or total destruction of any of the Improvements located on the Leased Premises by any cause, whether insured or uninsured, during the last year of the Term of this Lease, the Lessee may terminate this Lease by notifying the City in writing of its intent to do so within thirty (30) days of the event causing such destruction. If the Lessee shall elect to cancel this Lease pursuant to this Paragraph, it shall have no duty to repair, replace, or restore the affected buildings, structures or other improvements to the condition existing prior to the occurrence of such destruction or damage and (except for obligations that expressly survive the expiration or earlier termination of the Lease) all liabilities of either party to the other party which would have accrued under this Lease from and after such date shall be cancelled; provided, however, that each party shall remain liable to the other party for any and all obligations and duties which arise or accrue under this Lease prior to such termination date.

E.    Repair Work

Any reconstruction and repair work provided to be performed by Lessee hereunder shall be commenced and continued to completion promptly and diligently. Such reconstruction and repair work shall be performed, insofar as reasonably possible, in compliance with and pursuant to the original Plans and in compliance with the provisions of Paragraph 12

herein.  The City may require a payment bond from Lessee to assure the removal or bonding of any liens.

   F. Rent

    In the event of destruction or damage, whether total or partial, to the Improvements on the Leased Premises, the Rent and Additional Rent provided for hereunder shall not be abated by reason of the occurrence of any such destruction or damage as long as the Term of this Lease continues and remains in existence and is not cancelled in accordance with Paragraph 20(C), but any amounts paid to the City from any rent insurance maintained pursuant to Paragraph 19(C) or otherwise, shall offset the Rent payable hereunder.

  21. ASSIGNMENT AND SUBLETTING

   A. Consent

    (1) Lessee shall not sublet all or any part of the Leased Premises, or assign this Lease or any interest herein or in the Leased Premises (collectively, a "Transfer"), without first obtaining the written consent of the City Council, which consent shall not be unreasonably withheld.  Notwithstanding the provisions of this Section 21, in the event that the proposed assignee or sublessee is an Affiliate (as hereinafter defined) of Lessee, the City Council will not withhold its consent to such an Affiliate proposed assignee or sublessee if the proposed assignee or sublessee provides evidence to City establishing that such proposed assignee or sublessee (i) has a net worth (calculated in accordance with generally accepted accounting principles) of at least Five Million Dollars ($5,000,000) as of the date of such proposed assignment, (ii) has at least five (5) years experience in the operation and management of comparable or larger projects with uses consistent with the uses permitted hereunder, or will enter into a management contract for the Leased Premises with a manager having such experience for such minimum period who will actively manage the Leased Premises, (iii) has satisfied all conditions provided in Paragraph 21(B) of this Lease, and (iv) does not have a reputation which would embarrass the City or disparage its reputation - e.g., a reputation for connections with or control by criminal elements, past criminal violations or prosecutions, or a reputation for disreputable practices.  As used herein, an "Affiliate" of Lessee shall mean any corporation or other entity that is directly controlled by LISI Aerospace (the "Parent").  As used herein, "controlled by" shall mean that more than 50% of the outstanding partnership, membership, capital stock or other beneficial ownership interests of the Affiliate is/are owned by the Parent and the Parent possesses the power to direct or cause the direction of the management and policies of the Affiliate.

    (2) In addition to the circumstances identified in Section 21(A)(1) above, the term "Transfer" shall also include the circumstances hereinafter set forth, and any of the following shall be deemed "Transfer" that is prohibited hereby unless the written consent of the City be first obtained thereto:

    (a) If Lessee is a partnership, limited liability company, or joint venture, a withdrawal, addition or change (voluntary, involuntary, by operation of law, directly or indirectly, or otherwise) of any, of the partners, members, or venturers thereof; or

(b)     If Lessee is composed of more than one person, a purported assignment or transfer (voluntary or involuntary, by operation of law, directly or indirectly, or otherwise) from one to any other or others thereof; or

(c)     If Lessee is a corporation, a cumulative change in the ownership (voluntary, involuntary, by operation of law, directly or indirectly or otherwise) of thirty-three and one-third percent (33-1/3%) or more of its capital stock owned as of the date of its acquisition of this Lease; provided, however, that any such transfer as a result of the death or judicially declared incompetency of any such person may be made without the consent of the City so long as such transfer is to the immediate family, or to a trust for the benefit of the immediate family, of such deceased or incompetent person.

Lessee shall give the City prompt written notice of any such change in the ownership interests in Lessee whether or not the consent of the City is required therefor. The provisions of this Paragraph 21 [except for the notice provisions hereof] shall not be applicable to any Approved Leasehold Mortgagee (as defined below) that is a corporation, the stock of which is publicly traded on a recognized stock exchange.

(3)     Without limiting the City's right of refusal to consent to any Transfer, the City's refusal to consent to any Transfer shall be considered reasonable if the Lessee cannot demonstrate to the reasonable satisfaction of the City that such proposed Transfer would not result in a partial assignment or a de facto division of the Lessee's rights or duties hereunder. It is the City's intention that this Lease be held as an entirety by the Lessee and it may not be divided.

(4)     City's granting consent to any assignment or sublease hereunder (a) shall not be a waiver of any right to object to further or future assignments or subleases and the consent to each successive assignment or sublease must be first obtained in writing from the City Council, and (b) shall not release Lessee of its obligations hereunder and Lessee shall remain fully liable for the performance of all of the covenants to be performed by Lessee under this Lease.

B.     Vesting

As a condition to the vesting of any rights in this Lease or in the leasehold estate created hereby in any City-approved assignee or sublessee of the Lessee's interest hereunder, whether voluntary or involuntary, each such proposed assignee or sublessee shall first have delivered to the City Clerk of the City a written notice of such proposed assignment or sublease, which notice:

(1)     Shall contain a statement that the proposed assignee or sublessee agrees to be bound by all the terms, covenants and conditions of this Lease which are to be performed by Lessee;

(2)     Shall state the name and address of the proposed assignee or sublessee for the purpose of enabling notices to be given under Paragraph 27 herein; and

(3)     Shall state whether the proposed assignee or sublessee is an individual, a corporation or a partnership; and if such assignee or sublessee is a corporation, the names of such corporation's principal offices and directors, its state of incorporation, the amount of capital stock authorized and the amount of capital stock outstanding at the time of the assignment, the number of shareholders and the names and address of every shareholder who directly or indirectly owns or controls five percent (5%) of more of such stock (stating the number of such shares); and if such assignee or sublessee is a partnership, the names and addresses of the members of such partnership.  The provisions of this Paragraph 21(B)(3) shall not apply to any assignee of an Approved Leasehold Mortgagee (as defined below), the stock of which assignee is publicly traded on a recognized stock exchange.

C.     Voidability

Any Transfer that has been made in violation of or which is not in full compliance with the provisions of this Paragraph 21 shall be voidable by the City and shall constitute a material default under this Lease.

D.     Non-Disturbance and Attornment Agreements

Upon the Lessee's written request, the City shall enter into a non-disturbance and attornment agreement with the Lessee's sublessee(s) on the City's form of agreement.

22.   ENCUMBRANCES

A.     Right to Encumber

During the Term of this Lease and any extension or renewal thereof, Lessee may assign for security purposes only or may encumber Lessee's leasehold interest under this Lease and the leasehold estate created hereby (a "Leasehold Mortgage") in favor of an institutional lender (herein sometimes referred to as the "Leasehold Mortgagee") and in that connection may perform any and all acts and execute any and all instruments necessary or proper to consummate any loan transaction and perfect the security therefor to be given the Leasehold Mortgagee; provided, however, that:

(1)     Any such Leasehold Mortgage must constitute a first lien on Lessee's leasehold estate; and

(2)     Such Leasehold Mortgage shall be an assignment or encumbrance only of the Lessee's leasehold interest under this Lease and the leasehold estate created hereby and shall not convey or be a lien upon the City's fee estate in the Leased Premises or the City's reversionary interest in all buildings and improvements located on the Leased Premises.

B.     Leasehold Mortgagee Defined

The term "Leasehold Mortgagee" as used in this Paragraph 22 and elsewhere in this Lease shall mean the mortgagee under any mortgage, or the trustee and beneficiary under any deed of trust or indenture of mortgage and deed of trust encumbering the

leasehold estate or Lessee's interest therein (including the assignee or successor of any such mortgagee, beneficiary or trustee and the holder of any promissory note or bond secured thereby), and executed by Lessee and delivered for the purpose of securing to such mortgagee, trustee or beneficiary payment of any indebtedness incurred by Lessee and secured by such mortgage, deed of trust or indenture of mortgage and deed of trust. The terms "Approved Leasehold Mortgagee" and "Approved Leasehold Mortgage" shall mean a Leasehold Mortgagee and a Leasehold Mortgage, respectively, complying with the requirements of Paragraph 22(A) above.

C.   Agreements Regarding Leasehold Mortgagees

(1)   Notices to Leasehold Mortgagee. So long as an Approved Leasehold Mortgagee notifies the City in writing of its Approved Leasehold Mortgagee status and provides City with an address for delivery of notices, copies of all notices given or documents delivered by the City to Lessee under the terms of this Lease, including without limitation notices of Lessee's default under this Lease, shall be concurrently served by the City on the Approved Leasehold Mortgagee by United States mail, postage prepaid, registered or certified mail, return receipt requested, at the address last provided to the City in writing by such Approved Leasehold Mortgagee. No notice given by the City under this Lease shall be effective unless served as provided in this Section.

