1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11

12   CITY OF TORRANCE,                    | Case No. 2:17-cv-07732-FWS-JPR

13          Plaintiff,                    | Judge:   Hon. Fred W. Slaughter

14     vs.                               | **CONSENT DECREE BETWEEN PLAINTIFF CITY OF TORRANCE AND DEFENDANT HI-SHEAR CORPORATION**

15   HI-SHEAR CORPORATION, a Delaware corporation, d/b/a LISI AEROSPACE; MAGELLAN AEROSPACE MIDDLETOWN, INC., an Ohio corporation; and ROBINSON HELICOPTER COMPANY, INC., a California corporation,

16

17                                       | Date Action Filed:   October 23, 2017
                                         | Trial Date:          January 27, 2026

18

19          Defendants.

20

21   AND RELATED COUNTERCLAIMS, CROSS-CLAIMS AND THIRD-PARTY COMPLAINT.

22

23

24

25

26

27

28

Rutan & Tucker, LLP
attorneys at law

## I. <u>BACKGROUND</u>

A.      Plaintiff City of Torrance ("Plaintiff" or "City") and Defendant Hi-Shear Corporation ("Hi-Shear") have agreed to a final settlement of the Plaintiff's claims against Hi-Shear and Hi-Shear's counter-claims against the City in the above referenced action ("Action").  Plaintiff and Hi-Shear are each individually referred to herein as a "Settling Party" in this Consent Decree, and are collectively referred to herein as the "Settling Parties".

B.      Plaintiff is a municipal corporation located in the County of Los Angeles and the owner of certain real property located on and within the vicinity of the Torrance Airport/Zamperini Field (the "Airport"), including specifically real property the City leases on a long term basis to various tenants, and other real property located in and around the Airport (hereafter collectively, "Airport Property").

C.      This Action involves a dispute over environmental contamination existing on and migrating from the Airport Property, including specifically, contamination on and migrating from those properties located in the City of Torrance, California at: 2600 Skypark Drive (the "Hi-Shear Property"); 2700 Skypark Drive  (the "Lowes Property"); 24751 and 24777 Crenshaw Boulevard ("EA Property 1"); 24707, 24747 and 24701 Crenshaw Boulevard ("EA Property 2"); 2530 and 2540 Skypark Drive ("EA Property 3"); and the property making up the former Nike missile battery number 57, located adjacent to the runway at the Airport and west of Crenshaw Boulevard and south of Skypark Drive, Torrance, CA (the "Nike Property").  EA Properties 1, 2 and 3 are east and adjacent to the Hi-Shear Property, and are hereafter collectively referred to herein as the "East Adjacent Properties" or "EA Properties".

D.      The Hi-Shear Property is an approximately 14 acre portion of the Airport Property, and is currently being leased by the City to Defendant Hi-Shear, doing business as Lisi Aerospace.  Hi-Shear is a wholly owned subsidiary of LISI

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-2-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

1   Aerospace, a foreign company with its corporate offices being located in Paris,
2   France.

3        E.     Since 1954, Defendant Hi-Shear has continuously leased some portion
4   of the Hi-Shear Property from the City, and over the years, has leased and operated
5   on the property immediately adjacent and to the west of such property, *i.e.*, the
6   Lowes Property.  Hi-Shear is currently operating on the Hi-Shear Property pursuant
7   to a lease it entered into with the City on July 27, 2004, which lease was later
8   amended on July 1, 2014 (collectively, the "Lease" or the "Hi-Shear Lease").  Hi-
9   Shear's business and operations on the Hi-Shear Property, inclusive of its prior
10  operations on the Lowes Property, involved the development, manufacturing and/or
11  production of various fasteners and/or mechanical parts, components and/or
12  equipment, and other related products, for the aerospace industry.

13       F.     Plaintiff filed its initial complaint in this Action on October 23, 2017
14  (Dkt. 1), against Defendant Hi-Shear, asserting claims under the Comprehensive
15  Environmental Response, Compensation and Liability Act of 1980, as amended, 42
16  U.S.C. § 9601, *et seq.* ("CERCLA"), the Resource Conservation and Recovery Act
17  ("RCRA" – 42 U.S.C. § 6901 *et. seq.*), the California Hazardous Substances
18  Account Act ("HSAA" or "California Superfund" – Cal. Health & Safety Code §
19  78000, et seq., formerly § 25300 *et. seq.*), and claims for breach of Hi-Shear's Lease
20  and the express indemnity obligations thereunder to the City, along with the State
21  law common law claims of nuisance, trespass, waste and negligence, and
22  declaratory relief under California law.  (Dkt. # 1.)

23       G.     On December 22, 2017, Hi-Shear filed its Counterclaim against the
24  City (Dkt. 13) alleging seven claims in total, as follows: (1) Contribution under
25  CERCLA; (2) Cost Recovery under CERCLA; (3) Declaratory Relief under
26  CERCLA; (4) Contribution under the HSAA; (5) Declaratory Relief under the
27  HSAA; (6) Total Indemnity; and (7) Equitable Indemnity.  (Dkt. 13 – hereafter, "Hi-
28  Shear Counterclaim".)

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25
-3-
Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

H.    On May 6, 2022, the City filed its First Amended Complaint (Dkt. 438 – "FAC"), adding Defendants Magellan Aerospace, Middletown, Inc. ("Magellan"), Robinson Helicopter Company, Inc. ("Robinson") and Esterline Technologies Corporation ("Esterline") as defendants (each of whom had previously been named as third-party defendants by Defendant Hi-Shear), and asserting claims for response costs and declaratory relief under CERCLA, and claims under State law for nuisance, trespass and negligence against all such added defendants, as well as a claim for breach of contract/lease against Defendant Magellan.

I.    On May 22, 2024, the Court approved a settlement between Esterline and the City (Dkt. 815), thereby resulting in Esterline being dismissed from the Action and all claims against it and its subsidiaries and their successor entities being barred.

J.    On June 26, 2024, the City filed its Second Amended Complaint (corrected – Dkt. 838 - "SAC"), adding among other allegations, a demand for punitive damages against Hi-Shear, and a RCRA claim against Magellan, and removing all claims against Esterline (in light the City/Esterline settlement  entered into with Esterline).  Defendants Hi-Shear, Magellan and Robinson, are collectively hereafter referred to herein as "Defendants".

K.    The SAC is the City's operative complaint in this Action, wherein it alleges that Defendants received, stored, used, generated, transported, released, discharged and/or disposed of various "hazardous substances," "hazardous materials," "hazardous wastes," and/or "toxic chemicals," as such terms are defined under any federal, state, local and/or regional law, rule, regulation, order or directive (collectively, "Hazardous Substances"), including but not limited to, certain halogenated volatile organic compounds known as trichloroethylene ("TCE"), perchloroethylene, aka tetrachloroethylene ("PCE") and/or 1,1,1 trichloroethane ("TCA" or "1,1,1 TCA"), and potentially other Hazardous Substances, during their operations on the Airport Property.

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-4-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

L.     Environmental investigations conducted on the Airport Property have identified the presence of various Hazardous Substances, including, but not limited to, PCE, TCE, TCA, and breakdown daughter chemicals therefrom, as well as other Hazardous Substances, such as perchlorate, 1,4- dioxane, per-and polyfluoroalkyl substances, metals and total petroleum hydrocarbons and other constituents (collectively, "Contaminants"), existing in the soil, soil gas, soil vapor and groundwater, within and migrating from the various properties that make up the "Site" (as defined below – see Exhibit 1 hereto which generally depicts the individual referenced properties included within the definition of "Site"), including but not limited to, Contaminants that have migrated east of the EA Properties and beneath and across Crenshaw Boulevard and into the City of Lomita.

M.     The City alleges that the migration of the Contaminants across Crenshaw Boulevard into a residential community within the City of Lomita, led to the California Regional Water Quality Control Board, Los Angeles Region ("Regional Board"), on June 18, 2021, issuing Cleanup and Abatement Order No. R4-2021-0079 ("Cleanup Order"), pursuant to California Water Code sections 13304 and 13267.  In the Cleanup Order, the Regional Board names Hi-Shear, Magellan, Esterline, Robinson, the City, and Third-Party Defendants Excellon Technologies, LLC, Excellon Acquisitions, LLC and Dasco Engineering as responsible parties for the Contaminants.

N.     In response to the City's Lawsuit, Hi-Shear filed and subsequently amended a third party complaint against a number of third parties.  In its Fifth Amended Third-Party Complaint filed on August 30, 2023 (Dkt. 657 – "HSC Third-Party Complaint"), Hi-Shear asserts claims under CERCLA, the HSAA, and state common law and declaratory relief claims against the third party defendants, wherein such third-party defendants are alleged to have occupied or to be liable as a result of activities on properties located within and outside the City's Airport property, and to be liable to Hi-Shear to the extent of Hi-Shear's liability to the City,

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-5-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

and with respect to costs incurred by Hi-Shear itself to address the Contaminants.

O.    On March 6, 2025, the Court issued an Order granting the City's Motion for Partial Summary Judgment on Hi-Shear's Counterclaim against the City (hereafter, "Summary Judgment Order"), and determining "*that Hi-Shear shall take nothing on its Counterclaim against the City and that judgment should be entered on Hi-Shear's Counterclaim in favor of the City and against Hi-Shear.*" Dkt. 925. This Consent Decree hereby incorporates the Court's determinations in the Summary Judgment Order as though fully set forth and incorporated herein.

P.    In addition to its pending claims against Hi-Shear in this Action, on November 22, 2024, the City filed a complaint for Unlawful Detainer against Hi-Shear in Los Angeles Superior Court, entitled *City of Torrance v. Hi-Shear Corporation, et. al.,* Case No. 24TRCV03955 ("State UD Action").  In the State UD Action, the City alleges that Hi-Shear violated various covenants imposed on Hi-Shear under the Hi-Shear Lease, that the City had terminated the Lease as a result of Hi-Shear's violations of these covenants, that Hi-Shear was wrongly withholding possession of the Hi-Shear Property from the City in light of these violations, and that the City was/is entitled to a forfeiture of the Lease and certain damages, interest and its attorneys' fees in pursuing such State UD Action.

Q.    The Federal National Oil and Hazardous Substances Pollution Contingency Plan ("NCP" – 40 CFR Part 300 *et. seq.*), allows a contaminated site to be divided into "Operable Units" to enable discrete actions and incremental steps to better facilitate the management of a site cleanup, where it defines an "*Operable Unit*" as follows: "*a discrete action that comprises an incremental step toward comprehensively addressing site problems. This discrete portion of a remedial response manages migration, or eliminates or mitigates a release, threat of a release, or pathway of exposure. The cleanup of a site can be divided into a number of operable units, depending on the complexity of the problems associated with the site. Operable units may address geographical portions of a site, specific site*

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-6-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

1  *problems, or initial phases of an action, or may consist of any set of actions*
2  *performed over time or any actions that are concurrent but located in different parts*
3  *of a site.*"  40 CFR § 300.5, definition of "Operable Unit."  For purposes of this
4  Consent Decree, and to, in part, facilitate the cleanup of this Site and better identify
5  the Settling Parties' obligations with regard the cleanup of the Site, the Settling
6  Parties have agreed to divide the "Site" into five Operable Units or OUs, as defined
7  below and depicted geographically in Exhibit 2 hereto.

8      R.    As a material part of and in addition to entering into this Consent
9  Decree, the City and Hi-Shear have entered into a second amendment to the Hi-
10  Shear Lease ("Second Lease Amendment"), which Second Lease Amendment is to
11  become effective only if this Consent Decree becomes effective.  The Second Lease
12  Amendment shall be in substantial conformance with the terms of the Lease
13  amendment attached hereto as Exhibit 3 to this Consent Decree.

14      S.    Also as a material part of and in addition to entering into this Consent
15  Decree, the City and Hi-Shear have entered into a security agreement ("Security
16  Agreement"), which agreement is to become effective only if this Consent Decree
17  becomes effective.  The Security Agreement shall be in substantial conformance
18  with the agreement attached hereto as Exhibit 4 to this Consent Decree, and is to
19  secure the timely and full performance and payment to the City of all costs and
20  damages incurred by the City resulting from any "Hi-Shear Material Default," as
21  such term is defined below in this Consent Decree.

22      T.    Given the Settling Parties' respective claims and defenses, the
23  extensive discovery conducted to date in this Action, the complexity of the issues
24  involved in this Action, and the substantial amount of technical data obtained on the
25  scope and extent of the Contamination (as defined below), a settlement of the claims
26  pending between the City and Hi-Shear in this Action, is in the public interest and
27  will avoid the costs and uncertainties of further extensive litigation between the
28  Settling Parties.  Subject to the Court's approval of this Consent Decree, the

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-7-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

1  settlement will result in Hi-Shear paying the City an equitable portion of the City's

2  alleged response costs, damages and past attorney's fees, and will benefit the

3  environment by Hi-Shear agreeing to undertake the cleanup of a significant amount

4  of the Contamination the City alleges is attributed to Hi-Shear's operations.

5      U.    This Consent Decree is intended to constitute a full and final resolution

6  of any and all claims that have been or could have been alleged as between the City

7  and Hi-Shear in this Action and in the State UD Action.