(2)   Approved Leasehold Mortgagee's Rights to Cure. Notwithstanding any provision to the contrary set forth in this Lease, the City shall not terminate this Lease because of any default by Lessee or on the basis of any other event or circumstance which gives the City the right to terminate this Lease if the Approved Leasehold Mortgagee, within twenty (20) days after its receipt of notice from the City of a default by the Lessee under this Lease in the case of a default which can be cured by the payment of money required to be paid by Lessee under the terms of this Lease, or within thirty (30) days after its receipt of such notice in the case of a nonmonetary default, shall at its election either:

(a)   Cure such default within such twenty (20) days, if the default can be cured by the payment of money required to be paid by Lessee under the terms of this Lease or, if the default cannot be cured in such a manner, commence to cure the default within such thirty (30) day period and thereafter diligently proceed to complete the cure; or

(b)   (i) Institute a trustee's sale or judicial foreclosure proceedings under the Approved Leasehold Mortgage and thereafter diligently proceed to complete such proceedings; (ii) cure such default within such twenty (20) days if the default can be cured by the payment of money required to be paid by Lessee under the terms of this Lease; (iii) comply with all of the terms and conditions of this Lease requiring the payment or expenditure of money by Lessee (including but not limited to Paragraph 17 of this Lease) until such time (the "Foreclosure Date") as this Lease has been sold by trustee's sale, judicial foreclosure or transfer in lieu of foreclosure or reconveyed under the Approved Leasehold Mortgage; and (iv) commence to cure all non-monetary defaults within thirty (30) days following the Foreclosure Date and thereafter diligently proceed to complete the cure; provided, however, that if the Approved Leasehold Mortgagee fails to comply with any one of the

conditions set forth in Paragraph 22(C)(2)(a) or 22(C)(2)(b), then the City shall be released from the covenant of forbearance contained in this subsection.

(3)    Prosecution of Foreclosure. The Approved Leasehold Mortgagee shall be deemed to be diligently proceeding to complete a trustee's sale or judicial foreclosure notwithstanding the fact that such proceedings or the commencement of such proceedings are stayed by statute, rule, court order, bankruptcy stay, or other similar enactment or action, provided that, (a) such Approved Leasehold Mortgagee is at all times during such stay in compliance with the provisions of Paragraphs 22(C)(2)(b)(ii) and 22(C)(2)(b)(iii) hereof, and (b) such trustee's sale or judicial foreclosure is completed within twenty-four (24) months following the institution of such proceedings; provided that, such twenty four (24) month period shall be extended if the Approved Leasehold Mortgagee is unable to complete such proceedings within such twenty-four (24) month period so long as the Approved Leasehold Mortgagee is at all times diligently prosecuting such proceedings to conclusion.

(4)    New Lease. If this Lease terminates because of a default by Lessee or any other event or circumstance which entitles the City to terminate this Lease (including, but not limited to, rejection of the Lease in a bankruptcy proceeding), the City shall provide the Approved Leasehold Mortgagee with written notice of such termination. If within thirty (30) days after receiving notice of such termination, the Approved Leasehold Mortgagee by written notice to the City requests that the City enter into a new lease for the Leased Premises, then the City shall enter into a new lease for the Leased Premises with the Approved Leasehold Mortgagee within thirty (30) days after the Approved Leasehold Mortgagee's request, provided that the Approved Leasehold Mortgagee has delivered to the City at the time of such request the Approved Leasehold Mortgagee's written agreement to cure Lessee's defaults under this Lease, and provided further that if Lessee has defaulted under Article 9 of this Lease, the Approved Leasehold Mortgagee shall have entered into a written agreement with City pursuant to which such Approved Leasehold Mortgagee has agreed to perform the remaining obligations of Lessee under said Article 9 in a manner and within a time period satisfactory to City, or obtained the agreement of a third party satisfactory to City to so perform such obligations. The new lease shall commence, and rent and all obligations of the Approved Leasehold Mortgagee shall begin to accrue, as of the date of termination of this Lease. The term of the new lease shall be for the period which would have constituted the remainder of the Term of this Lease had this Lease not been terminated, and the new lease shall be upon all of the other terms and conditions of this Lease, as modified by all amendments, if any, entered into by City and Lessee. The new lease shall be free of all rights of Lessee. Lessee shall provide in all subleases pertaining to the Leased Premises that each subtenant of the Leased Premises shall, at the Approved Leasehold Mortgagee's option, attorn to the Approved Leasehold Mortgagee under the new lease, and the Approved Leasehold Mortgagee agrees to accept such an attornment, provided the subtenant is not in default under its sublease at the time of such attornment. Prior to or upon execution of the new lease, the Approved Leasehold Mortgagee shall (a) pay to the City all Rent, Additional Rent, and other amounts owing to the City by Lessee under this Lease as of the date of termination of this Lease; (b) shall pay to the City all rent and other amounts due under the new lease from the date of commencement of the term of the new lease to the date of execution of the new lease; (c) shall pay to the City all reasonable costs and expenses incurred by the City in connection with the new lease; and (d) shall provide in a manner satisfactory to City for the cure of all nonmonetary defaults of Lessee under this Lease.

(5)     Performance by Approved Leasehold Mortgagee. The City agrees to accept performance by the Approved Leasehold Mortgagee of Lessee's obligations under this Lease with the same force and effect as if performed by Lessee; provided, however, that the Approved Leasehold Mortgagee shall not become liable for the performance of Lessee's obligations under this Lease unless and until the Approved Leasehold Mortgagee acquires title to the Lease, and provided further that, if the Approved Leasehold Mortgagee shall so acquire title to this Lease or any new Lease pursuant to Paragraph 22(C)(4) above, within sixty (60) days after such Approved Leasehold Mortgagee shall have so acquired title to this Lease or such new Lease, such Approved Leasehold Mortgagee shall have either (i) sold or otherwise transferred this Lease to a third party approved by City pursuant to Paragraph 21 of this Lease, which third party shall be financially capable and experienced in operating commercial retail shopping centers similar to the Leased Premises; or (ii) engaged the services of a management company reasonably acceptable to and approved in writing by the City which management company shall be experienced in operating commercial retail shopping centers similar to the Leased Premises and which management company shall actively operate and manage the Leased Premises until such time as such Approved Leasehold Mortgagee shall have sold or otherwise transferred this Lease to a third party as required in clause (i) of this sentence. An Approved Leasehold Mortgagee acquiring title to this Lease shall be liable for the performance of Lessee's obligations under this Lease only for so long as the Approved Leasehold Mortgagee holds title to this Lease. The City agrees that an Approved Leasehold Mortgagee may enter on the Leased Premises to perform any curative act.

Notwithstanding the provisions of this Paragraph 22(C)(5) of the Lease, (i) an Approved Leasehold Mortgagee shall not become liable for the performance of obligations of Lessee under the Lease which, by their nature, cannot be performed without such Approved Leasehold Mortgagee having possession of the Leased Premises, unless and until the Approved Leasehold Mortgagee actually acquires possession of the Leased Premises (regardless of whether, prior to obtaining such possession, such Approved Leasehold Mortgagee has title to the Lease), provided that the Approved Leasehold Mortgagee is at all times diligently taking all action required in order to obtain possession of the Leased Premises at the earliest possible date and (ii) the approval of City required under Paragraphs 22(C)(5)(i) and 21(C)(5)(ii) of the Lease shall be deemed satisfied if the third party transferee or the management company referred to therein meet the respective criteria for each set forth in Paragraph 22(C)(9) above.

(6)     No Merger. Without the written consent of the Approved Leasehold Mortgagee, there shall be no merger of this Lease or of the leasehold estate created hereunder with the fee estate in the Leased Premises by reason of the fact that this Lease or the leasehold estate may be held directly or indirectly by or for the benefit of any person who owns the fee estate in the Leased Premises or any portion thereof.

(7)     No Voluntary Surrender. No voluntary surrender of this Lease by Lessee or amendment or mutual termination of this Lease shall be effective without the prior written consent of the Approved Leasehold Mortgagee.

(8)     Leasehold Foreclosure. The City's consent shall not be required for a transfer of this Lease to the Approved Leasehold Mortgagee by trustee's sale, judicial foreclosure or transfer in lieu of foreclosure.

(9)    Approved Transfers by an Approved Leasehold Mortgagee. Notwithstanding any provision to the contrary contained in the Lease, including, without limitation, Paragraph 21 of the Lease, in the event that an Approved Leasehold Mortgagee acquires title to the Leased Premises by way of foreclosure, deed in lieu of foreclosure, or other exercise of remedies provided under its Approved Leasehold Mortgage, such Approved Leasehold Mortgagee shall thereafter have the right, with the consent of the City Council, to assign the Lease to a purchaser/assignee who proposes to assume each and all of the obligations of the Lessee under the Lease. The City Council will not withhold its consent to such a proposed transferee if the Approved Leasehold Mortgagee and the proposed transferor provide evidence to City establishing that such proposed transferee (i) has a net worth (calculated in accordance with generally accepted accounting principles) of at least Five Million Dollars ($5,000,000) as of the date of such proposed assignment, (ii) has at least five (5) years experience in the operation and management of comparable or larger properties, or will enter into a management contract for the Leased Premises with a manager having such experience for such minimum period who will actively manage the Leased Premises, (iii) has satisfied all conditions provided in Paragraph 21(B) of the Lease (except regarding shareholders owning or controlling five percent (5%) or more of the stock of a publicly held corporation), and (iv) does not have a reputation which would embarrass the City or disparage its reputation - e.g., a reputation for connections with or control by criminal elements, past criminal violations or prosecutions, or a reputation for disreputable practices.

(10)    Cure of a Prohibited Junior Leasehold Mortgage. City agrees that if Lessee violates the prohibition in the Lease on creation of any junior Leasehold Mortgage, City shall give written notice to the Approved Leasehold Mortgagee. If the Approved Leasehold Mortgagee, within thirty (30) days after receipt of such notice either (i) pays and discharges the junior Leasehold Mortgagee in its entirety, or (ii) commences foreclosure proceedings, or exercises a power of sale, under a trust deed or mortgage held by the Approved Mortgagee, and thereafter diligently prosecutes such proceedings or sale to conclusion, either of such actions shall constitute a "cure" of such default by Lessee entitling the Approved Leasehold Mortgagee to obtain the new lease provided for in Paragraph 21(C)(4) of the Lease. Nothing contained herein shall alter the prohibition against creation of junior Leasehold Mortgages by the Lessee nor be construed as City's consent thereto.