8      THEREFORE, without further litigation or adjudication of any disputed

9  claims between the Settling Parties, and upon consent of the Settling Parties by their

10  authorized representatives, it is hereby ORDERED, ADJUDGED and DECREED as

11  follows:

12  **II.  JURISDICTION AND VENUE**

13      1.    This Court has jurisdiction over the subject matter of this Action

14  pursuant to 28 U.S.C. §§ 1331 and 1367, and 42 U.S.C. §§ 6972(a) and 9613(b), and

15  supplemental jurisdiction over the various state-law claims pending in this Action

16  pursuant to 28 U.S.C. § 1367(a), as such state law claims arise from the same

17  "common nucleus of operative facts" as the federal-law claims under CERCLA and

18  RCRA.

19      2.    Venue is proper in the Central District of California pursuant to 42

20  U.S.C. §§ 6972(a) and 9613(b), and 28 U.S.C. § 1391(b), because the alleged

21  releases of Hazardous Substances occurred in the City of Torrance, California,

22  which is located within this Court District.

23  **III.  PARTIES BOUND**

24      3.    This Consent Decree applies to and is binding upon the Settling Parties

25  and their successors and assigns.  Except as specifically otherwise provided herein,

26  this Consent Decree does not extend to or inure to the benefit of any party, person,

27  or entity other than the Plaintiff and Hi-Shear.  Nothing in this Consent Decree shall

28  be construed to make any other person or entity that is not a signatory to this

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-8-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

Consent Decree, a third-party beneficiary of this Consent Decree. Any change in ownership or corporate or other legal status, including but not limited to, any transfer of assets or real or personal property, shall in no way alter the status or responsibilities of the Settling Parties under this Consent Decree.

## IV. **DEFINITIONS**

4.      Unless otherwise expressly provided herein, terms used in this Consent Decree that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. The definitions of the terms defined above in the Background section, or below in this Definitions section, shall apply to interpret and enforce the terms of this Consent Decree. In the event of a conflict between any term defined above in the Background section, versus in this Definition section, the definition set forth in this Definition section shall govern:

a.      "Affiliate" shall mean any and all past, present or future employees, officers, directors, board members, department heads, council members, mayors, commissioners, contractors, subcontractors, consultants, agents, attorneys, representatives and assigns of a Settling Party, and any and all predecessor, successor, parent, subsidiary, sister or related corporation, company, department or division of a Settling Party.

b.      "Agency Oversight Costs" shall mean all costs incurred in connection with the investigation, analysis, planning, implementation, oversight and any other activity of the Regional Board or Other Regulatory Agency (including all direct, indirect, payroll, contractor, travel, vendor, and laboratory costs), incurred or paid in supporting, developing, implementing, overseeing, or enforcing the Cleanup Order or any other order, agreement, directive or requirement of any such agency or agencies concerning the Site, including but not limited to, said agency's time, fees, costs and expenses billed pursuant to California Water Code sections 13304, 13267 and/or 13365, or Chapter 6.66 of Division 20 of the California Health and Safety

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-9-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

1    Code, sections 25269 et. seq.

2    c.    "<u>Amsler Properties</u>" shall mean collectively those properties

3    located at 2426 and 2430 Amsler Street, Torrance, CA; and 24650 and 24660

4    Crenshaw Blvd., Torrance, CA.

5    d.    "<u>City Carriers</u>" shall mean those insurance companies of the

6    City, who the City has alleged are obligated to provide the City with a defense of the

7    Claims brought against the City in the Action, and who, as of December 31, 2024,

8    have paid the City for some portion of such City defense costs.

9    e.    "<u>City Consultant Oversight Costs</u>" shall mean the City's

10    reasonable consulting fees, costs and expenses incurred in monitoring, reviewing,

11    assessing, revising, approving, disapproving, conditionally approving or otherwise

12    commenting upon any Hi-Shear proposed Remedial Work or Mitigation Work

13    involving the Contamination, and/or implementation of any such work, including,

14    but not limited to, any "Hi-Shear Submittal", "Notice of Implementation" and/or

15    "OU-2 Remedial Work" (all defined below).

16    f.    "<u>City Owned Property</u>" shall mean the Airport and all Airport

17    Property, including but not limited to, the Hi-Shear Property, the Lowes Property,

18    the EA Properties and the Nike Property.

19    g.    "<u>Claim</u>" or "<u>Claims</u>" shall mean and include any and all past,

20    present or future causes of action, rights of action, suits, administrative proceedings,

21    judgments, orders, demands or claims of damages or liability of any kind or nature,

22    including any claim for contribution, equitable indemnity, injunctive relief,

23    declaratory relief or other similar relief, and including any and all claimed or

24    demanded "response costs" or natural resource damages, and any and all losses,

25    property damages, bodily injuries, personal injuries, death, consequential damages,

26    costs, fees, expenses, liens, fines, penalties, sanctions, attorneys', consultants'

27    and/or experts' fees and costs, and all litigation costs of whatever kind or nature,

28    arising under any contract or under any federal, state, regional, county or local law,

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-10-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

rule, regulation, common law, ordinance, order or directive, of any kind or nature, including under CERCLA, RCRA, the HSAA, the California Hazardous Waste Control Law ("HWCL" - Cal. Health & Safety Code § 25100 et seq.) and/or the California Porter-Cologne Water Quality Control Act (California Water Code section 13000 et. seq.).

h.      "Cleanup Order" shall mean and refer to Cleanup and Abatement Order No. R4-2021-0079, issued by the Regional Water Board on June 18, 2021, along with all amendments thereto.

i.      "Consent Decree" shall mean this Consent Decree and any and all amendments or modifications thereto that may be approved and entered by the Court.

j.      "Closure Letter" shall mean any "closure" or "no further action" determination, or other similar written determination from the Regional Water Board or Other Regulatory Agency, that no further action is being required to address the Contamination within the Site or within a particular Operable Unit, and that the Site, or the particular Operable Unit, is being "closed" by said agency and no further Remedial Work is being required.

k.      "Contamination" shall mean the existence, potential existence or alleged existence of any Hazardous Substances in any soil, soil vapor, ambient air, indoor air, surface water, perched water and/or regional groundwater (shallow, intermediate or deep), at, in, on, under, within and/or migrating or that have already migrated to or from any part or portion of the Hi-Shear Property, the Lowes Property, the Nike Property and/or the EA Properties, inclusive of any Hazardous Substances that have already migrated and/or continue to migrate beneath Crenshaw Boulevard and/or across Crenshaw Boulevard into the City of Lomita and other parts of the City of Torrance, and inclusive of any Hazardous Substances located within any structures or buildings on or within any such properties.

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-11-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

1    l.    "<u>Day</u>" shall mean a calendar day.  In computing any period of

2 time under this Consent Decree, where the last day would fall on a Saturday, Sunday

3 or federal holiday, the period shall run until 5:00 p.m. Pacific time of the next

4 working day.

5    m.    "<u>Effective Date</u>" shall mean the date the Court approves this

6 Consent Decree and that approval becomes final and is no longer subject to appeal.

7    n.    "<u>Enforcement Action</u>" shall mean any Claim brought by or on

8 behalf of the Regional Board or Other Regulatory Agency, that concerns or in any

9 way relates to the Contamination, including but not limited to any enforcement

10 action taken pursuant to the Enforcement Resolution, or any other enforcement

11 action that has been taken or may in the future be taken to enforce the terms and

12 requirements of the Cleanup Order or other Regional Board or Other Regulatory

13 Agency order, directive or requirement relating to the Contamination.

14    o.    "<u>Enforcement Resolution</u>" shall mean that resolution adopted by

15 the Regional Water Board on April 27, 2023, referring enforcement of the Cleanup

16 Order to the California Attorney General's Office, in part because of alleged delays

17 by the parties named in the Cleanup Order to comply with the requirements of the

18 Cleanup Order.

19    p.    "<u>Hazardous Substance(s)</u>" shall mean and include any and all

20 "hazardous substances," "hazardous wastes," "hazardous materials," "pollutants,"

21 "wastes," and/or "toxic chemicals," as such terms are defined under any federal,

22 state, local and/or regional law, rule, regulation, order or directive, including in

23 particular under CERCLA, RCRA, the HSAA, the HWCL, the Hazardous Materials

24 Release Response Plans & Inventory Act (<u>Cal. Health & Safety Code § 25500</u> et

25 seq.) and the California Porter-Cologne Water Quality Control Act (<u>California</u>

26 <u>Water Code section 13000</u> et. seq.), and including but not limited to, the

27 halogenated volatile organic compounds known as TCE, PCE, 1,1,1 TCA, and all

28 additive chemicals thereto and all breakdown daughter chemicals therefrom.

q.    "<u>Hi-Shear Material Default</u>" shall mean any breach or default by Hi-Shear of any one or more of the Hi-Shear Security Obligations, which results in the City incurring cumulative costs and/or damages of ten thousand dollars ($10,000) or more, as determined by the Court.  A Hi-Shear Material Default may include one or more of Hi-Shear's defaults or breaches of the Hi-Shear Security Obligations, that are individually less than ten thousand dollars ($10,000), but collectively more than ten thousand dollars ($10,000).

r.    "<u>Hi-Shear Security Obligations</u>" shall mean any one or more of the following Hi-Shear obligations:  "Hi-Shear Settlement Payment Obligations," "Hi-Shear Site Remediation Obligations", "Hi-Shear Indemnification Obligations" and/or the "Hi-Shear City Oversight Cost Payment Obligations," as all such terms are defined below.

s.    "<u>Mitigation Work</u>" shall mean any and all work necessary to prepare, develop, process, implement, maintain or otherwise comply with any land use covenants, "environmental restrictions" (pursuant to <u>California Civil Code section 1471</u> or otherwise), soil management plan(s), operation and maintenance plan(s), financial assurance requirements, annual inspection requirements, closure requirements, five-year review requirements, sub-slab depressurization systems, vapor membranes, HVAC upgrades, and/or other similar or related mitigation measures that are or may be prudent, necessary or otherwise required by the Regional Board or Other Regulatory Agency, including any and all administration, management and/or oversight work involving the foregoing activities.

t.    "<u>Non-Settling Party or Parties</u>" shall mean any Defendant other than Hi-Shear, and any person or entity that has been named as a third-party defendant in this Action, or who has otherwise appeared on behalf of a third-party defendant in this Action.

u.    "<u>Operable Unit</u>" or "<u>OU</u>" as used herein shall mean, when used singularly, any one of the five Operable Units described below, and when used in

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-13-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

1 the plural, any two or more of the five Operable Units described below, *i.e.*,

2 Operable Units 1, 2, 3, 4 or 5.  The geographical area of all five (5) Operable Units

3 is generally depicted in <u>Exhibit 2</u> to this Consent Decree.

4          v.          "<u>Operable Unit 1</u>" or "<u>OU-1</u>" shall mean the Contamination on

5 or within the Hi-Shear and Lowes Properties, located in any soil, soil vapor, ambient

6 air, indoor air, surface water, perched groundwater and/or regional groundwater

7 (shallow, intermediate and deep, to the extent impacted), inclusive of any

8 Contamination located within any structures or buildings on or within such

9 properties.  The OU-1 geographical area is generally depicted on <u>Exhibit 2</u>.

10          w.          "<u>Operable Unit 2</u>" or "<u>OU-2</u>" shall mean the Contamination on

11 or within the regional groundwater (shallow, intermediate, and deep, to the extent

12 impacted) within EA Properties 2 and 3 and the northern and central portion of EA

13 Property 1.  The OU-2 geographical area is generally depicted on <u>Exhibit 2</u>.

14          x.          "<u>Operable Unit 3</u>" or "<u>OU-3</u>" shall mean the Contamination on

15 or within the central and southern portions of EA Property 1 and the northern

16 portion of the Nike Property as generally depicted in Exhibit 2, located in any soil,

17 soil vapor, ambient air, indoor air, surface water, perched groundwater and/or

18 regional groundwater (shallow, intermediate and deep, to the extent impacted),

19 inclusive of any Contamination located within any structures or buildings on or

20 within such properties or in any soil vapor, ambient air or indoor air that may be

21 located beyond the OU-3 geographical area depicted in Exhibit 2 but exclusive of

22 any Contamination within OU-4.

23          y.          "<u>Operable Unit 4</u>" or "<u>OU-4</u>" shall mean the Contamination on

24 or within EA Properties 2 and 3 and the northwest portion of EA Property 1, located

25 in any soil, soil vapor, ambient air, indoor air or surface water, inclusive of any

26 Contamination located within any structures or buildings on or within such

27 properties.  The OU-4 geographical area is generally depicted on <u>Exhibit 2</u>.