23.    BREACH OR DEFAULT

A.    Event of Default

Any of the following shall constitute an event of default ("Event of Default") by Lessee under this Lease:

(1)    Failure of Lessee to pay when due the Rent, the Additional Rent or any other sums payable by Lessee under this Lease, where such failure continues for ten (10) days after written notice thereof from the City that such payment is due; or

(2)    The complete abandonment of the Leased Premises for ten (10) days after written notice thereof from the City; or

(3)     The failure of Lessee to perform any other obligation hereunder which shall not be remedied to the satisfaction of City within thirty (30) days after written notice from the City specifying such failure to perform (or, if such failure cannot reasonably be remedied by Lessee within thirty (30) days, if Lessee shall not have commenced appropriate action to effect such remedy within said thirty (30) day period and thereafter prosecuted such action to completion with all due diligence); or

(4)     Except as otherwise provided by paramount law, the entry of any decree or order for relief by any court with respect to Lessee in any involuntary case under the Federal Bankruptcy Code or any other applicable federal or state law; or the appointment of or taking possession by any receiver, liquidator, assignee, trustee, sequestrator or other similar official, of the Leased Premises or of Lessee or of any substantial part of the property of Lessee or the ordering or winding up or liquidating of the affairs of Lessee and the continuance of such decree or order unstayed and in effect for a period of sixty (60) days; or the commencement by Lessee of a voluntary proceeding under the Federal Bankruptcy Code or any other applicable state or federal law or consent by Lessee to the entry of an order for relief in an involuntary case under any such law, or consent by Lessee to appointment of or taking of possession by a receiver, liquidator, assignee, trustee, sequestrator or other similar official, of Lessee or of any substantial part of the property of Lessee or the making by Lessee of any general assignment for the benefit of creditors; or the failure of Lessee to operate its business for ten (10) business days when such failure is due to any financial difficulty experienced by either of the foregoing; or Lessee taking any other voluntary action related to the dissolution of Lessee or the winding up of Lessee's affairs.

B.     City's Remedies

(1)     If an Event of Default by Lessee shall occur and be continuing as aforesaid, then in addition to any other remedies available to the City at law or in equity, the City shall have the immediate option to terminate this Lease, and bring suit against Lessee or submit the issue of Lessee's default to arbitration and recover as an award in such suit or arbitration proceeding the following:

(a)     The worth at the time of award of the unpaid rent and all other sums due hereunder which had been earned at the time of termination;

(b)     The worth at the time of award of the amount by which the unpaid rent and all other sums due hereunder which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided;

(c)     The worth at the time of award of the amount by which the unpaid rent and all other sums due hereunder for the balance of the Term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided;

(d)     Any other amount necessary to compensate the City for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things could be likely to result therefrom; and

(e)     Such amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable California law.

(2)     The "worth at the time of award" of the amounts referred to in Paragraphs 23(B)(1)(a) and 23(B)(1)(b) above shall be computed by allowing interest at the lesser of one and one-half percent (1-1/2%) per month or the maximum allowable rate under applicable law on the date of the award. The "worth at the time of award" of the amount referred to in Paragraph 23(B)(1)(c) is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).

(3)     If an Event of Default shall occur, and the City shall choose not to exercise the option to terminate this Lease as provided herein, this Lease shall continue in full force and effect for so long as the City chooses not to terminate Lessee's right to possession, and the City may enforce all its rights and remedies under this Lease, including the right to recover rent as it becomes due.

(4)     For the purpose of this Paragraph 23(B), the following shall not constitute a termination of the Lessee's right to possession:

(a)     Acts of maintenance or preservation or effort to relet all or any part of the Leased Premises; or

(b)     The appointment of a receiver upon initiative of the City to protect the City's interest under this Lease.

(5)     The City may, at any time after Lessee commits a default under this Lease, remedy such default at Lessee's expense. If the City at any time, by reason of Lessee's default, pays any sum or does any act that requires the payment of any sum, the sum paid by the City shall be due immediately from Lessee to the City at the time the sum is paid, and if paid at a later date shall bear interest at the lesser of the rate of one and one-half percent (1-1/2%) per month from the date the sum is paid by the City until the City is reimbursed by Lessee or the maximum rate allowed by law. The sum, together with interest on it, shall be Additional Rent.

C.     Receipt of Rent Not Waiver of Default

The receipt by the City of Rent, Additional Rent or any other charges due to the City, with knowledge of any breach of this Lease by Lessee or of any default on the part of Lessee in the observance or performance of any of the conditions or covenants of this Lease, shall not be deemed to be a waiver of any provisions of this Lease. No acceptance by the City of a lesser sum than the Rent, Additional Rent, or any other charges then due shall be deemed to be other than on account of the earliest installment of the Rent, Additional Rent or other charges due, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as the Rent, Additional Rent or charges due be deemed an accord and satisfaction, and the City may accept such check or payment without prejudice to the City's right to recover the balance of such installment or pursue any other remedy provided in this Lease. No failure on the part of the City to enforce any covenant or provision herein contained, nor any waiver of any right hereunder by the City shall discharge or invalidate such covenant or provision or affect the

right of the City to enforce the same in the event of any subsequent breach or default, unless expressly agreed to by the City Manager in writing. The receipt by the City of any of the Rent, Additional Rent or any other sum of money or any other consideration paid by Lessee after the termination in any manner of the Term, or after notice by City of such termination, shall not reinstate, continue, or extend the Term hereof, or destroy, or in any manner impair the efficacy of any such notice of termination as may have been given hereunder by the City to Lessee prior to the receipt of any such sum of money or other consideration, unless so agreed to in writing and signed by the City Manager. Neither acceptance of the keys nor any other act or thing done by the City or by its agents or employees during the Term shall be deemed to be an acceptance of a surrender of the Leased Premises, excepting only an agreement in writing signed by the City Manager accepting or agreeing to accept such a surrender.

24.   COMPLIANCE WITH LAW

Lessee agrees to comply with, and to cause all sublessees, licensees and concessionaires to comply with, all statutes, ordinances, rules, laws or regulations of any governmental agency (including, without limitation, those of the City of Torrance) which are applicable to said Leased Premises or the operation of Lessee or such sublessees on the Leased Premises (collectively, the "Applicable Laws").

25.   CITY'S RIGHT OF ACCESS

A.   City's Access to Leased Premises

During normal business hours, the City and the City's officers, employees and agents shall have the right to enter upon the Leased Premises or any Improvements located thereon for the purpose of inspecting the same and posting notices of non-responsibility or any other notices the City may reasonably deem necessary or desirable.

B.   Lessee's Access to Airport Runways

Lessee shall have no right of access for aircraft, vehicles or people to the runways, taxiways or other property or facilities on the Torrance Municipal Airport.

26.   QUIET ENJOYMENT

Except as provided otherwise herein, the City covenants that Lessee, upon paying the Rent expressly reserved in this Lease and observing and keeping the terms, covenants, and conditions of this Lease on its part to be kept and performed, shall lawfully and quietly hold, occupy and enjoy the Leased Premises during the Term of this Lease.

27.   NOTICES

All notices, demands, or other communications under this Lease will be in writing. Notice will be sufficiently given for all purposes as follows:

A.   Personal delivery. When personally delivered to the recipient: notice is effective on delivery.

B. _First Class mail._  When mailed first class to the last address of the recipient known to the party giving notice:  notice is effective three mail delivery days after deposit in a United States Postal Service office or mailbox.

C. _Certified mail._  When mailed certified mail, return receipt requested: notice is effective on receipt, if delivery is confirmed by a return receipt.

D. _Overnight delivery._  When delivered by an overnight delivery service, charges prepaid or charged to the sender's account:  notice is effective on delivery, if delivery is confirmed by the delivery service.

E. _Facsimile transmission._  When sent by fax to the last fax number of the recipient known to the party giving notice:  notice is effective on receipt.  Any notice given by fax will be deemed received on the next business day if it is received after 5:00 p.m. (recipient's time) or on a non-business day.

Addresses for purposes of giving notice are as follows:

LESSEE:

Hi-Shear Corporation
Attn:  Mary Hanley or Chief Financial Officer
2600 Skypark Drive
Torrance, California  90509

with a copy to:

James D. Robinson
Kelly Lytton & Vann, LLP
1900 Avenue of the Stars, Suite 1450
Los Angeles, California  90067

CITY:

City of Torrance
3031 Torrance Boulevard
Torrance, California  90509-2970
Attention:  City Manager
Copy To:  City Attorney

Any correctly addressed notice that is refused, unclaimed, or undeliverable because of an act or omission of the party to be notified, will be deemed effective as of the first date the notice was refused, unclaimed or deemed undeliverable by the postal authorities, messenger or overnight delivery service.

Either party may change its notice information by giving the other party notice of the change in any matter permitted by this Agreement.

28.   AMENDMENTS AND MODIFICATIONS

This Lease shall not be amended or modified in any way, and no purported amendment or modification shall be effective, unless same has been (i) approved by the City Council and set forth in a written instrument, expressly purporting to amend this Lease, executed by the City Manager or the Mayor for the City; (ii) executed by Lessee; and (iii) approved in writing by any Approved Leasehold Mortgagee.

29.   APPROVALS BY CITY; CITY ACTING IN ITS PROPRIETARY CAPACITY.

No consent, approval or satisfaction of the City provided for hereunder, and no waiver by the City of any provisions hereof, shall be effective unless given in writing specifically referring to this Lease and executed by the City Manager or the Mayor for the City; no such consent, approval, satisfaction or waiver under or with respect to this Lease shall be inferred or implied from any other act or omission of the City or any agent or employee thereof. Unless otherwise expressly provided therein, no approval, consent or other action taken by the City under or pursuant to this Lease shall be deemed to waive any other rights or authority of the City in any capacity other than as the lessor under this Lease.