28

z.      "Operable Unit 5" or "OU-5" shall mean the Contamination on or within Crenshaw Boulevard and any property located east of Crenshaw Boulevard within the Cities of Lomita and Torrance (inclusive of the Amsler Properties), and located in any soil, soil vapor, ambient air, indoor air, surface water, perched water and/or regional groundwater (shallow, intermediate and deep, to the extent impacted), inclusive of any Contamination located within any buildings or structures on or within any such properties.  The OU-5 geographical area is generally depicted on Exhibit 2.

aa.     "Other Regulatory Agency" shall mean any regulatory environmental governmental agency, other than the Regional Water Board, including but not limited to the California State Water Resources Control Board, that is exercising oversight jurisdiction over the Remedial Work or Mitigation Work at the Site.  The term "Other Regulatory Agency" shall not include the City or any department or division of the City.

bb.     "OU-2 Remediation Account" shall mean the account to be established by the City in which Hi-Shear's "OU-2 Payment" of $3,000,000 (defined below), is to be deposited, and with all such funds in this account to be used to conduct Remedial Work or Mitigation Work to address the Contamination within OU-2, as described further below.

cc.     "OU-2 Remedial Work" shall mean any and all Remedial Work and/or Mitigation Work conducted or to be conducted to address the Contamination within OU-2.

dd.     "Regional Board" or "Regional Water Board" shall mean the California Regional Water Quality Control Board, Los Angeles Region.

ee.     "Remedial Work" shall mean all of the following: (i) any work to assess, analyze, study, investigate, test, pilot test, sample, report, monitor, mitigate, remove, abate, remediate or otherwise cleanup the alleged or actual release or threatened release of any Hazardous Substance, including but not limited to the

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-15-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

development, processing, preparation and/or implementation of any "remedial investigation" (as defined in section 300.5 of the NCP), any "remove" or "removal" action (as defined in section 9601(23) of CERCLA and section 300.5 of the NCP), any "feasibility study" (as defined in section 300.5 of the NCP), any "remedy" or "remedial action" (as defined in section 9601(24) of CERCLA and section 300.5 of the NCP); (ii) any investigation, characterization, study, testing, monitoring, risk assessment, or removal or interim or final remedial action work as may be directed or required under the Cleanup Order, or under any other order or directive by the Regional Board and/or Other Regulatory Agency, to address the alleged or actual release or threatened release of any Hazardous Substance; (iii) any other activities as may be prudent or reasonable under the circumstances to address any Hazardous Substance in, on, under, within and/or migrating to or from the Site; and (v) any administration, management and/or oversight of any of the foregoing activities.

ff.    "Reopener Closure" shall mean any subsequent "closure," "no further action" determination, or other similar written determination from the Regional Water Board or Other Regulatory Agency, following the issue of a Reopener Determination, that no further action or other Remedial or Mitigation Work is being required to address the Reopener Determination.

gg.    "Reopener Determination" shall mean a determination by the Regional Board or Other Regulatory Agency that a Closure Letter is being reopened and that further Remedial or Mitigation Work is or may be required.  Examples of reasons why a Closure Letter may be reopened include, but are not limited to: the discovery of previously unknown Hazardous Substances and/or additional Contamination within the area that is the subject of the Closure Letter ("Closure Area"); the discovery of additional Hazardous Substances that have migrated outside of the Closure Area; new information and/or changed circumstances from when the Closure Letter was first issued that would justify the reopening of the Closure Letter; changed cleanup and/or health and safety standards since the

issuance of the Closure Letter that would justify the reopening of the Closure Letter; a remedy failure or remedy ineffectiveness within or affecting the Closure Area; and other conditions that would justify a determination by the Regional Board or Other Regulatory Agency to reopen the Closure Letter in order to further protect the health and safety of the public and/or the environment.

hh.   "Reopener Work" shall mean all Remedial Work and/or Mitigation Work necessary to respond to a Reopener Determination or to otherwise obtain Reopener Closure.

ii.   "Settling Parties" shall mean the City and Hi-Shear.

jj.   "Site" shall mean and refer to the areal extent of any and all alleged or actual Contamination, in whatever media, including in any soil, soil vapor, indoor air, ambient air, surface water, perched water and/or regional groundwater (shallow, intermediate or deep), located within and/or migrating to or from any of the following properties, including, but not limited to, within any building or structures located on or within such properties:  (i) the Hi-Shear Property; (ii) the Lowes Property; (iii) the EA Properties; (iv) the Nike Property; (v) Crenshaw Boulevard; (vi) any property located east of Crenshaw Boulevard within either the City of Lomita or the City of Torrance and (vii) the Amsler Properties. (Exhibit 1 hereto generally depicts the individual referenced properties included within the definition of "Site".)  The term "Site" specifically includes the areal extent of all Contamination that has resulted from, or is alleged to have resulted from, any activities on any of the above listed properties, including any Contamination that has, may have, or in the future may be alleged to have migrated into any drinking water well or wells within the City of Lomita.

kk.   "Unrelated Person" shall mean any person, entity, corporation, partnership, association or organization of any kind or nature, other than a Settling Party or a Non-Settling Party.

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-17-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

ll.     "ZVI Barrier" shall mean the proposed "zero valent iron" barrier remedy, as described in the Groundwater Removal Action Workplan ("Groundwater RAW") submitted on behalf of the City (through its environmental consultant Terraphase Engineering, Inc.) to the Regional Board on January 31, 2022, and as subsequently amended, revised and/or updated by the City in correspondence to the Regional Board on September 5, 2023, December 17, 2024 and April 18, 2025, and as may be further amended and/or revised from time to time.

## V. **SETTLEMENT PAYMENTS**

5.     In consideration of the waivers and releases provided herein and of the proposed dismissal of the claims set forth in the State UD Action against Hi-Shear, within forty-five (45) days of the Effective Date, the following payments ("Settlement Payments") shall be made by or on behalf of Hi-Shear to the City, by wire or electronic method of payment to the City, per instructions to be provided by the City to Hi-Shear, or by such other payment method as the Settling Parties may mutually agree upon ("Hi-Shear Settlement Payment Obligations"):

a.     Twelve million dollars ($12,000,000) to be paid by or on behalf of Hi-Shear to the City of Torrance.  This payment to the City shall constitute *partial* compensation to the City for some of the City's costs, damages, fees and expenses associated with the Contamination as follows:  contribution to the City for the City's past unreimbursed attorneys' fees and consultant/expert litigation fees and costs incurred in connection with this Action from its inception through December 31, 2024; the City's attorneys' fees and litigation fees and costs incurred in prosecuting the State UD Action against Hi-Shear; damages to the City for under-market rent payments by Hi-Shear to the City, from the date of the City's Notices of Termination of the Lease through December 31, 2024; contribution to the City for its past unreimbursed response costs to design, pilot and implement the ZVI Barrier; contribution to the City for its future estimated response costs to design, pilot and implement the ZVI Barrier; contribution to the City for its other past unreimbursed

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-18-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

response costs incurred in connection with the Site in general and not specific to any particular Operable Unit, through December 31, 2024; contribution to the City for future response costs expected to be incurred in connection with the Contamination within OU-3 and OU-4, from and after December 31, 2024; contribution to the City for its past unreimbursed and future anticipated general property damages to the EA Properties, inclusive of the potential costs and damages resulting from the possible need for vapor mitigation measures and/or increased future development/construction costs for any of the EA Properties (*e.g.*, sub-slab depressurization systems, vapor membranes, HVAC upgrades, health risk assessments, soil management plans, operations and maintenance plans, and/or other potential mitigation measures that may be necessary because of the Contamination within the EA Properties); contribution to the City for its general damages resulting from future potential reductions in rent/diminution in property value because of the Contamination within the EA Properties, *e.g.*, based on a risk of exposure to tenant employees to the Contamination, the possible need for purchasing pollution legal liability insurance coverage, and the potential for ongoing liability/litigation and disruption in tenant operations from Remedial Work; and contribution to the City for its general damages resulting from the necessary costs, fees and expenses related to the potential need for future deed restrictions, land use covenants and/or environmental restrictions for the EA Properties because of the Contamination.

b.    Three million dollars ($3,000,000) to be paid by or on behalf of Hi-Shear to the City of Torrance (the "OU-2 Payment"), which the City represents and warrants that, within fifteen (15) days of receipt, will be deposited by the City, into the OU-2 Remediation Account.  The OU-2 Remediation Account shall only be used by the City to reimburse Hi-Shear for the cost of Hi-Shear's reasonably incurred OU-2 Remedial Work; except that, in the event of a breach by Hi-Shear of any of the Hi-Shear Site Remediation Obligations (defined below) concerning OU-2, the City may perform the OU-2 Remedial Work, and may use the OU-2

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-19-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

Remediation Account to reimburse itself for the performance of all such work.  The City agrees to keep an accurate accounting of the OU-2 Remediation Account and to provide Hi-Shear with a copy of the accounting upon Hi-Shear's reasonable written request.  Hi-Shear may submit, from time to time, to the City, detailed invoices for the OU-2 Remedial Work conducted by Hi-Shear ("OU-2 Invoices"), which invoices shall identify with sufficient particularity, a description of the OU-2 Remedial Work performed, the time period and dates the work was performed, the entit(ies) and individual(s) performing the work, a detailed breakdown of the fees and costs of the work performed, and whether the work was pre-approved by the City.  Except where exigent circumstances do not allow for sufficient notice and pre-approval by the City of any OU-2 Remedial Work, all OU-2 Remedial Work to be conducted by or on behalf of Hi-Shear for payment from the OU-2 Remediation Account, shall be pre-approved in writing by the City, which approval shall not be unreasonable withheld or delayed.  Except as otherwise provided for in this paragraph, the City will pay all OU-2 Invoices, for such work that was pre-approved by the City, from the OU-2 Remediation Account within thirty (30) days of receipt of the OU-2 Invoice.  The City has the sole and absolute discretion to pay or not pay any OU-2 Invoice submitted by Hi-Shear where the scope of work being conducted was not pre-approved by the City or where the fees and/or costs incurred were not reasonable in scope or amount or were not reasonably related to the approved OU-2 Remedial Work, or where the OU-2 Invoice did not conform with the requirements of this section.  The Settling Parties agree that they shall attempt to resolve any payment dispute over an OU-2 Invoice in accordance with the alternative dispute resolution process set forth in Section XIV below.

6.    If the above referenced Settlement Payments are not paid in full within forty-five (45) days of the Effective Date, then such an event or events shall be considered a Hi-Shear Material Default, and interest on the unpaid balance(s) shall accrue starting on the 46th day after the Effective Date, at the legal rate of interest in

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-20-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

the State of California for unsatisfied money judgments (Cal. Civil Code § 685.010).

7.    It is the City present intent to continue to prosecute the Claims the City currently has pending against Magellan and Robinson in the City's Second Amended Complaint ( Dkt. 838) ("City Magellan/Robinson Claims"); *provided however*, that the City shall have the sole and absolute discretion in deciding how and to what extent it will continue to prosecute the City Magellan/Robinson Claims, and/or whether to settle all or any portion of such claims, and if so, the terms of any such settlement or settlements.

## VI.  OU-2 REMEDIATION ACCOUNT EXHAUSTION OR REPAYMENT

8.    Within sixty (60) days following the exhaustion/expenditure of all payments and funds deposited into the OU-2 Remediation Account, pursuant to payments made pursuant to the provisions of this Consent Decree, the City shall provide written notice to Hi-Shear that the funds in the OU-2 Remediation Account have been fully exhausted, and that all future expenditures by Hi-Shear to comply with its obligation to obtain the OU-2 Closure, and/or any OU-2 Reopener Closure, are to be paid directly by Hi-Shear, at Hi-Shear's sole cost and expense going forward and without any contribution of any kind from the City, and that no future expenditures from the OU-2 Remediation Account will be possible ("Notice of Exhaustion of OU-2 Remediation Account").  Upon the City sending the Notice of Exhaustion of OU-2 Remediation Account to Hi-Shear, the City may proceed to close such account.

9.    In the event that a Closure Letter is issued for OU-2 and all outstanding OU-2 Invoices have been paid in full, any remaining funds in the OU-2 Remediation Account, if any, shall be distributed by the City to Hi-Shear within forty-five (45) days of the City's receipt of both the Closure Letter and a written request from Hi-Shear for payment of the remaining OU-2 Remediation Account funds directly to Hi-Shear. The City may thereafter proceed to close the OU-2 Remediation Account.

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-21-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

## VII.  THE HI-SHEAR SITE REMEDIATION OBLIGATIONS

10.     Notwithstanding Hi-Shear's right to seek reimbursement or cost recovery or to prosecute any Claim against any Non-Settling Party or Unrelated Person, Hi-Shear represents, warrants, covenants and agrees that it shall, at its sole cost and expense, and without any recourse or right of reimbursement from the City: (a) use its best efforts to timely and diligently perform all Remedial Work to address the Contamination within OU-1, OU-2 and OU-5, as necessary to obtain a Closure Letter for all such Operable Units (collectively, "Hi-Shear OU Closure Work"); (b) use its best efforts to timely and diligently perform all Mitigation Work as may be directed or otherwise required by the Regional Board or Other Regulatory Agency for all Contamination within OU-1, OU-2 and OU-5 (hereafter, "Hi-Shear OU Mitigation Work"); (c) use its best efforts to timely and diligently perform all Reopener Work as necessary to obtain a Reopener Closure in the event a Reopener Determination has been made in connection any Contamination located within OU-1, OU-2 and/or OU-5 (collectively, "Hi-Shear OU Reopener Work"); and (d) timely pay all properly incurred Agency Oversight Costs relating to the Site and invoiced to Hi-Shear and/or to the City ("Hi-Shear Oversight Payment Obligation").  Hi-Shear's OU Closure Work, OU Mitigation Work, OU Reopener Work and Oversight Payment Obligation, are hereafter collectively referred to as the "Hi-Shear Site Remediation Obligations".

11.     By August 15, 2026, and for each August 15 annually thereafter until Closure Letters have been issued for OU-1, OU-2 and OU-5, and each of them, Hi-Shear shall submit to the City an "Annual Remediation Progress Report" describing in detail the Remedial and Mitigation Work that Hi-Shear has both proposed and/or accomplished in the preceding twelve (12) month period from July 1 to June 30, including a detailed discussion of their associated costs, along with a description of any Remedial and/or Mitigation Work Hi-Shear anticipates proposing and/or completing over the course of the ensuing twelve month period from July 1 to June

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-22-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

30.  The Annual Remediation Progress Report shall also include a summary of substantive communications with the Regional Board that have or are expected to materially impact the progress of any Remedial and/or Mitigation Work by Hi-Shear within OU-1, OU-2 and/or OU-5 in the preceding or upcoming annual period.