Although City is a city of the State of California having regulatory powers, the execution of this Agreement and the lease of the Leased Premised as contemplated by this Agreement is undertaken by the City in its proprietary capacity and not in its regulatory capacity. Lessee agrees that City retains all of its regulatory powers and the development contemplated is subject to the applicable laws and regulations of City and other governmental agencies having jurisdiction. Nothing contained in this Lease shall in any way restrict or diminish the rights, powers or jurisdiction of the City, its City Council, Planning Commission and other agencies with respect to the governance of the Leased Premises and all buildings, improvements, business and activities located on or conducted thereon. Lessee acknowledges that it will have to apply for land use entitlements and building permits and to comply with applicable laws and ordinances in order to implement the development of the Project. This Agreement does not and the Lease will not constitute any agreement, promise or assurance by City to grant such land use entitlements or issue building permits, or that City is obligated to obtain the agreement or assurance from such agencies that such agencies will do so, nor is City obligated to amend any of its laws or regulations regarding land use entitlements or building permits, or to grant any entitlements or building permits.

30.   CONDEMNATION

A.   Award

In the event that all or any part of the Leased Premises or any buildings or improvements thereon shall, during the Term of this Lease, be taken or damaged by eminent domain, the total consideration paid in connection with such taking and damage (including both amounts paid for property taken and severance or other damage to the portion of the Leased Premises not taken) shall be paid and applied in the following order of priority:

(1)   First, to reimburse the City for the reasonable costs, fees and expenses incurred by the City in connection with the collection of such award.

(2)     Second, but only if such taking does not result in the termination of this Lease as further provided in this Section, all remaining proceeds, if any, shall be paid to a trustee, reasonably acceptable to both the City and Lessee who shall disburse the funds for construction purposes as construction progresses to repair any and all damage to the Leased Premises or the buildings or improvements located thereon resulting from such taking, with such safeguards as said trustee may deem to be desirable to assure that workmen and materialmen are paid and that no mechanic's liens may be recorded.  If the Approved Leasehold Mortgagee, as defined in Paragraph 23(B) of this Lease, agrees to disburse such proceeds for restoration as aforesaid, such Approved Leasehold Mortgagee shall be acceptable to the City as the trustee for purposes of this provision.

(3)     Third, any excess proceeds held by the trustee following completion of the restoration and repair described in Paragraph 30(A) above or in the event this Lease is terminated pursuant to the provisions of this Section so that no reconstruction or repair is to be undertaken, the balance of such proceeds, if any, shall be paid and applied in the following order of priority:

(a)     First, to the City to the extent of the fair market value of the land of the Leased Premises so taken (including the full amount of the award for severance damages to the land not so taken).  The fair market value of the land so taken shall be the value which is established by the parties as a part of any litigation or arbitration in connection with such taking.  In the event there is no such litigation or determination, the fair market value of the land so taken shall be determined by the procedure set forth in Paragraph 4(B) above.

(b)     Second, after any payment to the City required by Paragraph 30(A)(3) above, Lessee shall receive the remainder of such award, if any.

(4)     If any of Lessee's trade fixtures or any of Lessee's other personal property shall be so taken, and if a separate and distinct award is made in connection therewith, such separate and distinct award (including amounts paid for trade fixtures and personal property taken and severance or other damages to such of Lessee's trade fixtures and other personal property as shall not be taken) shall belong solely to Lessee.  Lessee's right to such award shall, however, not diminish or detract in any way from any award or amount due to the City.

B.     Settlement of Claims

Lessee shall not settle or adjust any claim for damages resulting from a taking of the Leased Premises or any buildings or improvements thereon without the City's prior written consent, which consent shall be given if, and only if, the amount of such award shall be sufficient to pay the amounts to which the City is entitled pursuant to the provisions of this Section.

C.     Reconstruction and Repairs

If such taking does not result in the termination of this Lease as further provided in this Section, Lessee, whether or not damages, if any, on account of such be sufficient for such purposes, shall at its sole cost and expense, promptly commence and diligently complete the restoration of the Leased Premises and all buildings and improvements located thereon as

nearly as possible to their value, condition and character immediately prior to such taking, except only for any reduction in any areas caused or necessitated by such taking; provided, however, that if the total cost to restore the Leased Premises and all buildings and improvements located thereon remaining after said taking is reasonably estimated to exceed the portion of any award made available to Lessee for that purpose by fifteen percent (15%) of the replacement value of such building, structure or other improvement immediately prior to such damage, Lessee may elect to demolish same, restore the Leased Premises to a neat and clean condition to the reasonable satisfaction of the City and terminate this Lease by notifying the City in writing of its intent to do so within thirty (30) days of the event causing such damage or destruction. If Lessee shall elect to cancel this Lease as provided for above, except with respect to obligations that expressly survive the expiration or earlier termination of this Lease, Lessee shall have no further obligation for rental or other payments hereunder from and after the date that such demolition and restoration are completed.

    D.    Lease Termination

In the event all of the Leased Premises, or so much thereof and/or the buildings and improvements thereon are taken so that the use of the remainder, in the Lessee's reasonable judgment, is economically unfeasible, the Term of this Lease shall terminate as of, and the City and, except with respect to obligations that expressly survive the expiration or earlier termination of this Lease, Lessee shall be released of all obligations under this Lease arising subsequent to, the date of such taking. If only a part of the Leased Premises are so taken, and this Lease is not terminated as a result thereof, this Lease shall remain in full force and effect as to the portion of the Leased Premises and the buildings and improvements thereon remaining except that the Rent, then applicable shall be reduced in that proportion or percentage which the fair market value of that portion of the land of the Leased Premises so taken bears to the total fair market value of the land of the Leased Premises immediately preceding such taking. Such total fair market value shall, for the purposes of this Paragraph, be determined in the manner set forth in Paragraph 4(B) above.

    E.    Approved Leasehold Mortgagee Participation

The City agrees that an Approved Leasehold Mortgagee shall have the right to participate with the City and Lessee in any condemnation proceedings affecting the Leased Premises; provided that, the Approved Leasehold Mortgagee's rights shall be limited to enforcing its rights (if any) with respect to Lessee's share (if any) of such condemnation proceeds and shall not apply to or affect City's share of any such condemnation proceeds.

31.   GENERAL PROVISIONS

A.   Estoppel Certificates

The City and Lessee shall at any time and from time to time upon not less than thirty (30) days prior written request by the other, deliver to the requesting party an executed and acknowledged written statement certifying that (a) this Lease is unmodified and in full force and effect (or if this Lease has been modified or if this Lease is not in full force or effect, stating the nature of the modification or the basis on which this Lease had been terminated, whichever is applicable); (b) to its knowledge, the requesting party is not in default under this Lease (or if any such default exists, stating the specific nature and extent of the default); and (c) the dates to which the monthly rent and other monetary obligations under this Lease have been paid in advance.   Each certificate delivered pursuant to this Section may be relied upon by any prospective purchaser or transferee of the City's or Lessee's respective interests in the Leased Premises, including without limitation any prospective Approved Leasehold Mortgagee.

B.   Remedies Cumulative

No remedy or election provided by any provisions in this Lease shall be deemed exclusive unless so indicated, but shall whenever possible be cumulative with all other remedies in law or equity except as otherwise herein specifically provided.

C.   Provisions as Covenants

Each provision hereof shall be deemed both a covenant and condition and all of the conditions and covenants contained herein shall be covenants running with the land and shall be construed as such.

D.   Time

Time is of the essence of this Lease.

E.   Headings

The Paragraph headings in this Lease contained are for convenience and reference only, and are not intended to and shall not define, govern, limit, modify or in any manner affect the scope, meaning, or intent of any provision in this Lease contained.

F.   Successors in Interest

Except as otherwise herein provided, each and every of the terms, covenants and conditions of this Lease shall inure to the benefit of and shall bind, as the case may be, not only the parties hereto but each and every of the heirs, executors, administrators, successors, assigns and legal representatives of the parties hereto.

G.      Waivers

The waiver by either Lessee or the City of any breach of any of the covenants, agreements, obligations, conditions or provisions of this Lease must be in writing and shall not be construed to be a waiver of such covenant, agreement, obligation, condition, term or provision upon any subsequent breach of the same or of any other covenant, agreement, obligation, condition, term or provision herein contained.

H.      Gender and Number

In this Lease, whenever the context so requires, the masculine gender includes the feminine and/or neuter, and the neuter gender includes the masculine and/or feminine, and the singular number includes the plural and the plural includes the singular.

I.      Memorandum of Lease

A memorandum of this Lease, in recordable form, will be prepared, executed by both parties, and recorded in accordance with California Government Code Section 37393.

J.      No Brokers

Lessee covenants and agrees that no commission or fees are due and owing to any person or entity by reason of the execution of this Lease or the payment of rent hereunder, and Lessee shall indemnify and hold the City harmless from and against any demand, liability, claim or obligation for any such fees or commissions from any person or entity claiming to have.

K.      Good Faith and Reasonability

In the event any provision under this Lease shall require or anticipate that either party hereto make a judgment, give consent or approval, or exercise discretion, that party agrees to do so reasonably and in good faith, with due diligence, communicated to the other party in writing except in those instances where a Lease provision specifically sets forth a different standard of approval, in which case the specific standard of that Lease provision shall govern.

L.      Incorporation of Exhibits

Exhibits "A", "B", "C", "D", and "E", each as attached to this Lease, are incorporated herein and made a part hereof.

M.      Severability

If any provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions will nevertheless continue in full force without being impaired or invalidated in any way.

N.     Integration

This Lease incorporates all of the terms and conditions mentioned herein, or incidental hereto, and supersedes all negotiations and previous agreements between the parties with respect to all or part of the subject matter hereof. Any amendment or modification to this Lease must be in writing and executed by the appropriate authorities of Lessor and Lessee.

O.     Independent Review

Each party acknowledges and agrees that it has had the opportunity to thoroughly review the terms contained herein, to obtain the advice of independent legal counsel in connection therewith, and that this Lease is the product of negotiations between the parties. Consequently, the parties agree that in the event of any dispute arising out of this Lease, this instrument shall not be construed against one party, and in favor of another, based upon the fact that one party may have drafted this Lease, or a particular provision thereof.

P.     Governing Law

This Agreement is made under and shall be construed pursuant to the laws of the State of California. Any suit hereon or hereunder shall be brought only in a state or federal court sitting in the City of Los Angeles, State of California, and all parties hereto hereby agree that venue shall lie therein.