12.     Hi-Shear shall comply with the Hi-Shear Site Remediation Obligations in accordance with all applicable federal, state, local and/or regional laws, rules, regulations, orders and directives, whether currently enacted or subsequently adopted.

13.     The Hi-Shear Site Remediation Obligations shall not in any way be limited or otherwise diminished by the alleged or actual presence and/or commingling of any Contamination from OU-3 and/or OU-4, into OU-1, OU-2 and/or OU-5, or by the alleged or actual presence or commingling of any other Hazardous Substances into OU-1, OU-2 and/or OU-5, including any other Contamination or other Hazardous Substances resulting from the performance of any Remedial Work conducted by any Non-Settling Party or Unrelated Person.

14.     Hi-Shear acknowledges and agrees that, pursuant to this Consent Decree, as of the Effective Date and as between Hi-Shear and the City, Hi-Shear is accepting sole and complete responsibility for addressing all Contamination within OU-1, OU-2 and OU-5, and conducting all Remedial Work through completion and obtaining a Closure Letter or Letters for all such Operable Units, and performing all Reopener Work as may be necessary to obtain any Reopener Closure for OU-1, OU-2 and/or OU-5.

15.     Except for any Court determination or order on the interpretation or breach or default of any provision in this Consent Decree that may affect any of the Hi-Shear Site Remediation Obligations, the Hi-Shear Site Remediation Obligations shall remain in full force and effect, regardless of any subsequent decisions, orders or judgments that may be issued by the Court in this Action.

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-23-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

## VIII.   HI-SHEAR INDEMNIFICATION OF CITY

16.    Notwithstanding any other judgment or other agreement that may exist among any of the Settling Parties, or any other provision in this Consent Decree, Hi-Shear shall defend, reimburse, hold harmless and indemnify the City and its respective Affiliates (collectively, "City Indemnified Parties"), from and against any and all Claims that concern, relate to, result from or in any way arise out of: (a) the Cleanup Order and/or any other directive or requirement of the Regional Board or Other Regulatory Agency concerning any Contamination located anywhere within the Site; (b) any Agency Oversight Costs concerning the Site and invoiced to Hi-Shear and/or the City; (c) any Enforcement Action; (d) the existence, alleged existence or potential existence of any Contamination located within OU-1, OU-2 and/or OU-5; (e) any bodily injury, wrongful death or property damage Claims relating to or arising out of or allegedly relating to or arising out of any Contamination located within OU-1, OU-2 and/or OU-5; (f) any Claims arising out of the existence, potential existence or alleged existence of any Contamination in any drinking water well, or the threat or alleged threat of the migration of any Contamination to any drinking water well; (g) Hi-Shear's negligent or intentional actions, inactions, and/or omissions in conducting any Remedial Work and/or Mitigation Work; (h) any failure on the part of Hi-Shear to comply with any of the Hi-Shear Site Remediation Obligations, inclusive of any costs incurred by the City to implement any of the Hi-Shear Site Remediation Obligations in the event Hi-Shear fails to do so in a timely manner; and (i) any breach or failure by Hi-Shear to comply with any other term or provision of this Consent Decree.  Hi-Shear's indemnification obligations under this Section shall hereafter collectively be referred to as the "Hi-Shear Indemnification Obligations."

17.    Except for any Court determination or order on the interpretation or breach or default of any provision in this Consent Decree that may affect Hi-Shear's Indemnification Obligations, Hi-Shear's Indemnification Obligations shall remain in

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-24-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

1    full force and effect, regardless of any subsequent decisions, orders or judgments

2    that may be issued by the Court in this Action

3    **IX.  <u>RELEASES AND WAIVERS OF CLAIMS</u>**

4           18.      **Except for the rights and obligations provided for in this Consent**

5    **Decree**, effective as of the Effective Date, the Settling Parties hereto, on their behalf

6    and on behalf of their respective Affiliates, and each of them, hereby waive, release,

7    acquit and forever discharge each of the other Settling Parties hereto, and their

8    respective Affiliates, and each of them, from and against any and all Claims,

9    whether known or unknown, asserted or unasserted, suspected or unsuspected,

10   foreseen or unforeseen, fixed or contingent, liquidated or unliquidated,

11   administrative, legal or equitable, past, present, or future, that concern, relate to or

12   arise out of: (a) the Contamination; (b) the Cleanup Order; (c) the Enforcement

13   Resolution; and (d) the Action (hereinafter, collectively the "Released Claims").

14   **With the exception of the rights and obligations provided for under this**

15   **Consent Decree**, the releases and waivers provided for in this Section are intended

16   to be full and complete releases and discharges of any and all of the Released

17   Claims existing or which may exist in the future by and against any of the Settling

18   Parties and their Affiliates.

19          19.     As to the Released Claims herein, the Settling Parties acknowledge that

20   they have been advised of the provisions of Section 1542 of the California Civil

21   Code, and are familiar with said provisions, and that they are willingly and

22   knowingly waiving and releasing all rights they have or may have pursuant to said

23   section or any similar or related section.  Section 1542 of the California Civil Code

24   provides as follows:

25          **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS**

26          **WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT**

27          **TO EXIST IN HIS OR HER FAVOR AT THE TIME OF**

28          **EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM**

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-25-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

**OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

20.     The Settling Parties acknowledge and agree that they may hereafter discover facts in addition to or different from those that they now know or believe to be true with respect to the Released Claims, but recognize this possibility and expressly waive and release any and all rights they have or may have under California Civil Code Section 1542 and any similar or related provision, but solely with respect to the Released Claims.

**X.   CITY APPROVAL OF WORK ON CITY OWNED PROPERTY**

21.     Hi-Shear shall not conduct or caused to be conducted any Remedial Work or Mitigation Work on City Owned Property, without the City's prior written consent, which consent shall not be unreasonable delayed or withheld.  For all such work, Hi-Shear shall provide the City with a minimum of thirty (30) days prior written notice of any submittal to the Regional Board ("Hi-Shear Submittal" or "Submittal"), and the City shall provide its written approval or disapproval of the Submittal within twenty-one (21) days of its receipt, and shall include its reasoning for any disapproval of all or any portion of the Submittal.  Hi-Shear shall also provide the City with a minimum of thirty (30) days prior written notice of its intent to commence implementation of any Remedial Work or Mitigation Work on City Owned Property ("Notice of Implementation"), and shall not conduct any such work without the City's prior written consent, which consent shall not be unreasonable withheld or delayed.  The Hi-Shear Notice of Implementation shall include a description of the work, the proposed location of the work, the date or dates the work is to be conducted, and whether all permits and required approvals for the work have been obtained.  The City shall respond in writing to the Notice of Implementation within twenty-one (21) days of its receipt of such notice, and shall approve, disapprove or approve in part and disapprove in part, the proposed work. The City shall not impose any requirements on Hi-Shear in connection with any Hi-

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-26-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

Shear Submittal or Notice of Implementation that are contrary to or inconsistent with any applicable federal or state law or with this Consent Decree. Absent a request by the City for a reasonable extension of time to review a Hi-Shear Submittal or a Hi-Shear Notice of Implementation, in the event that the City fails to respond to a Hi-Shear Submittal or a Hi-Shear Notice of Implementation within the time specified above, Hi-Shear may proceed, as the case may be, and submit the Hi-Shear Submittal to the Regional Board, or to proceed with the implementation of the work described in the Hi-Shear Notice of Implementation. Hi-Shear and the City shall work cooperatively to attempt to resolve any dispute over a Hi-Shear Submittal or Notice of Implementation on an expedited basis and in accordance with the alternative dispute resolution process set forth in Section XIV below.

## XI.  PAYMENT OF CITY CONSULTANT OVERSIGHT COSTS

22.    Commencing as of the Effective Date, within forty-five (45) days of being invoiced, Hi-Shear shall pay the City for all reasonably incurred and invoiced City Consultant Oversight Costs ("Hi-Shear City Oversight Cost Payment Obligations"); *provided however*, that the City's Consultant Oversight Costs shall not exceed one hundred and twenty thousand dollars ($120,000) on an annual basis for any City fiscal year (July 1 to June 30) (hereafter, "City Oversight Cap"). For the period of time from the Effective Date to June 30 of that same fiscal year, the City Oversight Cap shall be prorated. Hi-Shear's obligation to pay the City Consultant Oversight Costs shall remain in full force and effect until such time as Hi-Shear has obtained a Closure Letter or Letters for all three Operable Units, *i.e.*, OU-1, OU-2 and OU-5, and from the time any Reopener Determination for any of these Operable Units has been issued, until such time as the Reopener Closure has been obtained.

## XII.  CITY EXERCISE OF SECURITY AGREEMENT RIGHTS

23.    The City may exercise any and all of its rights under the Security Agreement in accordance with the terms provided for therein, including but not

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-27-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

1  limited to, in the event there has been a Hi-Shear Material Default.

2  **XIII.  AGENCY COMMUNICATIONS**

3      24.  Hi-Shear shall provide true, correct and complete copies to the City of

4  all substantive written correspondence involving any Hi-Shear Remedial or

5  Mitigation Work, between Hi-Shear and the Regional Board or Other Regulatory

6  Agency, within no more than five (5) business days of receiving or sending any such

7  correspondence.

8  **XIV.  ALTERNATIVE DISPUTE RESOLUTION**

9      25.  In the event any dispute arises between the Settling Parties regarding

10  the interpretation, enforcement and/or alleged breach or default of any provision of

11  this Consent Decree (collectively, "Non-Compliance"), and except where immediate

12  relief is necessary and insufficient time exists to initiate and complete the following

13  alternative dispute resolution process, the Settling Parties shall seek to resolve the

14  dispute as follows:  (a) through an informal meet and confer process, with the

15  claiming Settling Party providing ten (10) days prior written notice requesting an in-

16  person, Zoom, Teams or telephonic meet and confer with the opposing Setting

17  Party, and describing in the written notice, the nature of the alleged Non-

18  Compliance and providing reasonable available dates and times for the meet and

19  confer; and (b) if the meet and confer process does not resolve the dispute and if the

20  Settling Parties do not otherwise mutually agree in writing to continue the meet and

21  confer process or to otherwise forego mediation, then through mediation by use of a

22  mutually agreed-upon qualified mediator (the Settling Parties agree that Timothy

23  Gallagher, Esq. is qualified and agreeable, if available), the payment for which shall

24  be divided equally among the Settling Parties; the mediation process shall be

25  completed by no more than thirty (30) days after a written mediation demand notice

26  has been provided by the claiming Settling Party to the opposing Settling Party.

27  Where the alternative dispute resolution process set forth above does not fully

28  resolve the dispute, or where immediate relief is necessary and insufficient time

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-28-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

exists to initiate and complete the above alternative dispute resolution process, the aggrieved Settling Party may pursue the requested relief from the Court in accordance with the Federal Rules of Civil Procedure ("FRCP") and the Local Rules of Court of the United States District Court for the Central District of California. The Settling Parties understand and agree that the Court has the authority to issue a mandatory or prohibitory injunction to require compliance with any and all of the terms of this Consent Decree, including but not limited to, enforcing compliance with the Hi-Shear Site Remediation Obligations and holding any Settling Party in contempt for failing to comply with its obligations under this Consent Decree, as well as ordering all other necessary and appropriate relief as the Court deems just and proper, such as, for example, in the event of a breach by Hi-Shear of any of the Hi-Shear Site Remediation Obligations, ordering Hi-Shear to reimburse the City for all of the costs and fees the City incurs in rectifying any such breach.

## XV.   NOTICE TO REGIONAL BOARD OF CONSENT DECREE

26.    Within seven (7) days of the Effective Date, Hi-Shear shall notify the Regional Water Board, in writing, with a copy to the City, of Hi-Shear's commitments to the City under this Consent Decree to perform the Hi-Shear Site Remediation Obligations herein, including but not limited to, Hi-Shear's Oversight Payment Obligation.

## XVI.  WAIVER OF RIGHTS OF SUBROGATION

27.    The Settling Parties represents and warrants that in any subsequent settlement agreement involving a claim for defense or indemnity with any of the Settling Parties' respective insurance carriers who are alleged to have provided insurance coverage for any claim pending in this Action, that the Settling Party will obtain from all such settling insurance carriers a waiver of any and all rights or alleged rights of subrogation, contribution and/or recoupment they have or may have as against the other Settling Party that arise out of or in any way relate to the Action.

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-29-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

## XVII. GOOD FAITH DETERMINATION

28.    The Court hereby finds that the terms of this Consent Decree, all of which have been agreed to by the Settling Parties, including but not limited to, the terms governing the Settlement Payments to be made by Hi-Shear, and the terms imposing the various Hi-Shear Site Remediation Obligations and other obligations on Hi-Shear, represent a settlement by and between the Settling Parties that is procedurally and substantively fair, reasonable and consistent with the objectives of CERCLA, and that was entered into in good faith, and is absent of fraud, collusion, or tortious conduct aimed at injuring the interests of any Non-Settling Party or Unrelated Person.

29.    The Consent Decree represents a good faith settlement within the meaning of California Code of Civil Procedure sections 877 and 877.6 and is in accordance with the California Supreme Court's decision in *Tech-Bilt, Inc. v. Woodward-Clyde & Associates*, 38 Cal. 3d 488 (1985).