Q.     Attorneys' and Other Fees

All sums reasonably incurred by City in connection with an Event of Default or holding over of possession by Lessee after the expiration or termination of this Lease, including, but not limited to, all costs, expenses and actual accountants', appraisers', attorneys' and other professional fees, and any collection agency or other collection charges, shall be due and payable by Lessee to City on demand. In addition, in the event that any action shall be instituted by either of the parties hereto for the enforcement of any of its rights in and under this Lease, the party in whose favor judgment shall be rendered shall be entitled to recover from the other party all expenses reasonably incurred by the prevailing party in such action, including actual costs and reasonable attorneys' fees.


[THE REMAINDER OF THIS PAGE WAS INTENTIONALLY LEFT BLANK. SIGNATURES FOLLOW.]

IN WITNESS WHEREOF, the parties hereto have executed this Lease the date and year first above written.

"CITY"

CITY OF TORRANCE,
a municipal corporation

By: _____

Dan Walker
City Mayor

ATTEST:

_____
Sue Herbers, CMC
City Clerk

APPROVED AS TO FORM:
JOHN L. FELLOWS III, City Attorney

By: _____

[Signatures continued on next page]

[Signatures continued from previous page]

"LESSEE"

HI-SHEAR CORPORATION,
a Delaware corporation

By: _____

Name:  Mary Hanley

Its:  CFO and Secretary

STATE OF CALIFORNIA )
) ss.
COUNTY OF _LOS ANGELES_ )

On _JULY 22, 2004_, before me, _A. L. MANALILI_, Notary Public, personally appeared _MARY HANLEY_, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

_____
Notary Public

[SEAL]

A. L. MANALILI
Commission # 1473523
Notary Public - California
Los Angeles County
My Comm. Expires Mar 2, 2008

STATE OF CALIFORNIA )
) ss.
COUNTY OF _LOS ANGELES_ )

On _AUGUST 4, 2004_, before me, _A. L. MANALILI_, Notary Public, personally appeared _DAN WALKER and SUE HERBERS_, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

_____
Notary Public

[SEAL]

A. L. MANALILI
Commission # 1473523
Notary Public - California
Los Angeles County
My Comm. Expires Mar 2, 2008

v15·062579·0068
470523.09 PS104

-48-

STATE OF CALIFORNIA            )
                              ) ss.
COUNTY OF                      )

    On _____, before me, _____, Notary Public,
personally appeared _____,
personally known to me (or proved to me on the basis of satisfactory evidence) to be the
person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s)
acted, executed the instrument.

    Witness my hand and official seal.

                   _____
                   Notary Public

[SEAL]


STATE OF CALIFORNIA            )
                              ) ss.
COUNTY OF                      )

    On _____, before me, _____, Notary Public,
personally appeared _____,
personally known to me (or proved to me on the basis of satisfactory evidence) to be the
person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s)
acted, executed the instrument.

    Witness my hand and official seal.

                   _____
                   Notary Public

[SEAL]

STATE OF CALIFORNIA          )
                             ) ss.
COUNTY OF                    )

     On _____, before me, _____, Notary Public,
personally appeared _____,
personally known to me (or proved to me on the basis of satisfactory evidence) to be the
person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s)
acted, executed the instrument.

     Witness my hand and official seal.

_____
Notary Public

[SEAL]

EXHIBIT "A"

## LEGAL DESCRIPTION OF THE LEASED PREMISES

The real property is located in the County of Los Angeles, State of California and is more particularly described as follows:

That portion of Parcel 32 of Official Map No. 2 in the City Of Torrance, County of Los Angeles, State Of California, as Recorded in Book 5 pages 44 - 51 in the Office of Said County Recorder, Described as beginning at the Northeasterly corner of said Parcel 32, Thence Along Northerly Line of Parcel 32 North 62 Degrees 26 Minutes 06 Seconds Said Northerly Line Also being the Southerly Line of Skypark Drive 861.69 Feet, Thence leaving the Northerly line of Parcel 32 South 27 degrees 33 Minutes 44 Seconds West 422.25 feet, Thence South 6 Degrees 21 Minutes 11 Seconds East 61.46, Thence South 51 Degrees 21 Minutes 11 Seconds West 106.10 Feet, Thence South 38 Degrees 38 Minutes 49 Seconds West 180.61 Feet to a point on the Southerly line of Parcel 32, Thence along the Southerly line of Parcel 32 South 51 Degrees 21 Minutes 11 Seconds East 759.70 Feet, Thence North 38 Degrees 38 Minutes 49 Seconds 65.00 Feet, Thence North 27 Degrees 33 Minutes 54 Seconds East 753.32 Feet to the northeasterly corner of Parcel 32.

**TOGETHER WITH** a nonexclusive easement (the "Remediation Easement") over, under, and across that certain real property located in the County of Los Angeles, State of California and is more particularly described as follows (the "Remediation Easement Area"):

That portion of Parcel 32 of Official Map No. 2 in the City Of Torrance, County of Los Angeles, State Of California, as Recorded in Book 5 pages 44 - 51 in the Office of Said County Recorder, Described as beginning at the Northwesterly corner of said Parcel 32, Thence South 62 Degrees 26 Minutes 06 Seconds East 938.12 along the northerly line of Parcel 32, said northerly line also being the Southerly line of Skypark Drive, Thence leaving the Northerly line of Parcel 32 South 27 degrees 33 Minutes 44 Seconds West 422.25 feet, Thence South 6 Degrees 21 Minutes 11 Seconds East 61.46, Thence South 51 Degrees 21 Minutes 11 Seconds West 106.10 Feet, Thence South 38 Degrees 38 Minutes 49 Seconds West 180.61 Feet to a point on the Southerly line of Parcel 32, Thence along the Southerly line of Parcel 32 North 51 Degrees 21 Minutes 11 Seconds West 162.50 Feet, Thence Continuing along the Southerly line of Parcel 32 North 38 Degrees 38 Minutes 49 Seconds East 65.00 feet, Thence Continuing along the Southerly line of Parcel 32 North 51 Degrees 21 Minutes 11 Seconds West 911.77 Feet to the Westerly Line of Parcel 32, Thence Along the Westerly Line of Parcel 32 North 27 Degrees 33 Minutes 54 Seconds East 401.10 Feet to the Northwesterly corner of Parcel 32.

Lessee may use the foregoing Remediation Easement for each of the following purposes so long as Lessee shall avoid or, to the extent possible, minimize interference with the development, use, and/or operation of the premises affected by the Remediation Easement:

i) Vehicular and pedestrian entry on and over and access to the Remediation Easement Area, including, without limitation, those area(s) of the Remediation Easement Area upon which currently exist monitoring wells which sample the soil, soil vapor and/or groundwater, by Lessee, its agents, consultants, attorneys, contractors, engineers, employees and other representatives ("Permittees") for the purpose of conducting any environmental tests or samples of the soil, soil vapor and/or groundwater of the Remediation Easement Area that Lessee may deem necessary or appropriate for the characterization, analysis, monitoring and/or remediation (collectively, the "Remediation") of the Leased Premises and/or the Remediation Easement Area; and

ii) The Remediation of any Hazardous Material Condition (as hereinafter defined) and for the installation, inspection, use, operation, maintenance, repair and removal by Lessee and its Permittees of any of Lessee's "Remediation Equipment" (as hereinafter defined) which currently exists or is later installed on the Property in connection with the Remediation of any Hazardous Material Condition. As used herein, the term "Remediation Equipment" means; (a) any and all existing facilities for Remediation which are now located in, on, under or about the Remediation Easement Area; (b) any new facilities for Remediation that may be installed in, on, under or about the Remediation Easement Area and/or (c) any facilities that may be required by an any governmental authority with jurisdiction over any Hazardous Material Condition and/or the Leased Premises or the Remediation Easement Area to be installed and (d) any replacements and upgrades of the facilities described in (a)-(c) of this sentence. Remediation Equipment shall include, without limitation, monitoring, containment, extraction, treatment and discharge facilities, structures, equipment, devices, pipes, systems or other infrastructure items for Remediation. As used herein, the term "Hazardous Material Condition" means the presence on, in or under the Leased Premises and/or the Remediation Easement Area (including without limitation the soil, soil vapor and/or groundwater of same) of any Hazardous Material at levels of contamination that require Remediation under standards required by applicable Environmental Laws.

**TOGETHER WITH** a nonexclusive easement (the "Watermain Easement") over, under, and across a 14' strip of land located along the westernmost boundary of the adjacent premises, more particularly depicted on Exhibit "B" (the "Watermain Easement Area").

**RESERVING THEREFROM,** together with the right to grant and transfer same, a nonexclusive easement and right-of-way (the "Road Easement") for the purposes of access over and across a 28' strip of land located along the westernmost boundary of the Leased Premises, more particularly depicted on Exhibit "B" (the "Road Easement Area").





EXHIBIT "B"

DEPICTION OF THE LEASED PREMISES

[SEE ATTACHED]

EXHIBIT "B"
TO LEASE



PAR 31

PAR 30

N 27°33'54" E
753.32'

L-6

HI-SHEAR CORPORATION

NORTHEASTERLY CORNER OF PARCEL 32

N 62°26'06" W
861.69'

32B
14.00 AC
610,036 SQFT

N 51°21'11" W
759.70'
PARCEL 45

L-2

L-3

L-1

SKYPARK DRIVE

S 62°26'06" W   L=1799.81'

PARCEL 32

S 27°33'44" W
422.25'

L-5

L-4

TORRANCE AIRPORT

NOT A PART OF THIS LEASE

S 62°26'06" E
9.38.12'

NORTHWESTERLY CORNER OF PARCEL 32

32A
11.22 AC.
488,814 SQFT

N 51°21'11" W
911.77'
PARCEL 45

NORTH

NORTHWESTERLY CORNER OF PARCEL 32

N 27°33'54" E
401.10'

PAR 33

| LINE TABLE | | |
|------|--------------|----------|
| LINE | BEARING | DISTANCE |
| L-1 | S 6°21'11" E | 61.46' |
| L-2 | S 51°21'11" W | 106.10' |
| L-3 | S 38°38'49" W | 180.61' |
| L-4 | N 51°21'11" W | 162.50' |
| L-5 | N 38°38'49" E | 65.00' |
| L-6 | N 38°38'49" E | 65.00' |

Bryant·Palmer·Soto Inc.