## XVIII. EFFECT OF CONSENT DECREE; CONTRIBUTION PROTECTION

30.    All of the City's claims pending against Hi-Shear in this Action as set forth in the City's SAC, are hereby resolved in accordance with the relief provided in this Consent Decree.  All of the claims alleged by Hi-Shear against the City in the Hi-Shear Counterclaim have been resolved by the Summary Judgment Order, and the Court hereby finds that there is no just reason for delay and that upon entry of this Consent Decree, the Summary Judgment Order shall become a final and appealable judgment pursuant to FRCP 54(b).  By entering into this Consent Decree, Hi-Shear understands and agrees that it is waiving any right to appeal or otherwise challenge the Summary Judgment Order.

31.    Nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person or entity not a party to this Consent Decree.  Unless otherwise precluded by this Consent Decree, each of the Settling Parties expressly reserves any and all rights (including, but not limited to, any right

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-30-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

1    to contribution), defenses, claims, demands, and causes of action which each

2    Settling Party has or may have against any person or entity not a party to this

3    Consent Decree.

4        32.    The Settling Parties agree, and the Court finds, that Hi-Shear is entitled

5    to contribution protection under CERCLA section 113(f), <u>42 U.S.C. § 9613(f)</u>, and

6    any other applicable provision of federal or state law, whether by statute or common

7    law.

8        33.    Excepting only express contractual indemnity claims (if any), all claims

9    of a Non-Settling Party pending against Hi-Shear in this Action, are hereby barred,

10   regardless of when or by whom they are asserted, and regardless of whether they are

11   brought for the recovery of direct response costs, or for contribution, reimbursement

12   or equitable indemnity or injunctive or declaratory relief under sections 9607 and/or

13   9613 of CERCLA, or under the RCRA, or under the HSAA, or pursuant to any other

14   federal or state law, including claims for implied and/or equitable indemnity or

15   contribution, implied and/or equitable comparative contribution, cost recovery,

16   equitable partial indemnity based on comparative negligence or comparative fault,

17   or for negligence or negligence per se or as co-obligors on a contract debt; *provided*

18   *however*, that nothing in this Consent Decree is intended to bar, and shall not bar,

19   any claims that exist or may exist or be filed by the United States on behalf of the

20   United States Environmental Protection Agency, or by any federal natural resources

21   trustee, relating to the Contamination that is the subject of this Action.

22       34.    The Settling Parties agree and the Court finds that the effect of this

23   Consent Decree on any of the Non-Settling Parties shall be governed by the

24   proportionate share approach set forth in the Uniform Comparative Fault Act.

25   **XIX.  PENDING STATE UD ACTION**

26       35.    The City shall dismiss its State UD Action pending against Hi-Shear,

27   with prejudice, within ten (10) days of the later of: (a) the Settling Parties execution

28   of the Second Lease Amendment; (b) the City's receipt of all of the Settlement

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-31-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

Payments; and (c) the City's receipt of all unpaid rent dating back to January 1, 2025, per the terms of the Second Lease Amendment; *provided however* that, neither the City's dismissal of the State UD Action, nor anything in this Consent Decree, shall in any way affect the City's future rights to pursue an unlawful detainer action to obtain possession of the Hi-Shear Property and any and all attendant relief thereto, in Los Angeles County Superior Court, as permitted under California law, as a result of any actions, inactions or omissions by Hi-Shear occurring after the Effective Date.

## XX.  **ATTORNEYS' FEES AND COSTS**

36.    Except as otherwise provided for in this Consent Decree and in this Section below, the Settling Parties shall, as amongst each other, bear their own respective attorneys' fees and costs and other fees and costs incurred in the Action and in the State UD Action; *provided however* that, in the event of a dispute concerning or in any way involving the interpretation, enforcement and/or alleged breach of any of the terms of this Consent Decree, including those incurred in connection with the alternative dispute resolution process set forth in Section XIV above, the prevailing Settling Party shall be entitled to the recovery of its reasonable attorney's fees and costs and litigation expenses, including such fees and costs incurred in connection with any appeal.

## XXI.  **INTEGRATION**

37.    This Consent Decree, along with the Second Lease Amendment and the Security Agreement, contain all of the promises, terms and conditions agreed upon by the Settling Parties relating to the matters covered herein, and supersedes any and all prior and contemporaneous agreements, negotiations, correspondence, understandings, and communications of the Settling Parties, whether oral or written, concerning such matters.

## XXII.  **MODIFICATIONS TO CONSENT DECREE**

38.    This Consent Decree shall not be amended or modified except by

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-32-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

written order of this Court. Any amendment or modification to this Consent Decree shall be in writing and signed by both Settling Parties, but shall not become effective unless and until approved by this Court.

## XXIII. WARRANTY OF AUTHORITY TO EXECUTE

39. Each individual signing this Consent Decree on behalf of a corporation, municipality, agency, partnership or association represents and warrants that he or she has the authority and power to legally bind and enter into this Consent Decree on behalf of the entity for which he/she is signing, and that all necessary corporate, agency or governmental resolutions and/or formalities have been followed granting full authority and power to each such individual.

## XXIV. RETENTION OF JURISDICTION

40. This Court shall retain jurisdiction over all matters set forth in this Consent Decree for the purpose of: (1) interpreting and enforcing the terms of this Consent Decree and resolving any disputes arising hereunder; (2) amending and modifying this Consent Decree.

## XXV. FINAL JUDGMENT

41. The Court hereby determines that there is no just reason for delay and that this Consent Decree shall constitute a final appealable judgment, pursuant to FRCP 54(b).

**IT IS SO ORDERED.**

Dated: _____August 6, 2025_____

_____
Honorable Fred W. Slaughter
United States District Judge

Rutan & Tucker, LLP
attorneys at law

2590/062579-0117
21672532.13 a06/02/25

-33-

Case No.  2:17-cv-07732-FWS-JPR
CITY/HI-SHEAR CONSENT DECREE

1 | **FOR SETTLING PARTY-PLAINTIFF CITY OF TORRANCE**

2 | Representative Authorized To Sign:

3 | Signature: _Aram Chaparyan_

Name:       Aram Chaparyan

4 | Dated: _June 19_ , 2025     Title:        City Manager

5 | Address:    3031 Torrance Blvd.

Torrance, CA 90503

6 | Email:      AChaparyan@TorranceCA.gov

7 |

8 | **FOR SETTLING PARTY-DEFENDANT HI-SHEAR CORPORATION**

Representative Authorized To Sign:

9 | Signature: _____

10 | Name:     CHRISTIAN DARVILLE.

Dated: _JUNE 4th_ , 2025     Title:       VICE PRESIDEN.

11 | Address:   2600 SKYPARK DRIVE.

12 | TORRANCE, CA 90505

13 | Email:     CHRISTIN-DARVILLE@LISI-GROUP.M

14 | **APPROVED AS TO FORM:**

15 | Dated: _June 4_ , 2025     HAMRICK & EVANS, LLP

DAVID L. EVANS

16 | THOMAS P. SCHMIDT

JEFF W. POOLE

17 |

18 | By: _____

19 | Jeff W. Poole

Attorneys for Defendant

20 | HI-SHEAR CORPORATION

21 | Dated: _June 19_, 2025     CITY OF TORRANCE

22 | By: _Patrick D Sull___

23 | Patrick Sullivan

TORRANCE CITY ATTORNEY

24 |

25 | Dated: _June 20_ , 2025     RUTAN & TUCKER, LLP

26 | By: _Richard Montevideo___

27 | Richard Montevideo

28 | Attorneys for Plaintiff

CITY OF TORRANCE

Exhibit 1



**Legend**
- Former Nike Missile Base
- Amsler Properties
- Crenshaw Blvd
- Hi-Shear Property
- Lowes Property
- EA Property 1
- EA Property 2
- EA Property 3

**Site Plan of Individual Site Properties**

Exhibit 1

CLIENT: Rutan & Tucker
PROJECT: Skypark Commercial Properties
PROJECT NUMBER: 5042.010.001

**SAFETY FIRST**

terraphase
engineering

Amsler Properties

Pennsylvania Ave

249th St

Crenshaw Blvd

250th St

251st St

Amsler St

Crenshaw Blvd

EA Property 2
24747 Crenshaw Boulevard and
24701 Crenshaw Boulevard, Torrance

EA Property 3
2520 and 2530 Skypark
Drive, Torrance

Skypark Dr.

Former Nike Missile Base

EA Property 1
24777 Crenshaw Boulevard, Torrance

Hi-Shear Property
2600 Skypark Drive, Torrance

Lowes Property
2700 Skypark Drive, Torrance

N

0    200    400    800    Feet

1 inch = 400 feet

Aerial Imagery Source: Nearmap January 17, 2023

Exhibit 2



Exhibit 3

<u>SECOND AMENDMENT TO LEASE</u>

THIS SECOND AMENDMENT TO LEASE (the "Second Amendment"), is made and entered into in Torrance, California, and is dated for reference purposes only as of June 17, 2025, by and between the CITY OF TORRANCE, a municipal corporation ("City") and HI-SHEAR CORPORATION, a Delaware corporation, dba LISI Aerospace ("Lessee").

W I T N E S S E T H :

A.    City and Lessee have previously entered into a Lease dated for reference purposes only as of July 27, 2004, as amended by that certain First Amendment to Lease dated for reference purposes only as of May 13, 2013 (together, the "2004 Lease"). Capitalized terms used in this Second Amendment, but not defined herein shall have the same meaning as set forth in the 2004 Lease.

B.    City and Lessee are parties to that certain Consent Decree entered into in that action entitled *City of Torrance v. Hi-Shear Corporation, et. al*. Case No. 2-17-CV-07732-FWS-JPR ("Consent Decree"), and that Security Agreement entered into in relation thereto.

C.    In furtherance of the Consent Decree, City and Lessee desire to modify the 2004 Lease to provide for, among other terms, a revised Rent schedule, a revised Option Period, and updated Lessee remediation, indemnification and release provisions in accordance with the Consent Decree terms, all as more particularly set forth herein.

D.    This Second Amendment shall become effective as of the same date as the "Effective Date" of the Consent Decree ("Second Amendment Effective Date"). The term "Lease," as used herein, shall mean the 2004 Lease, as modified by this Second Amendment.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements hereinafter contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

A G R E E M E N T :

1.    Article 1 of the 2004 Lease, which is entitled: "<u>LEASED PREMISES</u>" is hereby amended and restated in its entirety to read in full as follows:

"1.    <u>LEASED PREMISES</u>

For and in consideration of the rents, covenants and conditions herein contained, the City does hereby lease to Lessee and Lessee hereby hires from City that certain real property commonly known as 2600 Skypark Drive, located in the City of Torrance, State of California which real property is legally described on <u>Exhibit "A"</u>, and located as shown on <u>Exhibit "B"</u> as Parcel 32B, attached hereto and made a part hereof, which real property is hereinafter referred to as the "Leased Premises", together with the nonexclusive easement more particularly described in <u>Exhibit "A"</u> as the "Remediation Easement" and depicted on <u>Exhibit "B"</u> as "Parcel

32A", and the nonexclusive easement more particularly described in Exhibit "A" as the "Watermain Easement" and depicted on Exhibit "A" as the "Water Line Easement", and reserving therefrom, together with the right to grant and transfer the same, along with the "Road Easement", as more particularly described in Exhibit "A" and depicted on Exhibit "B" as the "Driveway Easement." Lessee and City stipulate that the Leased Premises contain 14 acres and that, notwithstanding any remeasurement that may occur, the City and Lessee agree for all purposes of this Lease the Leased Premises shall be deemed to consist of 14 acres."

2.    Article 2 of the 2004 Lease, which is entitled: "INITIAL TERM; OPTION TO EXTEND" is hereby amended and restated in its entirety to read in full as follows:

"2.  INITIAL TERM; FIRST EXTENDED TERM; SECOND EXTENDED TERM; OPTION TO EXTEND

The "Initial Term" of this Lease shall begin on the Effective Date and expired at midnight on June 30, 2014.

Pursuant to the First Amendment, the Initial Term of this Lease was extended to expire at midnight on June 30, 2029 (the "First Extended Term").

Pursuant to this Second Amendment, the First Extended Term of this Lease is hereby extended to expire at midnight on June 30, 2044 (the "Second Extended Term").

Provided that Lessee is not then in default hereunder, Lessee shall have the right and option to further extend the term of this Lease from the expiration of the Second Extended Term for one (1) additional fifteen-year period, expiring at midnight on June 30, 2059 (the "Option Period"), upon the same terms and conditions herein provided for in this Lease, except for rental adjustments to be made during said Option Period pursuant to Article 4 below, and except that Lessee shall have no further options to extend the term. Lessee shall exercise the foregoing option, if at all, by giving City written notice of such exercise not less than twelve (12) calendar months prior to the expiration of the Second Extended Term of this Lease (in accordance with the provisions of Article 4 below)."