DATED 5-0'-04

EXHIBIT "C"

DESCRIPTION OF THE PROJECT AND CONCEPTUAL PLANS

[SEE ATTACHED]

EXHIBIT "C"
TO LEASE



Hi-Shear Lease
Torrance CA
LA CAZE DEVELOPMENT

28 October 2003   Project No  03-0025:126

Bryant·Palmer·Soto Inc.

EXHIBIT "D"

QUITCLAIM DEED AND RELEASE

[SEE ATTACHED]

EXHIBIT "D"
TO LEASE

Recorded May 13, 1948
BOOK __27145__ Pages __362-368 Incl.__

## QUITCLAIM DEED

THIS INDENTURE, made this __5th__ day of __March__,
1948, between the United States of America, acting by and through
the War Assets Administration, and pursuant to Reorganization Plan
1 of 1947 (12 F.R. 4534), and pursuant to the powers and authority
contained in the provisions of the Surplus Property Act of 1944
(58 Stat. 765) as amended, and applicable rules, regulations and
orders, GRANTOR and the City of Torrance, a municipal corporation
under the laws of the State of California, acting by and through
its City Council, GRANTEE.

WITNESSETH: That the said Grantor, for and in consider-
ation of the assumption by the Grantee of all the obligations and
its taking subject to certain reservations, restrictions, and
conditions, and its covenant to abide by certain other reservations,
restrictions, and conditions, all as set out hereinafter, has
remised, released, and forever quitclaimed, and by these presents
does remise, release, and forever quitclaim unto the said Grantee,
its successors, and assigns, under and subject to the reservations,
restrictions, and conditions, exceptions and rights hereinafter set
out, all its right, title, and interest in the following described
property situated in the County of Los Angeles, State of California,
to wit:

That portion of Lot 1 of Tract No. 9765, as per map
recorded in Book 170, Pages 10, 11 and 12 of Maps, in
the office of the County Recorder of Los Angeles
County, in the City of Torrance, County of Los Angeles,
State of California, and described as follows:

Beginning at the northeasterly corner of said Lot 1;
thence along the East line of said Lot 1, South
0° 03' 45" East 4302.77 feet to the center line of the
Pacific Coast Highway, 100 feet wide, as described in
the deed to the State of California recorded in Book
12743, Page 23 of Official Records of said county; thence
along said center line as follows:

South 89° 56' 15" West 26.04 feet to the beginning of
curve concave northerly and having a radius of 1146.28
feet; thence westerly along the arc of said curve
821.34 feet; thence North 49° 00' 30" West 2390.48 feet;
thence North 49° 00' 56" West 11.96 feet to the be-
ginning of a curve concave northeasterly and having a
radius of 14,000 feet; thence along the arc of said
curve 777.84 feet; thence North 45° 49' 56" West 3481.23
feet to the beginning of a curve concave southwesterly
and having a radius of 3000 feet; thence northwesterly
along the arc of said curve 400.42 feet to the inter-
section of said center line with the West line of said
Lot 1; thence along said West line North 0° 01' 26"
West 1783.98 feet; thence South 51° 45' 55" East 6984.73
feet; thence North 38° 14' 05" East, 550 feet; thence
North 51° 45' 55" West 6534.21 feet to a point on the
northeasterly line of said Lot 1, said last mentioned

EXHIBIT "H"

Recorded May 13, 1948
BOOK 27145   Pages 362-368 Incl.

point being distant along said northeasterly line
South 62° 50' 50" East, 780.39 feet from the most
northerly corner of said Lot 1; thence South 62° 50' 50"
East along the said northeasterly line of Lot 1, a
distance of 5921.76 feet to the northeasterly corner of
said Lot 1, the point of beginning, containing 385.463
acres, more or less;

Excepting therefrom:

PARCEL 1-A

An easement for embankment slopes upon, over and across
that portion of said Lot 1 of Tract No. 9765, described
as follows:

Beginning at the most northerly corner of said Lot 1;
thence South 62° 50' 50" East along the northeasterly
line of said Lot 1, a distance of 780.39 feet; thence
South 51° 45' 55" East 3334.31 to the TRUE POINT OF
BEGINNING OF PARCEL 1-A;

Thence South 54° 37' 40" East a distance of 400.50 feet
more or less; thence South 51° 45' 55" East 2300 feet;
thence South 46° 03' 17" East 201 feet; thence North
51° 45' 55" West 2900 feet to the true point of be-
ginning;

and excepting therefrom:

PARCEL 1-B

An easement for road purposes upon, over and across that
portion of said Lot 1 of Tract 9765, included within a
strip of land 40 feet wide, being 20 feet on each side of
the following described center line:

Beginning at the most northerly corner of said Lot 1;
thence South 62° 50' 50" East along the northeasterly
line of said Lot 1, a distance of 780.39 feet; thence
South 51° 45' 55" East 6534.31 feet; thence South
38° 14' 05" West 230 feet to the TRUE POINT OF BEGINNING
OF PARCEL 1-B;

Thence South 51° 45' 55" East 159.79 feet; thence
southwesterly 133.72 feet along the arc of a curve
concave northeasterly and having a radius of 200 feet;
thence North 89° 55' 35" East 50.37 feet, to a point on
the westerly prolongation of the center line of 251st
Street, shown as Almond Street on map recorded in Book
17, page 125 of Maps, in the office of the County Recorde
of Los Angeles County, State of California, said point
being South 0° 03' 45" East, 25 feet from the southwest
corner of Lot 10 of Tract No. 592 as shown on said map
recorded in Book 17, page 125 of Maps;

and excepting therefrom:

EXHIBIT "H"
Page 2 of 8 Pages

Recorded May 13, 1948
BOOK __27145__ Pages __362-368 Incl.__

## PARCEL 1-C

An easement for drainage facilities upon, over and
across that portion of said Lot 1 of Tract No. 9765,
included within a strip of land 52 feet wide, being
26 feet on each side of the following described center
line:

Beginning at a point on the northeasterly line of said
Lot 1, distant thereon, South 62° 50' 50" East 3978.62
feet from the most northerly corner of said Lot; thence
South 0° 50' 55" East, 782.14 feet; thence South
15° 09' 05" West 848.57 feet;

Thence southwesterly along a curve concave north-
westerly, tangent to last described line and having
a radius of 520.60 feet; through an angle of 49° 30'
and an arc distance of 449.77 feet; thence tangent
South 64° 39' 05" West, 605 feet to a point in an
existing drainage channel:

AND ALSO, an easement for drainage facilities upon,
over and across that portion of said Lot 1, included
within a strip of land 32 feet wide, being 16 feet on
each side of the following described center line:

Beginning at the Southerly terminus of that certain
course herein described as having a length of 848.57
feet; thence southeasterly along a curve concave
northeasterly, tangent to said course having a length
of 848.57 feet and having a radius of 550 feet,
through an angle of 41° 00', an arc length of 393.57
feet; thence tangent South 25° 50' 55" East, a distance
of 574.06 feet; thence southerly along a curve concave
Westerly, tangent to last described course and having
a radius of 500 feet, through an angle of 25° 39', an
arc distance of 223.84 feet; thence tangent South
0° 11' 55" East, a distance of 200 feet to a point in
an existing drainage channel.

TOGETHER WITH those certain chattel enumerated in Exhibit
"B" attached hereto and made a part hereof; and TOGETHER WITH all
buildings, structures, and improvements located thereon, except
those thirty-four (34) structures hereinafter enumerated, and
described in a certain inventory attached hereto and made a part
hereof, marked Exhibit "A", and located on that portion of the
demised premises more particularly described in said Exhibit "A",
being a part of the same property acquired by the United States of
America under proceedings in condemnation had in Case No. 2527-PH,
Civil, of record in the District Court of the United States,
Southern District of California, Central Division.

The above described premises are transferred subject to
the following encumbrances:  All existing easements for roads,
highways, public utilities, railways, and pipe lines; leasehold
interest executed by the Grantor as Lessor and by A.P. Wright as

Recorded May 13, 1948
BOOK _27145_ Pages 362-368 Incl.

Lessee, designated as Lease No. W-04-193-Eng.-4974, dated April 17,
1945; and the right of the United States of America to occupy use,
and maintain in place, together with reasonable means of ingress
and egress without payment to the Grantee, its successors, or
assigns, all the buildings and structures enumerated in Exhibit
"A", and located on the demised premises.

EXCEPTING, HOWEVER, from this conveyance all right, title,
and interest in and to all property in the nature of equipment,
furnishings, and other personal property which can be removed from
the land without material injury to the land or structures located
thereon other than those chattels enumerated in Exhibit "B"; and
reserving to the Grantor the right of removal from the premises of
the personal property excepted hereby within a reasonable period
of time after the date hereof, which shall not be construed to
mean any period less than one (1) year after the date of this
instrument.

AND FURTHER EXCEPTING, from this conveyance and reserv-
ing to the GRANTOR, in accordance with Executive Order 9908
approved December 5, 1947 (12 F.R. 8223), all uranium, thorium,
and all other materials determined pursuant to section 5 (b) (1)
of the Atomic Energy Act of 1946 (60 Stat. 761) to be peculiarly
essential to the production of fissionable material, contained, in
whatever concentration, in deposits in the lands covered by this
instrument, together with the right of the United States through
its authorized agents or representatives at any time to enter upon
the land and prospect for, mine, and remove the same, making just
compensation for any damage or injury occasioned thereby. However,
such land may be used, and any rights otherwise acquired by this
disposition may be exercised, as if no reservation of such material
had been made; except that, when such use results in the extraction
of any such material from the land in quantities which may not be
transferred or delivered without a license under the Atomic Energy
Act of 1946, as it now exists or may hereafter be amended, such
material shall be the property of the United States Atomic Energy
Commission, and the Commission may require delivery of such
material to it by any possessor thereof after such material has
been separated as such from the ores in which it was contained.
If the Commission requires the delivery of such material to it, it
shall pay to the person mining or extracting the same, or to such
other person as the Commission determines to be entitled thereto,
such sums, including profits as the Commission deems fair and
reasonable for the discovery, mining, development, production,
extraction and other services performed with respect to such
material prior to such delivery, but such payment shall not includ
any amount on account of the value of such material before removal
from its place of deposit in nature. If the Commission does not
require delivery of such material to it, the reservation hereby
made shall be of no further force or effect.