3.    Article 3 of the 2004 Lease, which is entitled: "RENT" is hereby amended and restated in its entirety to read in full as follows:

"3.  RENT

As of January 1, 2025, and on or before the first day of each month during the remaining portion of the First Extended Term, Lessee shall pay, in advance, to the City rent (together, along with any and all applicable adjustments hereinafter referred to as "Rent") pursuant to the following schedule:

| Year 1 | January 1, 2025 – June 30, 2026 | $152,500 per month |
|--------|--------------------------------|--------------------|
| Year 2 | July 1, 2026 - June 30, 2027 | The amount of Rent for Year 1 per month, plus the annual increase amount set forth in this Article 3 |
| Year 3 | July 1, 2027 - June 30, 2028 | The amount of Rent for Year 2 per month, plus the annual increase amount set forth in this Article 3 |
| Year 4 | July 1, 2028 - June 30, 2029 | The amount of Rent for Year 3 per month, plus the annual increase amount set forth in this Article 3 |
| Second Extended Term and any Option Period | July 1, 2029 – Expiration of the Second Extended Term and any Option Periods | To be determined in accordance with Article 4 |

Within ten (10) days of the Second Amendment Effective Date, Lessee shall make a catch-up Rent payment to the City for all Year 1 Rent that has not been paid as of that date based on the Year 1 Rent schedule listed above ("Back Rent Payment"). The Back Rent Payment shall be calculated by subtracting the Year 1 Rent actually paid by Lessee from the Year 1 Rent that should have been paid pursuant to the Year 1 Rent schedule. Commencing on July 1, 2026, and the commencement of each Lease Year through July 1, 2029 (as hereinafter defined) thereafter (the "Adjustment Date"), the Rent shall be increased in proportion to the increase, if any, in the "Consumers Price Index, All Urban Consumers", 1982-84 = 100 ("Index"), prepared by the United States Bureau of Labor Statistics, Department of Labor (the "Bureau") for the immediately preceding Lease Year; provided, however, in no event shall any installment of minimum monthly Rent adjusted in accordance herewith be less than one hundred two percent (102%) of the monthly Rent in effect immediately preceding the applicable Adjustment Date nor exceed one hundred five percent (105%) of the monthly Rent in effect immediately preceding the applicable Adjustment Date. As used in this Section, the term "Lease Year" shall mean each twelve (12) month period commencing on July 1, 2026. The proportionate increase in the Index for each Lease Year shall be determined by dividing the Index published for the second month preceding the then current Adjustment Date by the Index for the second month preceding the immediately preceding Adjustment Date. In the event that the Index is not published in the requisite

month, then the Index utilized shall be the Index published for the month that is closest chronologically.

If said Bureau shall revise said Index, the parties shall accept the method of revision or conversion recommended by said Bureau; if said Index shall be discontinued with no recommended substitute, another index generally recognized as authoritative shall be substituted by agreement of the parties. If the parties are unable to agree upon a substitute index within thirty (30) days after demand by either party, on application of either party, then the substitute index shall be selected by the Chief Officer of the San Francisco Regional Office of the Bureau of Labor Statistics or its successor."

4.    Article 4 of the 2004 Lease, which is entitled: "ADJUSTMENT OF RENT DURING OPTION PERIODS; FAIR RENTAL VALUE" is hereby amended and restated in its entirety to read in full as follows:

"4.    ADJUSTMENT OF RENT DURING SECOND EXTENDED TERM AND ANY OPTION PERIOD; FAIR RENTAL VALUE

A.    Adjustment.

(1)    Notwithstanding the provisions of Article 3 above, or any other provision to the contrary set forth herein, the Rent shall be further adjusted pursuant to the provisions of this Article 4.  Commencing July 1, 2029, and each fifth (5th) Lease Year thereafter (i.e. July 1, 2034, and July 1, 2039, and, if the Option Period is applicable, July 1, 2044, July 1, 2049,  and July 1, 2054) during the remaining Term of this Lease (including, without limitation, during any applicable Option Period; each a "FRV Adjustment Date"), Rent shall be adjusted to Fair Rental Value.  On or before the date that is nine (9) calendar months prior to each FRV Adjustment Date, City and Lessee shall conduct a Fair Market Rent Analysis (as hereinafter described).  With respect to any Option Period, in the event that Lessee intends to exercise its option to extend the Second Extended Term of this Lease pursuant to Article 2 above, then on or before the date that is at least twelve (12) calendar months prior to the expiration of the Second Extension Term, Lessee shall deliver notice to City of such intent and City and Lessee shall conduct a Fair Market Rent Analysis (as hereinafter described). To the extent that, solely with respect to any Option Period, after the Fair Rental Value is determined in accordance with this Article 4, Lessee desires to revoke the exercise of its option hereunder, then Lessee shall deliver to City written notice of such revocation on or before the date that is nine (9) calendar months prior to the expiration of the Second Extended Term of this Lease; provided, however, if through no fault of Lessee the Fair Rental Value has not been determined on or before the date that is (9) calendar months prior to the expiration of the Second Extended Term of this Lease, Lessee shall have thirty (30) calendar days after the Fair Rental Value has been determined to deliver the notice of revocation. If such notice of revocation is not delivered in a timely manner, the Second Extended Term of the Lease will be deemed

extended in accordance with the provisions of Article 3 without the need for further action and the Rent shall be adjusted to the Fair Rental Value (as hereinafter defined) in accordance with this Article 4.

(2)        "Fair Rental Value" shall mean the amount determined by the parties to be the fair market value of the Leased Premises, exclusive of the improvements thereon, based upon the manufacturing and industrial uses permitted hereunder as of the date that is nine (9) calendar months prior to the commencement of the applicable FRV Adjustment Date, multiplied by a 5.0% annual rate of return. The foregoing calculation shall be referred to herein as the "Fair Rental Value Analysis."

(3)        The parties hereto acknowledge that the Rent has not been calculated in the manner described in the immediately preceding Paragraph, and that, accordingly, the Rent shall <u>not</u> be considered in determining the Fair Rental Value of the Leased Premises.

(4)        If the parties cannot agree on the Fair Rental Value of the Leased Premises on or before any FRV Adjustment Date, then such Fair Rental Value shall be determined by arbitration in accordance with Paragraph 4(B) below. Pending such determination by the arbitrators, Lessee shall continue to pay the Rent in accordance with this Lease until the Fair Rental Value of the Leased Premises has been determined by the arbitrators. The adjusted Rent determined by the arbitrators (which shall be equal to the Fair Rental Value of the Leased Premises) shall be retroactive to the applicable FRV Adjustment Date, and on the first day of the month following the date on which the arbitrators determine the Fair Rental Value of the Leased Premises (the "Arbitrator Adjustment Date'), Lessee shall pay the adjusted Rent for the period from the commencement of the applicable FRV Adjustment Date to the Arbitrator Adjustment Date, and for the month commencing on the Arbitrator Adjustment Date.

(5)        Commencing on the date that is one (1) year after each FRV Adjustment Date, and each Lease Year thereafter, the adjusted Rent shall be increased in proportion to the increase, if any, in the Index, prepared by the Bureau (as more particularly set forth in Article 3); provided, however, in no event shall any installment of minimum monthly Rent adjusted in accordance herewith be less than one hundred two percent (102%) of the monthly Rent in effect immediately preceding previous Lease Year nor exceed one hundred five percent (105%) of the monthly Rent in effect immediately preceding Lease Year.

B.     <u>Arbitration</u>

(1)        If arbitration is required to fix the Fair Rental Value of the Leased Premises, such arbitration shall be conducted in the following manner: Within ten (10) days after the parties determine that they have failed to determine a mutually acceptable figure for the Fair Rental Value, the City shall appoint an

arbitrator and give written notice thereof to Lessee, and within ten (10) days after the receipt of such notice, Lessee shall appoint an arbitrator and give written notice thereof to the City, or in case of the failure of either party hereto so to do, the other party shall have the right to apply to the Superior Court of Los Angeles County, California, to appoint an arbitrator to represent the defaulting party. The two arbitrators thus appointed (in either manner) shall select and appoint in writing a third arbitrator and give written notice thereof to the City and Lessee, or if within ten (10) days after their appointment, the two arbitrators shall fail to appoint a third, then either party hereto shall have the right to make application to said Superior Court to appoint such third arbitrator. All such arbitrators shall have a minimum of ten (10) years' experience as a commercial real estate appraisal and shall be both impartial and unrelated to either the City or the Lessee.

(2)    The three arbitrators so appointed (in either manner) shall within ten (10) days after all have been appointed fix a convenient time and place in the County of Los Angeles within thirty (30) days thereafter for hearing the matter to be arbitrated and shall give written notice thereof to each party hereto at least five (5) days prior to the date so fixed, and said arbitrators shall with reasonable diligence hear and determine the matter in accordance with the provisions hereof and of the statutes and judicial decisions of the State of California at the time applicable thereto, and shall execute and acknowledge their award thereon in writing and cause a copy thereof to be delivered to each of the parties hereto.

(3)    The award of a majority of said arbitrators shall determine the question arbitrated, and a judgment may be rendered by said Superior Court confirming said award, or the same may be vacated, modified, or corrected by said Court, at the instance of either of the parties hereto, in accordance with the then existing statutes of the State of California applicable to arbitrations, the provisions of which statutes shall apply hereto as fully as though incorporated herein.

(4)    If two of the three arbitrators first appointed as aforesaid shall fail to reach an agreement in the determination of the matter in question, the same shall be decided by three new arbitrators, who shall be appointed and shall proceed in the same manner as hereinabove set forth, and said process shall be repeated until a decision is finally reached by two of the three arbitrators selected.

(5)    Each of the parties hereto shall pay for the services of its appointee and one-half (1/2) of the fee charged by the arbitrator selected by their appointees and of all other proper costs of arbitration, with the exception of attorneys' fees and witness fees which shall be borne solely by the party incurring such fees."

5.      Article 8, Section A of the 2004 Lease, which is entitled:  "TITLE AND POSSESSION; Possession" is hereby amended and restated in its entirety to read in full as follows:

"A.      Possession.

Possession of the Leased Premises shall be deemed to have been delivered to Lessee on the Effective Date. Lessee acknowledges and agrees that Lessee (and/or its predecessors-in-interest) has had exclusive possession of the Leased Premises since 1954, and had been in possession of the "Adjoining Premises" (2700 Skypark Drive, Torrance, CA) from 1971 to 2004."

6.      Article 18 of the 2004 Lease, which is entitled: "LIABILITY" is hereby amended and restated in its entirety to read in full as follows:

"18.      LIABILITY

A.      Lessee Indemnification For Lessee Operations/Activities; Acceptance Of Property Conditions; Hazardous Materials

(1)      Lessee accepts the Leased Premises, the Remediation Easement and the Watermain Easement in their "AS IS", "WHERE IS" and "WITH ALL FAULTS" condition as of the Effective Date, and hereby further agrees that it shall defend, indemnify, reimburse and hold the City harmless from and against, any and all Claims (as defined below), of whatever kind or nature, relating to or in any way arising out of the condition of the Leased Premises, the Remediation Easement and/or the Watermain Easement as of the Effective Date, and/or from and against any and all actions, inactions, omissions and/or operations of Lessee or any Lessee Affiliate (defined below) or any sublessee of Lessee, in or on, or in connection with the Leased Premises, the Remediation Easement, the Watermain Easement, and any buildings or other improvements existing or subsequently constructed on such properties (hereafter collectively, "Lessee's Operations/Activities").

(2)      From and after the Effective Date, Lessee shall not use, handle, store, create, discard or dispose of, in or about the Leased Premises, any Hazardous Materials (defined below), in any manner that is in violation of any Environmental Laws (defined below), nor engage in any other activities in or about the Leased Premises that may constitute a violation of any Environmental Law.  If Lessee knows, or has reasonable cause to believe, that Hazardous Materials, or a condition involving or resulting from the same, has come to be located in, on, under or about the Leased Premises that constitutes a violation of any Environmental Law, where such violation would require, by law, notification to any governmental agency, Lessee shall immediately give written notice of such fact to the City, and as required by law, to all appropriate governmental agencies.  Lessee shall also immediately provide the City with a copy of any statement, report, notice, registration, application, permit, business plan, license, claim, action or proceeding given to, or received from any governmental agency or private party, or persons

entering or occupying the Leased Premises, which concerns or in any way relates to a violation or alleged violation of any Environmental Law, or which otherwise concerns or in any way relates to any spill, release, discharge, or disposal of, or exposure to, any Hazardous Material.

      B.      <u>Lessee's Release Of City For Claims Concerning Lessee's Operations/Activities; Lessee Contamination; Other Hazardous Materials</u>

      (1)      Lessee understands and agrees that in the event Lessee incurs any loss or liability concerning any Lessee Contamination (defined below) or any other Hazardous Materials of whatever kind or nature, whether attributable to events occurring prior to or following the Effective Date, then Lessee shall look solely to such person(s) or entity(ies) as are responsible for the existence of any such Hazardous Materials, but in no event shall Lessee look to City or to any City Affiliate for any liability or indemnification regarding any such Hazardous Materials.