AND FURTHER EXCEPTING from this conveyance and reserving
to the Grantor all minerals, other than those specifically men-
tioned in the last paragraph above, and all petroleum in the above
described land, together with the exclusive right at any and all
times to enter upon the lands and prospect for, mine for, and
remove such minerals or petroleum, with all necessary and conven-

Recorded May 13, 1948
BOOK _27145_ Pages _362-368 Incl._

ient means of working and transporting the materials and supplies;
and reserving unto the Grantor the exclusive right at any time to
drill from adjacent premises into and through the sub-surface of
the land hereby transferred, in order to recover, remove, and
transport therefrom any minerals or petroleum herein reserved.  By
accepting this instrument, or any rights hereunder, the said Grantee
hereby releases the Grantor from any and all liability for all
claims and losses or damage arising out of the exceptions and
reservations above.

          Said property transferred hereby was duly declared
surplus and was assigned to the War Assets Administration for
disposal, acting pursuant to the provisions of the above-mentioned
Act, as amended, Executive Order 9689, and applicable rules, reg-
ulations, and orders.

          By the acceptance of this deed or any rights hereunder,
the said Grantee, for itself, its successors, and assigns agrees
that transfer of the property transferred by this instrument, is
accepted subject to the following restrictions set forth in sub-
paragraphs (1) and (2) of this paragraph, which shall run with
the land, imposed pursuant to the authority of Article 4, Section
3, Clause 2 of the Constitution of the United States of America,
the Surplus Property Act of 1944, as amended, Reorganization Plan
1 of 1947 (12 F.R. 4534), and applicable rules, regulations, and
orders:

          (1)  That all of the property transferred hereby, here-
after in this instrument called the "airport", shall be used for
public airport purposes, and only for such purposes, on reason-
able terms and without unjust discrimination and without grant or
exercise of any exclusive right for use of the airport within the
meaning of Section 303 of the Civil Aeronautics Act of 1938.

          (2)  That the entire landing area, as hereinafter def-
ined, and all structures, improvements, facilities, and equipment
of the airport shall be maintained at all times in good and
serviceable condition to assure its efficient operation; provided,
however, that such maintenance shall be required as to structures,
improvements, facilities, and equipment only during the remainder
of their estimated life, as determined by the Civil Aeronautics
Administration or its successor Government agency.  In the event
materials are required to rehabilitate or repair certain of the
aforementioned structures, improvements, facilities, or equipment
they may be procured by demoliton of other structures, improve-
ments, facilities, or equipment transferred hereby and located on
the above-described premises, which have outlived their use as
airport property in the opinion of the Civil Aeronautics Admin-
istration or its successor Government agency.

          By the acceptance of this deed or any rights hereunder,
the said Grantee for itself, its successors, and assigns, also
assumes the obligations of, covenants to abide by, and agrees to,
and this transfer is made subject to, the following reservations
and restrictions set forth in subparagraphs (1) to (6) of this
paragraph, which shall run with the land, imposed pursuant to the

EXHIBIT "H"
Page 5 of 8 Pages

Recorded May 13, 1948
BOOK _27145_ Pages_362-368 Incl._

authority of Article 4, Section 3, Clause 2 of the Constitution
of the United States of America, the Surplus Property Act of 1944,
as amended, Reorganization Plan 1 of 1947 (12 F.R. 4534), and
applicable rules, regulations and orders:

(1)  That insofar as is within its power and reasonably
possible, the Grantee and all subsequent transferees shall prevent
any use of land either within or outside the boundaries of the
airport, including the construction, erection, alteration, or
growth of any structure or other object thereon, which use would
be a hazard to the landing, taking-off, or maneuvering of aircraft
at the airport, or otherwise limit its usefulness as an airport.

(2)  That the building areas and non-aviation facilities,
as such terms are hereinafter defined, of or on the airport shall
be used, altered, modified, or improved only in a manner which does
not interfere with the efficient operation of the landing area and
of the airport facilities, as hereinafter defined.

(3)  That itinerant aircraft owned by the United States
of America (hereinafter sometimes referred to as the "Government")
or operated by any of its employees or agents on Government bus-
iness shall at all times have the right to use the airport in
common with others; Provided, however, that such use may be limited
as may be determined at any time by the Civil Aeronautics Admin-
istration or its successor Government agency to be necessary to
prevent interference with use by other authorized aircraft, so long
as such limitation does not restrict Government use to less than
twenty-five (25) per centum of capacity of the landing area of the
airport.  Government use of the airport by virtue of the provisions
of this subparagraph shall be without charge of any nature other
than payment for damage caused by such itinerant aircraft.

(4)  That during the existence of any emergency declared
by the President of the United States of America or the Congress
thereof, the Government shall have the right without charge, ex-
cept as indicated below, to the full, unrestricted possession,
control, and use of the landing area, building areas, and airport
facilities, as such terms are hereinafter defined, or any part
thereof, including any additions or improvements thereto made sub-
sequent to the declaration of any part of the airport as surplus;
Provided, however, that the Government shall be responsible during
the period of such use for the entire cost of maintaining all such
areas, facilities, and improvements, or the portions used, and
shall pay a fair rental for the use of any installations or struct
ures which have been added thereto without Federal aid.

(5)  That no exclusive right for the use of any landing
area or air navigation facilities, included in or on the airport
shall be granted or exercised.

(6)  That the property transferred hereby may be succes-
sively transferred only with the approval of the Civil Aeronautic
Administration or its successor Government agency, and with the
proviso that any such subsequent transferee assumes all the obli-
gations imposed upon the Grantee by the provisions of this instru-
ment.

Recorded May 13, 1948
BOOK 27145 Pages 362-368 Incl.

As used in this Quitclaim Deed, the following terms shall
have the following meanings:

(a) "Landing Area" means any land, or combination of
water and land, together with improvements thereon and necessary
operational equipment used in connection therewith, which is used
for landing, take-offs, and parking of aircraft. The term includes
but is not limited to, runways, strips, taxiways, and parking
aprons.

(b) "Building Area" means any land other than a landing
area, used or necessary for or in connection with the operation or
maintenance of an airport.

(c) "Non-aviation facilities" means any building, struct-
ures, improvements and equipment located in a building area and
used in connection with, but not required for the efficient
operation and maintenance of the landing area or the airport
facilities.

(d) "Airport facilities" means any buildings, structures,
improvements and operational equipment other than non-aviation
facilities, which are used and necessary for or in connection with
the operation and maintenance of an airport.

By acceptance of this instrument or any rights hereunder,
the Grantee further agrees with the Grantor as follows:

(1) That upon a breach of any of the aforesaid reser-
vations or restrictions by the Grantee or any subsequent trans-
feree, whether caused by the legal inability of said Grantee or
subsequent transferee to perform any of the obligations herein
set out, or otherwise, the title, right of possession, and all
other rights transferred to the Grantee, or any portion thereof,
shall at the option of the Grantor revert to and become the
property of the United States of America upon demand made in
writing by the War Assets Administration or its successor Govern-
ment agency at least sixty (60) days prior to the date fixed for
the revesting of such title, right of possession, and other rights
transferred, or any portion thereof: Provided, that, as to
installations or structures which have been added to the premises
without Federal aid, the United States of America, shall have the
option to acquire title to or use of the same at the then fair
market value of the rights therein to be acquired by the United
States of America.

(2) That if the construction as covenants of any of
the foregoing reservations and restrictions recited herein as
covenants, or the application of the same as covenants in any
particular instance is held invalid, the particular reservations o
restrictions in question shall be construed instead merely as
conditions upon the breach of which the Grantor may exercise its
option to cause the title, right of possession and all other
rights transferred to the Grantee, or any portion thereof, to
revert to the United States of America, and the application of su
reservations or restrictions as covenants in any other instance a

EXHIBIT "H"
Page 7 of 8 Pages

Recorded May 13, 1948
BOOK _27145_ Pages _367-368 Incl._

the construction of the remainder of such reservations and restrictions as covenants shall not be affected thereby.

TO HAVE AND TO HOLD the said premises, with appurtenances, except those rights excepted and reserved above, and under and subject to the aforesaid reservations, restrictions, and conditions, unto the said Grantee, its successors, and assigns forever.

IN WITNESS WHEREOF, the Grantor has caused these presents to be executed as of the day and year first above written.

THE UNITED STATES OF AMERICA
Acting by and through
WAR ASSETS ADMINISTRATION

By _s/  ROBERT P. ALFORD_
   DEPUTY REGIONAL DIRECTOR
   For Real Property Disposal
   Los Angeles Regional Office
   War Assets Administration

WITNESSES:

s/  Devera L. Scholnek

s/  Doris Goodman

[EXHIBIT "E"]

FAA PROVISIONS AND AVIGATION REQUIREMENTS

[SEE ATTACHED]

EXHIBIT "E"
TO LEASE

## FEDERAL AVIATION ADMINISTRATION PROVISIONS

Lessee agrees to observe the following provisions required by the Federal Aviation Administration:

(a)  Lessee in the operations to be conducted pursuant to the provisions of this lease and otherwise in the use of the airport, will not discriminate or permit discrimination against any person or class of persons by reason of race, color, creed or national origin in any manner prohibited by Part 15 of the Federal Aviation Regulations or any amendments thereto.

(b)  Lessee shall furnish its accomodations and/or services on a fair, equal and not unjustly discriminatory basis to all users thereof and it shall charge fair, reasonable and not unjustly discriminatory prices for each unit of service:  PROVIDED, THAT the Lessee may be allowed to make reasonable and non-discriminatory discounts, rebates, or other similar type of price reductions to volume purchasers.