      (2)      Lessee hereby waives, releases, remises, acquits and forever discharges City and all City Affiliates (defined below), from and against any and all Claims which concern or in any way relate to: (i) the Lessee's Operations/Activities; (ii) the physical or environmental conditions of the Leased Premises, the Adjoining Premises and/or any Affected Surrounding Premises; (iii) the existence or alleged or potential existence of any Lessee Contamination or of any other Hazardous Materials of whatever kind or nature, in, on, under or within the Leased Premises, the Adjoining Premises and/or any Affected Surrounding Premises, including any such Hazardous Materials that have migrated or are migrating to or from any of the foregoing properties, whether in soil, soil vapor, ambient air, indoor air, perched groundwater and/or regional groundwater (shallow, intermediate or deep), and inclusive of any Lessee Contamination or any other Hazardous Materials located within any structures or buildings on or within any such properties, and whether existing prior to, at or after the Effective Date; and (iv) any and all Environmental Claims, Environmental Cleanup Liability and Environmental Compliance Costs, as those terms are defined below, resulting from the existence of any Lessee Contamination or any other Hazardous Materials within or migrating to or from the Leased Premises, the Adjoining Premises and/or the Affected Surrounding Premises.  It is the intention of the City and Lessee that any and all responsibilities and obligations of the City, and any and all Claims of Lessee or the Lessee's Affiliates, arising by virtue of the physical or environmental condition of the Leased Premises, the Adjoining Premises and/or the Affected Surrounding Premises; the existence of any Lessee Contamination or any other Hazardous Materials of whatever kind or nature thereon or migrating to or from or that have migrated to or from such properties, whether existing prior to, at or after the Effective Date; and/or by virtue of any Lessee's Operations/Activities occurring at any time; are by this release provision declared null and void and of no present or future force and effect (hereafter collectively, "Lessee Released Claims").  **IN CONNECTION WITH THE LESSEE RELEASED CLAIMS, LESSEE**

**EXPRESSLY AGREES THAT IT IS HEREBY WAIVING ANY AND ALL RIGHTS WHICH LESSEE HAS OR MAY HAVE WITH RESPECT TO SUCH LESSEE RELEASED CLAIMS UNDER SECTION 1542 OF THE CALIFORNIA CIVIL CODE, WHICH PROVIDES AS FOLLOWS**:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."**

LESSEE'S INITIALS: _____

CITY'S INITIALS: _____

  C. <u>Lessee Compliance with Consent Decree Requirements</u>

  (1)  Lessee shall timely and diligently comply with all Hi-Shear Settlement Payment Obligations as defined in and set forth in the Consent Decree.

  (2)  Lessee shall timely and diligently comply with all Hi-Shear Site Remediation Obligations as defined in and set forth in the Consent Decree.

  (3)  Lessee shall timely and diligently comply with all Hi-Shear Site Indemnification Obligations as defined in and set forth in the Consent Decree.

  (4)  Lessee shall timely and diligently comply with all Hi-Shear City Oversight Cost Payment Obligations as defined in and set forth in the Consent Decree.

  D. <u>Definitions.</u>

  For purposes of this Article 18 and other Lease provisions, the following terms shall have the following meanings:

  (1)  "**Affected Surrounding Premises**" shall mean any and all property, inclusive of any and all improvements located thereon, adjoining, surrounding or otherwise located in the vicinity of the Leased Premises and the Adjoining Premises, that has in any way been impacted by any Lessee Contamination.

  (2)  "**City Affiliate**" means any and all past, present or future employees, officers, directors, board members, department heads, council members, mayors, commissioners, contractors, subcontractors, consultants, agents, attorneys, representatives and assigns of the City.

  (3)  "**Consent Decree**" means that Consent Decree entered into by and between the City and the Lessee in that action entitled *City of Torrance v.*

*Hi-Shear Corporation, et. al.* Case No. 2-17-CV-07732-FWS-JPR, and which Consent Decree has been approved by the U.S. District Court, and with the approval having become final and no longer subject to any appeal.

(4)        "**Claim**" or "**Claims**" shall mean and include any and all past, present or future causes of action, rights of action, suits, administrative proceedings, judgments, orders, demands or claims of damages or liability of any kind or nature, including any claim for contribution, equitable indemnity, injunctive relief, declaratory relief or other similar relief, and including any and all claimed or demanded "response costs" or natural resource damages, and any and all losses, property damages, bodily injuries, personal injuries, death, consequential damages, costs, fees, expenses, liens, fines, penalties, sanctions, attorneys', consultants' and/or experts' fees and costs, and all litigation costs of whatever kind or nature, arising under any contract or under any federal, state, regional, county or local law, rule, regulation, common law, ordinance, order or directive, of any kind or nature, including under any Environmental Law.

(5)        "**Environmental Claim**" means any claim for personal injury, death and/or property damage made, asserted or prosecuted by or on behalf of any third party, including, without limitation, any governmental entity, arising under or alleged to arise under any Environmental Law.

(6)        "**Environmental Cleanup Liability**" means any cost or expense of any kind or nature whatsoever incurred to assess, study, test, investigate, analyze, monitor, contain, remove, treat, remedy, mitigate, clean up or otherwise abate any Hazardous Materials or any other contamination, located on, within, in or under all or any part of the Leased Premises, the Adjoining Premises and/or any Affected Surrounding Premises, including in any soil, soil vapor, ambient air, indoor air, surface water, perched groundwater and/or regional groundwater (shallow, intermediate and deep), inclusive of any Hazardous Materials located within any structures or buildings on or within any such properties.

(7)        "**Environmental Compliance Cost**" means any cost or expense of any kind or nature whatsoever necessary to comply with all applicable Environmental Laws.

(8)        "**Environmental Law**" means any federal, state, regional or local statute, ordinance, rule, regulation, order, directive, consent decree, judgment, administrative determination, or common-law doctrine, including but not limited to, any requirements and/or conditions in any permits, licenses or other operating authorizations relating to: (A) pollution or the protection of the environment, including natural resources, (B) the exposure of persons, including employees, to Hazardous Materials or other products, raw materials, chemicals or other substances, (C) the protection of the public health or welfare from the effects of chemicals, by-products, wastes, emissions, pollutants, discharges or releases of Hazardous Materials ,and/ or (D) any regulation governing any Hazardous Materials, including, without limitation, their manufacture, formulation, labeling,

distribution, transportation, handling, storage, manifesting, treatment, disposal and/or cleanup, including under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601, *et seq.* ("CERCLA"), the Resource Conservation and Recovery Act ("RCRA" – 42 U.S.C. § 6901 *et. seq.*), the California Hazardous Substances Account Act ("HSAA" or "California Superfund" – Cal. Health & Safety Code § 78000, et seq., formerly § 25300 *et. seq.*), the California Hazardous Waste Control Law ("HWCL" -Cal. Health & Safety Code § 25100 et seq.), the Hazardous Materials Release Response Plans & Inventory Act (Cal. Health & Safety Code § 25500 et seq.) and the California Porter-Cologne Water Quality Control Act (California Water Code section 13000 et. seq.).

(9)     "**Hazardous Material**" shall mean any and all "Hazardous Substances" as such term is defined in the definition section of the Consent Decree.

(10)     "**Lessee Affiliate**" means any and all predecessors, successors, parents, subsidiaries, sisters or related corporations, companies, departments or divisions of Lessee, and any and all past, present or future employees, officers, directors, board members, department heads, contractors, subcontractors, consultants, agents, attorneys, representatives and assigns of the foregoing.

(11)     "**Lessee Contamination**" means any and all Hazardous Materials that have been or may have been spilled, discharged, disposed of, dumped or in any way released into the environment or within or into any building or structure, accidentally or otherwise, by Lessee or any Lessee Affiliate, at any time, inclusive of any and all surface or subsurface migration of any such Hazardous Materials.

E.     Survival.

Notwithstanding any other provision of this Lease, the terms and provisions set forth in this Article 18, and all of the Lessee's obligations under this Article 18, shall survive the termination of this Lease and shall continue in perpetuity."

7.     Article 23, Section A. of the 2004 Lease, which is entitled: "BREACH OR DEFAULT; Event of Default" is hereby amended to add:

"(5)     Any breach of the Consent Decree by Lessee."

8.     Article 27 of the 2004 Lease, which is entitled: "NOTICES" is hereby amended to delete in its entirety Section 27(E) (which is entitled "Facsimile transmission") and to change the notice addresses as follows:

LESSEE:     Hi-Shear Corporation
            Attn: Christian Darville, Vice President
            2600 Skypark Drive
            Torrance, California 90509

with a copy to:

        James D. Robinson
        Babok & Robinson LLP
        9201 Wilshire Blvd., Suite 303
        Beverly Hills, CA 90210

CITY:       City of Torrance
        3031 Torrance Boulevard
        Torrance, California 90509-2970
        Attention:  City Manager
        Copy To:  City Attorney

9.      Each party hereto represents and warrants that it has the legal power, right and authority to enter into this Second Amendment, and that this Second Amendment has been duly executed and delivered by it or its duly authorized officers, members, partners or agents and constitutes a valid, binding and enforceable obligation of such party. The 2004 Lease, except as amended hereby, remains unamended, and, as amended hereby, remains in full force and effect.

10.     This Second Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  The execution of this Amendment may be effected by signatures delivered via facsimile, electronic mail or other electronic means (including pdf or any electronic signature complying with the U.S. Federal ESIGN Act of 2000, California's Uniform Electronic Transactions Act (Cal. Civ. Code § 1633.1, et seq.) or other applicable law), and any signatures so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

*[The remainder of this page was intentionally left blank.  Signatures follow.]*

      IN WITNESS WHEREOF, the parties hereto have executed this Second Amendment to Lease the date and year first above written.

                         "CITY"

                         CITY OF TORRANCE,
                         a municipal corporation

                         By: _____
                         Name :George K. Chen
                         Title:  City Mayor

ATTEST:

By: _____
Name: Rebecca Poirer
Title:  City Clerk

APPROVED AS TO FORM:

By: _____
Name: Patrick Q. Sullivan
Title:  City Attorney

               *[Signatures continued on next page.]*

*[Signatures continued from previous page.]*

"LESSEE"

HI-SHEAR CORPORATION,
a Delaware corporation

By:_____
Name:  Christian Darville
Its:  Vice President


APPROVED AS TO FORM:


By: _____
Name: Priti Vakharia
Title:  HI-SHEAR CORPORATION General Counsel

A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _____

   Subscribed and sworn to (or affirmed) before me on this _____ day of _____, 2025, by _____, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature _____

               [Seal]

A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _____

   Subscribed and sworn to (or affirmed) before me on this _____ day of _____, 2025, by _____, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature _____

               [Seal]

> A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _____

      Subscribed and sworn to (or affirmed) before me on this _____ day of _____, 2025, by _____, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature _____

                                          [Seal]

> A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _____

      Subscribed and sworn to (or affirmed) before me on this _____ day of _____, 2025, by _____, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature _____

                                          [Seal]

A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _____

　　　　Subscribed   and   sworn   to   (or   affirmed)   before   me   on   this _____ day of _____, 2025,   by _____, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.


Signature _____

　　　　　　　　　　　　　　　　　　　　　　　　　　　　[Seal]

Exhibit 4

## SECURITY AGREEMENT

This SECURITY AGREEMENT, is made as of June 17, 2025 (as amended, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "***Agreement***"), by and between Hi-Shear Corporation, a Delaware corporation (the "***Grantor***" or "***Hi-Shear***"), in favor of City of Torrance, a municipal corporation (the "***Secured Party***" or "***City***"). Hi-Shear and City are hereafter referred to individually as "***Party***" and collectively as "***Parties***".

WHEREAS, the Secured Party is a municipal corporation located in the County of Los Angeles, and the owner of certain real property located on and within the vicinity of the Torrance Municipal Airport/Zamperini Field, including specifically real property the Secured Party leases on a long term basis to various tenants (collectively, the "***Airport Property***").

WHEREAS, pursuant to that certain Lease Agreement dated July 27, 2004, as amended by the First Amendment to Lease dated May 13, 2014, and the Second Amendment to Lease dated April 15, 2025 ("Second Lease Amendment"), and as it may be further amended, supplemented or otherwise modified from time to time (collectively, the "***Lease***"), by and between the Secured Party, as lessor, and the Grantor, as lessee, the Secured Party leases an approximately 14 acre portion of the Airport Property to the Grantor located at 2600 Skypark Drive, Torrance, CA, as more specifically described in the Lease (the "***Premises***").

WHEREAS, on October 23, 2017, the Secured Party filed its original complaint against the Grantor in the United States District Court for the Central District of California (the "***Court***"), entitled *City of Torrance v. Hi-Shear Corporation, et. al.*, Case No. 2-17-CV-07732-FWS-JPR (the "***Action***"), in connection with a dispute over environmental contamination existing on and migrating from the Airport Property, including specifically, contamination on and migrating from the Premises  and other Airport Property (collectively, the "***Contamination***").

WHEREAS, on June 18, 2021, the California Regional Water Quality Control Board, Los Angeles Region issued Cleanup and Abatement Order No. R4-2021-0019 ("***CAO***") under California Water Code sections 13304 and 13267, and naming the Grantor and the Secured Party as responsible parties for the Contamination, among other parties.

WHEREAS, the Parties have agreed to a final settlement of the Secured Party's claims against the Grantor and the Grantor's counter-claims against the Secured Party in the Action, as more fully set forth in that certain Consent Decree submitted by the Secured Party and the Grantor to the Court in the Action for approval (the "***Consent Decree***").

WHEREAS, this Agreement shall become effective as of the "Effective Date" of the Consent Decree, as defined therein.

WHEREAS, under the terms of this Agreement, the Grantor desires to grant to the Secured Party a security interest in the Collateral (as defined below) to secure the payment and performance of all of the Secured Obligations (as defined below).

NOW THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    **DEFINITIONS.** All capitalized terms used herein without definitions shall have the respective meanings set forth in the Consent Decree. Unless otherwise defined herein, terms used herein that are defined in the Uniform Commercial Code as in effect from time to time in the State of California (the "**UCC**") shall have the meanings assigned to them in the UCC. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9.