(c)  Lessee shall make its accomodations and/or services available to the public on fair and reasonable terms without unjust discrimination on the basis of race, creed, color or national origin.

(d)  Non-compliance with provisions (a), (b) and (c) above shall constitute a material breach thereof and in the event of such non-compliance the City shall have the right to terminate this lease and the estate hereby created without liability therefor or, at the election of the City or the United States, either or both said Governments shall have the right to judicially enforce said provisions (a), (b) and (c).

(e)  Lessee agrees that it shall insert the above four provisions in any lease by which said Lessee grants a right or privilege to any person, firm or corporation to render accomodations and/or services to the public on the premises herein leased.

(f)  The City reserves the right to further develop or improve the landing area of the airport as it sees fit, regardless of the desires or view of the Lessee, and without interference or hindrance.

(g)  The City reserves the right, but shall not be obligated to the Lessee, to maintain and keep in repair the landing area of the airport and all publicly-owned facilities of the airport, together with the right to direct and control all activities of the lessee in this regard.

(h)  This lease shall be subordinate to the provisions and requirements of any existing or future agreement between the City and the United States, relative to the development, operation or maintenance of the airport.

(i)  Lessee agrees to comply with the notification and review requirements covered in Part 77 of the Federal Aviation Regulations in the event any future structure or building is planned for the leased premises, or in the event of any planned modification or alteration of any present or future building or structure situated on the leased premises.

(j)  It is understood and agreed that nothing herein contained shall be construed to grant or authorize the granting of an exclusive right within the meaning of Section 308 of the Federal Aviation Act.

(k)  This lease and all the provisions hereof shall be subject to whatever right the United States Government now has or in the future may have or acquire, affecting the control, operation, regulation and taking over of said airport or the exclusive or non-exclusive use of the airport by the United States during the time of war or national emergency.

EXHIBIT  "I"

Page 1 of 1 Page

EXHIBIT "I"



# C I T Y    O F
# T O R R A N C E

### CITY MANAGER'S OFFICE

**LeRoy J. Jackson**
City Manager

Brian Sunshine
Assistant to the City Manager
(310) 618-5880
bsunshine@torrnet.com

October 9, 2006

Hi-Shear Corporation
Attn: Mary Hanley or Chief Financial Officer
2600 Skypark Drive
Torrance, California 90509

**Subject: Scrivener's error Legal Description Exhibit "A" Lease Number C2004-154**

Dear Ms. Hanley:

Please find attached a revised legal description for your Lease with the City of Torrance.
The revised Exhibit "A" has a correction to a scrivener's error that does not change any of
your lease area boundaries. The correction to the legal description is found as follows:

> That portion of Parcel 32 of Official Map No. 2 in the City Of Torrance,
> County of Los Angeles, State Of California, as Recorded in Book 5 pages
> 44 - 51 in the Office of Said County Recorder, Described as beginning at
> the Northeasterly corner of said Parcel 32, Thence Along Northerly Line of
> Parcel 32 North 62 Degrees 26 Minutes 06 Seconds Said Northerly Line
> Also being the Southerly Line of Skypark Drive 861.69 Feet, Thence
> leaving the Northerly line of Parcel 32 South 27 degrees 33 Minutes 44
> Seconds West 422.25 feet, Thence South 6 Degrees 21 Minutes 11
> Seconds East 61.46, Thence South 51 Degrees 21 Minutes 11 Seconds
> West East 106.10 Feet, Thence South 38 Degrees 38 Minutes 49 Seconds
> West 180.61 Feet to a point on the Southerly line of Parcel 32, Thence
> along the Southerly line of Parcel 32 South 51 Degrees 21 Minutes 11
> Seconds East 759.70 Feet, Thence North 38 Degrees 38 Minutes 49
> Seconds 65.00 Feet, Thence North 27 Degrees 33 Minutes 54 Seconds
> East 753.32 Feet to the northeasterly corner of Parcel 32.

Please insert the revised Legal Description with the documents you have on file for this Lease.

If you have any questions, feel free to call me at 310-618-5887.

Sincerely,

Brian K. Sunshine
Assistant to the City Manager

Attachment:
Exhibit "A" to Lease as corrected

CC:
City Clerk
3031 Torrance Boulevard
Torrance, CA  90503

James D. Robinson
Kelly Lytton & Vann, LLP
1900 Avenue of the Stars, Suite 1450
Los Angeles, California  90067

EXHIBIT "A"

LEGAL DESCRIPTION OF THE LEASED PREMISES

The real property is located in the County of Los Angeles, State of California and is more particularly described as follows:

That portion of Parcel 32 of Official Map No. 2 in the City Of Torrance, County of Los Angles, State Of California, as Recorded in Book 5 pages 44 – 51 in the Office of Said County Recorder, Described as beginning at the Northeasterly corner of said Parcel 32, Thence Along Northerly Line of Parcel 32 North 62 Degrees 26 Minutes 06 Seconds Said Northerly Line Also being the Southerly Line of Skypark Drive 861.69 Feet, Thence leaving the Northerly line of Parcel 32 South 27 degrees 33 Minutes 44 Seconds West 422.25 feet, Thence South 6 Degrees 21 Minutes 11 Seconds East 61.46, Thence South 51 Degrees 21 Minutes 11 Seconds East 106.10 Feet, Thence South 38 Degrees 38 Minutes 49 Seconds West 180.61 Feet to a point on the Southerly line of Parcel 32, Thence along the Southerly line of Parcel 32 South 51 Degrees 21 Minutes 11 Seconds East 759.70 Feet, Thence North 38 Degrees 38 Minutes 49 Seconds 65.00 Feet, Thence North 27 Degrees 33 Minutes 54 Seconds East 753.32 Feet to the northeasterly corner of Parcel 32

**TOGETHER WITH** a nonexclusive easement (the "Remediation Easement") over, under, and across that certain real property located in the County of Los Angeles, State of California and is more particularly described as follows (the "Remediation Easement Area"):

That portion of Parcel 32 of Official Map No. 2 in the City Of Torrance, County of Los Angeles, State Of California, as Recorded in Book 5 pages 44 - 51 in the Office of Said County Recorder, Described as beginning at the Northwesterly corner of said Parcel 32, Thence South 62 Degrees 26 Minutes 06 Seconds East 938.12 along the northerly line of Parcel 32, said northerly line also being the Southerly line of Skypark Drive, Thence leaving the Northerly line of Parcel 32 South 27 degrees 33 Minutes 44 Seconds West 422.25 feet, Thence South 6 Degrees 21 Minutes 11 Seconds East 61.46, Thence South 51 Degrees 21 Minutes 11 Seconds West 106.10 Feet, Thence South 38 Degrees 38 Minutes 49 Seconds West 180.61 Feet to a point on the Southerly line of Parcel 32, Thence along the Southerly line of Parcel 32 North 51 Degrees 21 Minutes 11 Seconds West 162.50 Feet, Thence Continuing along the Southerly line of Parcel 32 North 38 Degrees 38 Minutes 49 Seconds East 65.00 feet, Thence Continuing along the Southerly line of Parcel 32 North 51 Degrees 21 Minutes 11 Seconds West 911.77 Feet to the Westerly Line of Parcel 32, Thence Along the Westerly Line of Parcel 32 North 27 Degrees 33 Minutes 54 Seconds East 401.10 Feet to the Northwesterly corner of Parcel 32.

Hi-Shear corrected legal

Lessee may use the foregoing Remediation Easement for each of the following purposes so long as Lessee shall avoid or, to the extent possible, minimize interference with the development, use, and/or operation of the premises affected by the Remediation Easement:

i)     Vehicular and pedestrian entry on and over and access to the Remediation Easement Area, including, without limitation, those area(s) of the Remediation Easement Area upon which currently exist monitoring wells which sample the soil, soil vapor and/or groundwater, by Lessee, its agents, consultants, attorneys, contractors, engineers, employees and other representatives ("Permittees") for the purpose of conducting any environmental tests or samples of the soil, soil vapor and/or groundwater of the Remediation Easement Area that Lessee may deem necessary or appropriate for the characterization, analysis, monitoring and/or remediation (collectively, the "Remediation") of the Leased Premises and/or the Remediation Easement Area; and

ii)     The Remediation of any Hazardous Material Condition (as hereinafter defined) and for the installation, inspection, use, operation, maintenance, repair and removal by Lessee and its Permittees of any of Lessee's "Remediation Equipment" (as hereinafter defined) which currently exists or is later installed on the Property in connection with the Remediation of any Hazardous Material Condition. As used herein, the term "Remediation Equipment" means; (a) any and all existing facilities for Remediation which are now located in, on, under or about the Remediation Easement Area; (b) any new facilities for Remediation that may be installed in, on, under or about the Remediation Easement Area and/or (c) any facilities that may be required by an any governmental authority with jurisdiction over any Hazardous Material Condition and/or the Leased Premises or the Remediation Easement Area to be installed and (d) any replacements and upgrades of the facilities described in (a)-(c) of this sentence. Remediation Equipment shall include, without limitation, monitoring, containment, extraction, treatment and discharge facilities, structures, equipment, devices, pipes, systems or other infrastructure items for Remediation. As used herein, the term "Hazardous Material Condition" means the presence on, in or under the Leased Premises and/or the Remediation Easement Area (including without limitation the soil, soil vapor and/or groundwater of same) of any Hazardous Material at levels of contamination that require Remediation under standards required by applicable Environmental Laws.

**TOGETHER WITH** a nonexclusive easement (the "Watermain Easement") over, under, and across a 14' strip of land located along the westernmost boundary of the adjacent premises, more particularly depicted on Exhibit "B" (the "Watermain Easement Area").

**RESERVING THEREFROM,** together with the right to grant and transfer same, a nonexclusive easement and right-of-way (the "Road Easement") for the purposes of access over and across a 28' strip of land located along the westernmost boundary of the Leased Premises, more particularly depicted on Exhibit "B" (the "Road Easement Area").

Hi-Shear corrected legal