2.    **GRANT OF SECURITY INTEREST.** The Grantor hereby pledges and grants to the Secured Party, and hereby creates a continuing first priority lien and security interest in favor of the Secured Party, in and to all of Grantor's right, title and interest in the following, wherever located, whether now existing or hereafter from time to time arising or acquired (collectively, the "*Collateral*"): all inventory, fixtures, equipment, machinery, raw materials, and finished goods and products of every kind or nature (including without limitation, all such collateral that is listed on that certain certificate, dated as of the date of this Agreement, delivered by the Grantor to the Secured Party pursuant to Section 4 of this Agreement), and all parts, accessions, additions, replacements, insurance proceeds and all other proceeds thereof.

3.    **SECURED OBLIGATIONS.** This Agreement secures, up to a cap amount of Thirty Million Dollars ($30,000,000), the prompt and full performance and payment of all of the indebtedness, obligations, liabilities, and undertakings of the Grantor to the Secured Party, of any kind or description, individually or collectively, whether direct or indirect, joint or several, absolute or contingent, due or to become due, voluntary or involuntary, now existing or hereafter arising (including, all costs, fees, interest, and expenses of whatever kind or nature, including attorneys' and consultant fees), that concern or relate to the payment or performance of the "*Hi-Shear Security Obligations*" (as defined and more fully set forth in the Consent Decree), whether accruing before and/or after the filing of any petition in bankruptcy or the commencement of any insolvency, reorganization or like proceeding relating to the Grantor, and whether or not a claim for post-petition interest, fees, costs or expenses is allowed in such proceeding (collectively, the "*Secured Obligations*"). For the avoidance of doubt, the Secured Obligations under this Agreement shall not exceed Thirty Million Dollars ($30,000,000), *plus* the amount of the cost of any collection and any other amounts that may become due under the terms of this Agreement (the "*Security Cap*").

4.    **LOCATION OF COLLATERAL; CHANGE IN COLLATERAL.** The Grantor shall notify the Secured Party, in writing or via electronic communication, immediately upon any change in the location of any Collateral and provide the Secured Party with the new location of such Collateral. Grantor shall also provide the Secured Party with a complete and accurate list of all Collateral, certified by an authorized officer of Grantor, on the date of this Agreement and on or before every September 30th and March 31st thereafter, as well as upon any other reasonable written request by the Secured Party in the interim, for the same.

5.    **CHANGES IN GRANTOR.** The Grantor hereby agrees to notify the Secured Party, in writing or via electronic communication, at least thirty (30) days before any of the

following actions: (a) change in the location of the Grantor's place of business; (b) change in the Grantor's name; (c) change in the Grantor's type of organization; (d) change in the Grantor's jurisdiction of organization; (e) change in the Grantor's corporate structure; and (f) change in control of the Grantor.

6. **TRANSFER OF COLLATERAL.** Except in the ordinary course of business, the Grantor shall not sell, offer to sell, assign, lease, license, or otherwise transfer, or grant, create, permit, or suffer to exist any option, security interest, lien, or other encumbrance in, any part of the Collateral, without the prior written consent of the Secured Party, which consent may be granted or withheld in the Secured Party's reasonable discretion.

7. **GRANTOR REPRESENTATIONS AND WARRANTIES.** The Grantor hereby represents, warrants, and covenants that: (a) the Grantor owns or has good and marketable title to the Collateral and no other person or organization can make any claim of ownership of any kind on the Collateral; (b) the Grantor has the full power, authority and legal right to grant the security interest in the Collateral; (c) the Collateral is free from any and all claims, encumbrances, rights of setoff or any other security interest or lien of any kind except for the security interest in favor of the Secured Party created by this Agreement and (d) this Agreement creates in favor of the Secured Party a valid security interest in the Collateral, securing payment of the Secured Obligations, and such security interest is first priority. The Grantor will defend the Collateral against all claims and demands made by all persons claiming either the Collateral or any interest in it.

8. **GRANTOR COVENANTS AND INSURANCE.** The Grantor hereby grants to the Secured Party the right to inspect the Collateral at any reasonable time, wherever located, provided that the Secured Party gives the Grantor at least two (2) business days' notice of any such inspection, however in no case shall notice be required if the Secured Party enters the Grantor's premises for the purposes of remedying a breach of this Agreement or the Consent Decree as provided in <u>Section 11</u> of this Agreement. The Grantor hereby waives presentment, demand, notice of dishonor, protest and notice of protest, and all other related notices. The Grantor agrees: (a) to maintain the Collateral in good order, repair, and condition at all times; (b) not to alter or remove any identifying symbol or number upon the Collateral; (c) to use the Collateral with all reasonable care and caution, and in conformity with all applicable laws, ordinances and regulations; (d) to promptly notify the Secured Party of any loss or damage to any of the Collateral or arising from its use; (e) to timely pay all taxes, judgments, levies, fees, or charges of any kind levied or assessed on the Collateral; (f) to timely pay all rent or mortgage payments of any kind as applicable to any real property upon which any part of the Collateral is located; (g) to have and maintain at all times a hazard insurance policy on the Collateral underwritten by a reputable insurance company, and in an amount of the replacement cost of the Collateral; and (h) not to, directly or indirectly, permit, create, assume, incur or suffer to be created, assumed or incurred any security interest, lien, charge, mortgage, pledge, hypothecation, assignment or encumbrance of any kind on all or any part of the Collateral other than as created by this Agreement or consented to by the Secured Party. The insurance procured in this Section shall contain a standard Lender's Loss Payable Clause in favor of the Secured Party, and provide that the Secured Party will receive at least thirty (30) days' notice of any cancellation of the policy. The Grantor hereby assigns to the Secured Party all rights to any proceeds of any insurance procured under this Section, and authorizes the Secured Party to receive such payments and Grantor hereby covenants and agrees it will execute any and all documents

required for the Secured Party to receive such payments up to the amount of the Secured Obligations. If the Grantor fails to provide for the insurance as set out in this Section, the Secured Party, in addition to any remedies as set out in <u>Section 11</u> of this Agreement, may after giving Grantor ten (10) business days' advanced notice, procure the requisite insurance on the Collateral on its own behalf and charge the Grantor with any and all costs of such procurement, and Grantor hereby agrees it will promptly reimburse the Secured Party for all such costs.

   **9.**   **PERFECTION OF SECURITY INTEREST.** The Grantor agrees that at any time and from time to time, at the expense of the Grantor, the Grantor will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable, or that the Secured Party may request, in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral. The Grantor hereby authorizes the Secured Party to file or record any document necessary to perfect, continue, amend, or terminate its security interest in the Collateral, including, but not limited to, any financing statements, including amendments, authorized to be filed under the UCC, without signature of the Grantor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by the Grantor, or words of similar effect.

   **10.**   **POWER OF ATTORNEY.** The Grantor hereby appoints the Secured Party the Grantor's true and lawful attorney-in-fact, with full power and authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time in the Secured Party's discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement (but the Secured Party shall not be obligated to and shall have no liability to the Grantor or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. The Grantor hereby ratifies all that said attorney in fact shall lawfully do or cause to be done by virtue hereof. The Secured Party shall provide the Grantor with copies of all documents executed by it pursuant to this power of attorney within ten (10) business days following such execution.

   **11.**   **REMEDIES.** If an event constituting a Hi-Shear Material Default (as defined in the Consent Decree) shall have occurred and be continuing, Grantor shall be deemed to be in default of its obligations under this Agreement and the Secured Party may do any or all of the following: (a) declare any or all Secured Obligations immediately due and payable; (b) enter the Grantor's property where the Collateral is located and take possession of some or all of the Collateral without demand or legal process; (c) require the Grantor to assemble and make available the Collateral at a specific time and place designated by the Secured Party;  (d) sell, lease, or otherwise dispose of any or all of the Collateral at any public or private sale in accordance with the law; and (e) enforce payment of the Secured Obligations and exercise any rights and remedies available to the Secured Party under law, including, but not limited to, those rights and remedies available to the Secured Party under Article 9 of the UCC.  Any amounts received by the Secured Party in connection with the exercise of the remedies provided herein or pursuant to applicable law, shall be distributed as follows: first to payment of all out-of-pocket costs and expenses paid or incurred by the Secured Party in enforcing this Agreement and, in realizing on or protecting any Collateral and in enforcing or collecting any Secured Obligations, including, without limitation,

court costs and attorney's fees and out-of-pocket expenses incurred by the Secured Party, second, to the payment of any remaining Secured Obligations, and third, any remaining amount shall be paid to the Grantor.

**12.** **SECURED PARTY RIGHTS.** Any and all rights of the Secured Party provided by this Agreement are in addition to any and all rights available to the Secured Party by law, and shall be cumulative and may be exercised simultaneously. No delay, omission, or failure on the part of the Secured Party to exercise or enforce any of its rights or remedies, either granted under this Agreement or by law, shall constitute an estoppel or waiver of such right or remedy or any other right or remedy. Any and all rights of the Secured Party provided by this Agreement shall inure to the benefit of its successors and assigns.

**13.** **SEVERABILITY AND MODIFICATION.** If any of the provisions in this Agreement is determined to be invalid, illegal, or unenforceable, such determination shall not affect the validity, legality, or enforceability of the other provisions in this Agreement. No waiver, modification or amendment of, or any other change to, this Agreement will be effective unless done so in a separate writing signed by the Secured Party.

**14.** **NOTICES.** Any notice or other communication required or permitted to be given under this Agreement, including, without limitation, notices under Section 4 and Section 5 of this Agreement, shall be given and shall become effective in accordance with the Consent Decree.

15. **ATTORNEY'S FEES.** If either Party institutes any legal suit, action, or proceeding against the other to enforce this Agreement (or obtain any other remedy regarding any breach of this Agreement), including, but not limited to, contract, equity, tort, fraud, and statutory claims, the prevailing Party in a final, non-appealable judgment regarding the suit, action, or proceeding is entitled to receive, and the non-prevailing Party shall pay, in addition to all other remedies to which the prevailing Party may be entitled, the costs and expenses incurred by the prevailing Party in conducting or defending the suit, action, or proceeding, including attorneys' fees and expenses, and court costs, even if not recoverable by law (including, without limitation, all fees, taxes, costs, and expenses incident to appellate, bankruptcy, and post-judgment proceedings).

**16.** **ENTIRE AGREEMENT.** This Agreement, the Second Lease Amendment and the Consent Decree (and including all other documents referred to herein) represents the entire agreement between the Grantor and the Secured Party, and supersedes all previous understandings and agreements between the Grantor and the Secured Party, whether oral or written, regarding the subject matter hereof.

**17.** **GOVERNING LAW.** This Agreement will be interpreted and construed according to the laws of the State of California, including, but not limited to, the UCC, without regard to choice-of-law rules in any jurisdiction.

**18.** **REDUCTION OF SECURITY CAP AND RELEASE OF SECURITY INTEREST.** No sooner than five (5) years from the Effective Date, and no more than annually thereafter, the Grantor, at is discretion, may apply to the Secured Party for a reduction in the Security Cap (the "***Security Cap Reduction Application***"), based on a showing by the Grantor,

that, excluding the Hi-Shear Settlement Payment Obligations, the Grantor has made substantial progress in complying with the Hi-Shear Security Obligations, and that a reduction in the then existing Security Cap is justified, based on the reasonable expected cost of completing the remaining Hi-Shear Security Obligations, inclusive of appropriate cost contingencies for future Remedial Work and/or Mitigation Work.  Any Security Cap Reduction Application must be supported by the Grantor's preceding Annual Remediation Progress Reports and a showing by the Grantor that the remaining Hi-Shear Security Obligations will be adequately secured by the Security CAP requested in the Security Cap Reduction Application, plus a premium of twenty-five percent (25%).  The Secured Party shall have sixty (60) days from the date of its receipt of a Security Cap Reduction Application, in which to review and act upon the application.  The Grantor and the Secured Party shall comply with the alternative dispute resolution process under Section XIV of the Consent Decree to resolve any dispute over a decision by the City on a Hi-Shear Security Cap Reduction Application.  In addition, if at any time upon the request of Grantor, made no sooner than five (5) years from the Effective Date, the Grantor can prove, through its Annual Remediation Progress Reports and any other information provided by the Grantor, that the expected cost of completing the remaining Hi-Shear Security Obligations is less than five million dollars ($5,000,000) in total, the Secured Party shall release its security interest in the Collateral and file the appropriate UCC termination documents.  The Grantor and the Secured Party shall comply with the alternative dispute resolution process under Section XIV of the Consent Decree to resolve any dispute over the Grantor's request that the Secured Party release its security interest. If the security interest granted in this Agreement has not been previously fully released, then, upon obtaining a "Closure Letter" or "Closure Letters" for each of the following "Operable Units": "Operable Unit 1," "Operable Unit 2" *and* "Operable Unit 5;" as all such terms are defined in the Consent Decree, and providing written evidence of the same to the Secured Party and requesting that the Secured Party release its security interest in the Collateral, the Secured Party shall make all filings and undertake all necessary actions to release its security interest in the Collateral, including, but not limited to, the filing of any UCC financing statements to terminate the Secured Party's security interest in the Collateral.

      **19.**　　**EFFECTIVE DATE**.  This Agreement shall become effective as of the Effective Date of the Consent Decree, as set forth therein.

[<em>SIGNATURE PAGE FOLLOWS</em>]

IN WITNESS WHEREOF, the undersigned Grantor and Secured Party have executed this Security Agreement as of the date first above written.

**GRANTOR**

Hi-Shear Corporation, as Grantor

By:  _____
Name:  Christian Darville
Title:  Vice President

**SECURED PARTY**

City of Torrance, as Secured Party

By:  _____
Name:  Aram Chaparyan
Title:  City Manager

*[SIGNATURE PAGE TO SECURITY AGREEMENT]*